# EXHIBIT "K"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **Ameriway Corporation** | **SECOND AMENDED** |
| Plaintiff, | **COMPLAINT** |
| v. | (Jury Trial Demanded) |
| **May Yan Chen**, | |
| **Ability Customs, Inc**., | |
| Defendants. | |

### SECOND AMENDED COMPLAINT AND JURY TRIAL DEMANDED

Plaintiff Ameriway Corporation ("Ameriway"), amends its First Amended

Complaint against Defendants, May Yan Chen, in her individual capacity and Ability

Customs, Inc. ("Ability") and now alleges as follows:

### PARTIES

Comes now, Plaintiff, Ameriway Corporation ("Ameriway") and for cause of action

against the Defendants, Ability Customs Inc. ("Ability") and Ms. May Yan Chen in her

individual capacity, complain and allege as follows.

1.  Plaintiff is a third-party logistics company incorporated in Wilmington,

Delaware, and having a principal address at 2424 E. York St. Ste. 300, Philadelphia, PA

19125.

2.  Defendant Ms. Chen is the owner and operator of Ability and has a principle

place of business at 13910 Doolittle Dr., San Leandro, CA 94577.  Although Ms. Chen

formally dissolved Ability on September 10, 2018, she continues to operate the business

under the slightly different name, "Ability Customs <u>Brokers</u> Inc."  (EX. A.) (emphasis

added.)  However, no such business is currently incorporated in the state of California.  The original Ability website is fully functional, and its staff operates out of the same office at 13910 Doolittle Dr.

3.  Defendant Ability was incorporated in California with a principle place of business at 13910 Doolittle Dr., San Leandro, CA 94577.  As noted, Ability was formally dissolved in September, 2018 but continued to operate under the original Ability name at least until Plaintiff filed its original complaint.  (EX. B.)

## JURISDICTION AND VENUE

4.  Plaintiff brings its amended complaint under federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

5.  Upon information and belief, the Court has personal jurisdiction over Ms. Chen and Ability in that Defendants each have committed acts within New York State and this judicial district giving rise to this action and Ms. Chen and Ability has established minimum contacts with the forum such that the exercise of jurisdiction over Ms. Chen and Ability would not offend traditional notion of fair play and substantial justice.  Specifically, Defendants have conducted an illegal interstate freight brokering scheme by arranging the transportation of Ameriway's inbound freight from the Port of NY to warehouses in New Jersey.  Defendants illegally inflated invoices in furtherance of this scheme.  Defendants also illegally detained Ameriway's freight arriving in the NY and CA.

6.  Upon information and belief, venue in this District is proper pursuant to 28 USC 1391 because Ms. Chen and Ability committed wrongful acts here.

**INTRODUCTION**

7.   Ameriway is a third-party logistics company primarily providing transportation and import services for exporters in China through a partnership with Shenzhen Liante International Logistics Co., Ltd. ("Liante"), based in Shenzhen, China.  Ameriway made a large investment into Liante to build up its infrastructure.

8.   In April, 2017, Ameriway retained Ability to provide customs clearance services.  Ameriway executed a Power of Attorney ("POA") form authorizing Ability to conduct customs filing on its behalf with the U.S. Customs and Border Protection Agency ("CBP").

9.   Defendants' business began to suffer partly because of the recent tariff increases on Chinese imports, by Ms. Chen's own admission.  To cover their losses, Defendants illegally detained Ameriway's freight without prior notice and demanded an immediate $100,000 in alleged past-due fees for its release.

10.  *However, the parties **never** executed a written contract stipulating a Terms and Conditions of Service, including a payment schedule and custom broker lien rights over Ameriway's cargo in the event of a payment dispute.  There is thus no common understanding between the parties of "past due payment" or other event that would prompt a broker's lien on Ameriway's cargo.  And assuming Defendants had an implied lien over the cargo, they never filed the statutorily required lien notices with either Ameriway or CBP.  Defendants' purported lien is thus invalid.  Detaining Ameriway's freight is thus an act of illegal possession.*

11.  In fact, Ms. Chen did not even assert a lien right when she started detaining Ameriway's containers in July, 2019.  She claimed her carrier vendors unilaterally asserted a nationwide general and continuous lien over several of her customers' freight because *Ability*

3

(not Ameriway) owed them a large past-due balance; and, Ameriway would need to pay Defendants (not the carriers) $100,000 immediately for its detained freight.

12. Ameriway offered to make specific payment arrangements directly with the carriers, but Ms. Chen refused to disclose their identity unless she received the $100,000 payment directly from Ameriway. It soon became evident that Defendants—not her carriers—were asserting a false lien on Ameriway's cargo without notice or legal authority. Defendants' seizure of Plaintiff's cargo thus amounts to an act of theft and conversion, resulting in millions of dollars in damages. Plaintiff still does not know where the missing containers are being held.

13. Ms. Chen also published false statements to third party vendors that Ameriway was fraudulently inducing Defendants to advance duty and broker fees with the intention of never paying them back. This is false: Defendants made several payments right up until the commencement of this lawsuit, but Defendant's demand for an immediate $100,000 was unreasonable, lacking basis in contract, and illegal.

14. There was no contract including a payment schedule and terms of service requiring Ameriway to pay such a large amount at a moment's notice. Nevertheless, Ameriway made $185,000 in payments from March 18th 2019 to August 7th, 2019, but Defendants were not satisfied. This is a common billing dispute, not an act of fraud by Plaintiff.

15. Moreover, over a two-year period, Defendants presented false invoices to Ameriway in an illegal freight brokering scheme, which concealed inflated drayage (transport of freight over short distances) and warehousing fees. On information and belief, Defendants purposely inflated the fees on over 450 shipments, resulting in significant damages to Plaintiff.

## STATEMENT OF FACTS

16. Shortly after Ameriway retained Ability in April, 2017, Ms. Chen offered to help find better vendors for drayage and warehousing services. Ms. Chen claimed she could utilize her connections with motor carriers and warehousing companies to Ameriway's benefit; and, that Ability would collect fees from Ameriway on behalf of those vendors once services were rendered completely to Ameriway's satisfaction. Ms. Chen unambiguously represented on several occasions to Mr. Xiyan Zhang, Ameriway's CEO, that Ability was not acting as a carrier or freight broker. She was simply doing Ameriway a service to retain its business, and would only collect fees on behalf of her vendors from Ameriway without charging a markup. On information and belief, Ability and Ms. Chen are not licensed freight brokers, nor do they hold themselves out as such.

17. Subsequently, Ms. Chen provided a list of fees from warehousing and drayage providers. Ameriway started to use some of the services.

18. Defendants ultimately provided customs brokerage and logistics services to Ameriway for over 450 containers over a two-year period.

19. On August 6, 2018, Defendant Chen dissolved Ability unbeknownst to Ameriway by executing a Certificate of Dissolution with the Secretary of State of California, which was subsequently filed on September 10, 2018. (EX. B.) Ms. Chen marked the box indicating "[t]he corporation never incurred any known debts or liabilities." *Id*. However, she continued to operate the business illegally in Ability's name at least until Plaintiff filed its original Complaint. In particular, Defendant Chen continued to use Ability's website, office space, email accounts, and reputation to conduct customs business from April, 2017 to August, 2019, the main period of dispute.

20. On information and belief, Ms. Chen dissolved Ability to avoid certain financial obligations to her carrier partners.  She hid this fact from Ameriway, her vendors, and clients, who would never entrust their cargo to a dissolved brokerage company in the first place.  By Ms. Chen's own admission in email and phone conversations, Ability is currently in financial distress, but continues to operate under the fabricated entity, Ability Customs <u>Brokers,</u> Inc.

**CONVERSION AND THEFT**

21. When Defendants' business suffered partly because of the recent tariff increases on Chinese imports, Ms. Chen rashly attempted to cover her losses by asserting a false lien right over Ameriway's cargo and systematically detaining its containers over a common billing dispute.

22. However, Ms. Chen initially claimed the containers were unilaterally detained by her <u>carriers</u> because <u>Ability</u> owed them money.  She later changed her story and claimed the lien right for herself because Ameriway allegedly owed Defendants a past due balance.

23. This supposed lien right was created by law under her inherent authority as a customs broker, according to Ms. Chen, even though there is no contract, statute, or common law authority creating such a lien.

24. Moreover, Ms. Chen did not file the proper lien notices with CBP before seizing Ameriway's freight.

25. After detaining Ameriway's containers—without prior notice to either CBP or Ameriway—Ms. Chen demanded the immediate payment of $100,000 in alleged past due customs duties and brokerage fees for their release.  But Ms. Chen did not detail which alleged past due invoices covering which containers comprised the $100,000 fee; she simply demanded

full payment immediately. Defendants still possess Ameriway's containers to this day, and have not specifically identified which invoices are outstanding.

26. The specific timeline for Defendants' act of conversion is as follows:

27. On August 7th, 2019, Ameriway received an email (in Chinese) from Ms. Chen stating that Container No. OOCU6964350 bound for the Port of New York was detained by her contracted trucking carrier. (EX. C.) Ms. Chen specifically stated that all her customers' containers were being detained due to her company's financial problems. *Id.* Ms. Chen also stated that Ability was trying very hard to resolve the issue and apologized for the "inconvenience." *Id.* Therefore, Defendants did not assert a lien right at this point.

28. Shortly after, Mr. Peter Wolfgram, Ameriway's attorney, called Ms. Chen and offered to deal with the carrier directly to get the container released, but, after several requests, Ms. Chen refused to disclose the name of the carrier to Mr. Wolfgram.

29. On August 8th, Ms. Chen sent another email (in Chinese) to Ameriway detailing Ability's financial difficulties, which caused a nationwide detention of its customers' containers, a large number of which were detained in Chicago, New York and Mobile by her carrier. *Id.* Ms. Chen stated that her carriers would not release *any* containers—not just Ameriway's freight—until Defendants paid all outstanding fees.

30. Ms. Chen also stated the recent tariff increase created a cash shortfall, and Ability was consequently unable to front its customers' port and duty fees. Ms. Chen needed cash to keep her business afloat, and demanded Ameriway pay at least $100,000 immediately. This payment would help alleviate Defendants' financial burden and persuade the carriers to release Ameriway's containers, stated Ms. Chen. (EX. D.) Ms. Chen still refused to disclose the name of her carriers to Ability.

31. Ameriway's Container No. BMOU5390536 arrived at the NY Port on August 7th. On information and belief, Ms. Chen processed the container with CBP, and sent it to an undisclosed location without Ameriway's permission.

32. Ameriway's container No. BMOU4739454 arrived at the NY Port on August 13th. Ameriway retained a different customs broker to clear the container and arrange drayage to transfer the container to a warehouse. The new broker completed customs clearance for Ameriway, but, on information and belief, Ms. Chen tracked Container No. BMOU4739454's location using CBP's subscriber database and sent a driver to transport the container without authorization to an undisclosed location before Ameriway's customs broker could do so.

33. Container No. HLXU8057236 arrived at the NY Port on August 16th. Ameriway again contracted a different customs brokerage firm to file an entry form for this container. On information and belief, Ms. Chen then took the unusual step of directly requesting the new firm to withdraw the entry form, and threatened to prevent the firm from clearing the container if it did not comply with her requests. On information and belief, Ms. Chen then cleared the container herself and transferred it to an undisclosed container without Ameriway's authorization.

34. Container No. APHU7253481 arrived at the NY Port on August 20th. Ameriway again retained a different customs broker to clear the container and arrange drayage to transfer the container to a warehouse. The new broker completed customs clearance for Ameriway. However, on information and belief, Ms. Chen again tracked the container's location using CBP's database and had it transferred to an undisclosed location.

35. Container No. OOLU9537235 arrived at the Port of Los Angeles on August 10th. On August 16, Ameriway sent Ms. Chen an email requesting Ms. Chen to cease any customs

business on behalf of Ameriway. To this end, Ameriway formally revoked Defendants' Power of Attorney on August 21st. (EX. E.)

36. On August 22th, Ms. Chen sent an email to Ameriway requesting permission to process another container, stating that "[w]e have no problem to continue complete the clearance for container # OOLU9537235." (EX. F.) She also requested authorization from Ameriway that Ability could "follow up this shipment's process." *Id*. In response, on August 26th, Ameriway granted Ms. Chen limited authority to clear the container. Ms. Chen then intentionally refused to provide updates on the container's status and let it sit at the port, where it accumulated demurrage fees. On September 18th, Ameriway retained a different custom broker to finish clearing the container and arrange transportation to Ameriway's warehouse. The new broker was able to successfully clear customs and retrieve the container from the port.

37. On August 25th, Ameriway's Attorney, Mr. Wolfgram, sent Ms. Chen a letter informing her that Ameriway was forced to suspend its commercial activities due to Ability's actions—it was impossible for Ameriway to accept new shipping orders while Defendants were seizing its customers' inventory. (EX. G.) Mr. Wolfgram requested Ms. Chen to contact him with information regarding the missing containers, but she never responded.

38. Mr. Wolfgram then sent a second letter to Ms. Chen demanding the return of the missing containers on August 30th and threatened legal action. (EX. H.)

39. The same day, Ms. Chen sent Ameriway an email stating she "found" the original container that was supposedly detained by her carrier and held in an unknown location: "[w]e found a container #OOCU6964350 and it is ready to delivery, please provide the delivery instruction to us." (EX. I.) Ameriway responded with delivery instructions to a nearby

warehouse.  However, Ms. Chen never delivered the container nor gave any updates regarding the container since.

40. Therefore, Defendant Chen asserted that Ameriway's cargo was detained for three reasons, all of which are false and/or illegal.  Initially, Ms. Chen stated that Ability was facing a serious cash shortage due to the recent tariff increases on Chinese imports.  Consequently, Ability could not pay its carrier partners, who themselves asserted a lien on several of Ability's customers' cargo, including but not limited to Ameriway's freight.  Ameriway would thus have to immediately *and without prior notice* pay Ability (not her carriers) $100,000 in alleged late invoices to get the containers released.  Ameriway offered to negotiate directly with the carriers, but Ms. Chen refused to disclose their identity.

41. Changing her story, Ms. Chen then claimed she was detaining Ameriway's containers on behalf of CBP, to whom Ameriway allegedly owed duty fees.  In other words, Ms. Chen asserted an inherent, continuous and general lien over Ameriway's cargo as a supposed agent of the federal government.  Even if this was a valid basis for asserting a broker's cargo lien (it is not), Ms. Chen told Ameriway that she already advanced these fees to CBP for Ameriway. Ameriway thus does not owe CBP any money, nor has it received any notices from CBP indicating so.  Because there are no outstanding CBP fees to Ameriway's knowledge, Ability asserted a lien over Ameriway's goods only to recoup fees it voluntarily advanced to CBP on Ameriway's behalf.

42. Finally, Defendants asserted the false lien to recoup the allegedly past due invoices owed by Ameriway.  In other words, Defendants seized Ameriway's containers over a common billing dispute, which is an act of illegal possession since there is no contract, statute, or common law creating either a general or specific broker's lien in the first place.

43. As a course of business, Defendants admittedly do not execute contracts with their customers detailing terms of service and collection procedures for late payments. Defendants' billing system was basically an occasional email or verbal request for payment. Ability never provided <u>any</u> notice to Ameriway of its intent to exercise a general and continuous lien, or detailed the *exact* amount of monies due and owing (as opposed to a round $100,000 figure) for customs brokerage services, duties, or any on-going storage and demurrage fees.

44. ***Again, there was no contract, so it is unclear when the balance even became "overdue," which would supposedly trigger the purported lien over Ameriway's cargo.***

45. Assuming *arguendo* Defendants had a valid lien right over Ameriway's cargo for unpaid invoices, Defendants never filed the proper lien notice with CBP. Under 19 CFR §141.112, which applies to customs brokers "who otherwise possess a lien," "<u>[a] notice of lien for freight, charges</u>, or contribution in general average pursuant to section 564, Tariff Act of 1930, as amended (19 U.S.C. § 1564), <u>shall</u> be filed with the port director on Customs Form 3485, signed by the authorized agent of the claimant and certified by him." Under 19 CFR §141.112 (emphasis added.)

46. 19 U.S.C. § 1564 states "whenever a customs officer shall be notified in writing of the existence of a lien for freight, charges, or contribution in general average upon any imported merchandise sent to the appraiser's store for examination, entered for warehousing or taken possession of by him, <u>he shall refuse to permit delivery thereof from public store or bonded warehouse until proof shall be produced that the said lien has been satisfied or discharged.</u> 19 U.S.C. § 1564 (emphasis added.)

47. Therefore, to perfect their purported lien, Defendants were required to file Form 3485 with CBP, who would then hold the merchandise in a bonded warehouse until the lien was

satisfied or discharged.  Defendants never filed the Form 3485 lien notice with CBP; instead, they simply seized Ameriway's freight from the port without authorization and sent it to an undisclosed warehouse.

48. As noted, Defendants' longstanding financial problems, most of which were unrelated to Ameriway, disrupted their operation.  They needed cash immediately to keep the business running, so Ms. Chen held Ameriway's cargo hostage without warning or legal basis and unreasonably demanded over $100,000 in alleged late fees for its release.

49. Ameriway lost several large clients because its containers were illegally detained by Defendants.  These clients refused to make payments to Ameriway and demanded compensation for their lost cargo.  Ameriway's cash flow was consequently restrained, and its business reputation both in China and the US was severely damaged, resulting in a drastic decrease in revenue.

## AMERIWAY OWNS THE STOLEN CONTAINERS

50. Ameriway assigned Eagle Trading, LLC ("Eagle") to act as the Importer of Record ("IOR") primarily to keep paperwork relating to the importation of cargo and payment of customs duties separate from Ameriway's primary logistics business.[1]

51. Eagle, as the IOR, was the temporary owner of the shipping goods until they were accepted by and transferred to the assigned entity, Ameriway, at the port of entry.

52. The subject containers were thus solely owned by Ameriway when Defendants illegally seized them at the port and afterwards, when Defendants refused Ameriway's repeated requests for the containers' release.

---

[1] Separating customs and logistics business is a common practice in the shipping industry. For example, Flexport, a large logistics company, uses its subsidiary, Flexport Customs, LLC, for its customs brokerage services.  (EX. O.)

53.   Moreover, there is a clear chain of title showing Ameriway is the ultimate owner of the missing cargo, a fact undoubtedly known by Defendants.  Though Eagle was the IOR listed on the entry documents, Defendants communicated with Ameriway employees to clear the containers with customs.

54. **Ameriway would then issue a Bill of Lading ("BOL") in its own name to Defendants as a matter of course while the containers were at the port.** (EX. P., 7-10.)  A bill of lading is "*a document of title*, a receipt for shipped goods, and a contract between the carrier and shipper."  (EX. Q,  emphasis added.)  A bill of lading "always" proves shipment ownership.  *Id*.  Ameriway's BOLs thus demonstrated sole possession of the cargo, a fact acknowledged by Ms. Chen.

55. After receiving Ameriway's BOL, Defendants would make arrangements with a designated carrier to transport the freight to an Amazon warehouse for temporary storage until final shipment.

56. Ameriway issued over 400 BOLs in its own name to Defendants, carriers, and warehousing providers since April, 2017.

57. In just one example, on June 18, 2019, Defendant Chen requested a BOL from Dustin Matos, an Ameriway employee, for Containers "484 & 486" having BOL Numbers OOLU9729705 and OOLU9719522, respectively.  (EX. P, at 2.)  These BOL numbers corresponded to the entry documents filed by Eagle as the IOR.

58. Mr. Matos then issued two BOLs to Ms. Chen **in Ameriway's name** and listing the referenced BOL numbers.  *Id*., at 1.

59. The same day, Mr. Zhang sent an email to "WA Transportation," a carrier, specifically requesting the containers be "delivered straight to the Amazon warehouse" from the port. Defendants were cc'd on this email. *Id.*, at 4.

60. Ms. Chen acknowledged receipt of Ameriway's own BOLs and facilitated transportation of the containers with WA Transportation to the Amazon warehouse. *Id.*

61. This was standard practice between the parties. There are hundreds of similar emails between Defendants and Ameriway employees having corporate email accounts between April, 2017 and July, 2019.

62. The only reason Ameriway did not issue BOLs for the six containers at issue in this case is because it never had the chance: Defendants illegally detained Ameriway's cargo from the port without Ameriway's knowledge and refused to disclose its location. Had Defendants not done so, Ameriway would surely have issued its own BOLs for the subject containers, as it did for the 400+ prior containers.

63. Additionally, Defendants' invoices were paid from Ameriway bank accounts. (EX. R.)

64. Defendants thus performed customs clearance and logistics services primarily for Ameriway, who had sole possession of the freight based on a clear chain of title at the time of the conversion.

### ILLEGAL FREIGHT BROKERING AND OVERBILLING SCHEME

65. Defendants engaged in an illegal freight brokering scheme to overbill Ameriway for "cartage services," "terminal gate fees," and warehousing services. As noted, prior to meeting Ms. Chen, Ameriway was using a different customs broker solely to clear its containers. Ameriway initially arranged its own drayage services, which included transporting

Ameriway's incoming freight from the Port of LA to a nearby warehouse; or, in the case of East Coast shipments, from the Port of NY to a warehouse in New Jersey.

66. Mr. Zhang similarly engaged Defendants for the sole purpose of clearing its West Coast containers with customs around April, 2017. But pointing to communication issues between Ability and Ameriway's current drayage provider, Ms. Chen recommended a different company, WA Transportation, with whom she had a longstanding business relationship. Mr. Zhang agreed to discuss terms directly with WA Transportation, but Ms. Chen said she would negotiate on Ameriway's behalf as a "favor" for Ameriway's continued business.

67. After Ms. Chen returned with a quote from WA Transportation, Mr. Zhang directly asked Ms. Chen if she was marking up the price and taking a commission on the shipments. Denying this, Ms. Chen said she was not a licensed freight broker, and legally could not profit from the transport of Ameriway's freight. Rather, Ability often collects fees on behalf of carriers to streamline invoicing and avoid delays due to late payment issues between the consignee and carrier, according to Ms. Chen.

68. This is in fact a standard industry practice among carriers and brokers: Those that decide to simply pass on the freight cost without markup feel that their competitive freight rates allow them to compete with vendors who may be closer to the customer and if they mark up the freight costs this might not allow them to make the sale in the first place. In other words, many companies pass on the freight charges with no markup to attract business. (EX. J.)

69. Companies who do not have a freight broker's license obviously do not have the option of charging additional fees for the transportation of freight. They are legally prohibited from doing so under Public Law 112-141, commonly referred to as "Map 21," which limits transportation brokering to those who are licensed under Regulation 49 CFR 371.2. Map 21

requires all forwarders to obtain a "brokers" license [as defined 49 CFR 371.2] in order to "arrange" [broker] freight. The rule makes clear that carriers, much less custom brokers, do not have the inherent authority to broker shipments.

70. Specifically, a "property broker" is an individual who "sells, offers for sale, **negotiates for**, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, **or arranging for, transportation by motor carrier <u>for compensation</u>**." 49 U.S.C. § 13102(2) (emphasis added). In other words, a broker acts as the link between a shipper and a carrier to facilitate the movement of goods. To operate as a property broker arranging for shipment of property between state lines, such broker must register and obtain a license from the United States Department of Transportation Federal Motor Carrier Safety Administration ("FMCSA"). *See* 49 U.S.C. § 13904. To qualify for registration, a property broker must either secure a surety bond or establish a trust fund and file proof of the security bond or trust fund with the FMCSA. See 49 U.S.C. § 13906(a)(2). The FMCSA will not issue a license for a property broker who has not complied with this requirement. See 49 C.F.R. § 387.307(a).

71. As stated, Defendants arranged drayage from the Port of NY to a New Jersey warehouse on behalf of Ameriway. Charging commission on this interstate freight without a broker's license would thus be a violation of Map 21, which carries a $10,000 civil fine per transaction. Defendants arranged drayage for over 200 East Coast shipments on behalf of Ameriway.

72. Mr. Zhang initially had no reason to believe Ms. Chen would break the law, and reasonably relied on her assertion that she was not being compensated for arranging the interstate freight. Therefore, on Ms. Chen's recommendation, Mr. Zhang agreed to use WA transportation after further negotiations.

73. Ability emailed invoices to Ameriway, which included line items for "cartage and services," "terminal gate fees," "transload services," and "terminal gate fee." These fees are indistinguishable from other services, for which Ability did not charge a mark-up. For instance, a "document handling fee" of $75.00 was verified by an attached check in the same amount paid by Ability to Famous Target Group, a forwarding company, on Ameriway's behalf. (EX. K.) This confirmed that Ability was not charging a markup on this service. But there was no supporting documentation verifying the cartage (drayage) services.

74. Moreover, the invoices often charge over $200 in terminal related fees, which includes electronically clearing Ameriway's containers through the Port of Long Beach using the "Pier Pass" website. (EX. L.) Ms. Chen did not inform, nor do the invoices indicate, that Defendants were charging over a 200% markup for processing these containers. However, Ms. Chen indicated this was just another standard port fee.

75. Around April, 2019, Ameriway decided to process the containers through Pier Pass itself, and discovered that the actual charge was only $63.04 per container. *Id*. And on information and belief, the drayage companies used by Ability have continuing pier passes, so they don't payt any terminal gate fees. Defendants would thus secretly profit $200 per container on over 450 shipments from Ameriway, totaling approximately $90,000. Ability has thus demonstrated a pattern of hiding exorbitant mark-up fees in its invoices.

76. Furthermore, Ability's invoices do not include the term "handling," which might indicate and excuse a markup for a licensed broker. As noted, the marked-up charges are hidden among other non-inflated line item entries. Defendants thus did not indicate they were charging for anything more than the services themselves.

77. Ms. Chen began arranging drayage and warehousing services for Ameriway's East Coast shipments around July, 2017. Again, stressing that she was not a licensed freight broker, Ms. Chen assured Mr. Zhang that she was not taking a commission on the loads, but arranged transportation for many of her clients' freight as an included service, and because working with familiar carriers made her job easier and avoided problems.

78. During the court of dealing, Ameriway briefly changed drayage and warehousing providers, who offered cheaper rates. However, primarily due to communication problems between these providers and Ability, Mr. Zhang became dissatisfied with their service and went back to the original providers recommended by Ms. Chen.

79. Mr. Zhang also attempted to speak directly with the providers recommended by May on several occasions regarding drayage fees, but was told that all pricing issues must "go through May" (Ms. Chen). Mr. Chen was thus presumably instructed by Ms. Chen not even to discuss pricing for his own drayage services with clients. Mr. Zhang again asked Ms. Chen whether she was taking a commission on the freight, which she again denied. Of course, she was prohibited from doing so under MAP-21.

80. However, Ms. Chen subsequently admitted that Defendants were in fact receiving compensation for the freight brokerage services. Ability informed Ameriway that Container No. OOCU6964350 was detained by one of her recommended carriers, as noted above, for past unpaid invoices owed by Ability. Ms. Chen offered to negotiate a release of the containers on Ameriway's behalf, provided that Ameriway immediately pay Ability a lump sum of $100,000. Mr. Wolfgram requested to negotiate directly with the carrier, but Ms. Chen refused to provide the carrier's name.

81. Mr. Zhang then told Ms. Chen he was skeptical that she could successfully negotiate the release of the containers even if Ameriway made the demanded $100,000 payment. *Ms. Chen replied that she had "contracts" with several carriers, which provided a valuable revenue stream for her business, expressly contradicting her previous assertions that she was not profiting from the drayage and warehousing services at all.* These contracts would give Ability leverage over the carriers to release the freight, according to Ms. Chen.

82. However, when it became evident that Defendants—not the carriers—were seizing the containers based on a false lien, discussions between the parties broke down. Plaintiff then filed this action.

### FIRST CLAIM FOR RELIEF
### Conversion
### (Against All Defendants)

83. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

84. At all relevant times, Plaintiff was and continues to be the sole rightful owners to the subject containers. Defendants never had an implied or contracted lien on the containers.

85. Furthermore, since Ability formally dissolved in September 2018, Ms. Chen intentionally seized the containers in her individual capacity when she took the first container on August 8, 2019. In this case, Ms. Chen herself never had a possessory interest in the containers because the POA was executed in the name of Ability, not Ms. Chen.

86. Defendants' wrongful acts include, but are not limited to, the detainment of the referenced containers without Plaintiff's authorization. Specifically, Defendants routed Plaintiffs containers from the Port of NY to undisclosed third-party carriers without Plaintiff's permission. Defendant Chen then claimed the carrier was detaining the containers due to a late balance but would not disclose the name and location of the carrier to Ameriway. Ms. Chen further stated

that Ameriway would need to make an immediate payment of $100,000 in outstanding invoices owed to Defendants before the containers would be released.

87. Furthermore, Defendants even seized containers that were processed by a *different* customs broker after her POA was expressly revoked by Plaintiff, as noted above.

88. Defendants have no legal lien—express or implied—on the containers.  Detaining them was thus illegal.  As noted, there was no contract stipulating a payment schedule and lien rights on cargo for past due debt between the parties—there was simply no contract executed between defendants and Ameriway.

89. Defendants did not provide notice to Plaintiff about their intention to assert a lien over the cargo.  Nor did Defendants file the necessary lien notice with CBP, in which event the cargo would remain in CBP's possession until the purported lien was satisfied or discharged.  Rather, Defendants just seized the containers from the port first and demanded payment afterwards.

90. Making matters worse, Defendants didn't even identify which allegedly past due invoices formed the basis of the purported lien.  Ms. Chen simply demanded $100,000 immediately in exchange for the seized containers.

91. Plaintiff was thus damaged in an amount of the fair market value of the merchandise at the time of the conversion, which is estimated to be $1,827,907.09.

**SECOND CLAIM FOR RELIEF**
**Tortious Interference with Business Relationship and Prospective Economic Advantage**
**(Against All Defendants)**

92. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

93. Plaintiff had business relationships with numerous exporters, importers and distributors who purchased Plaintiff's logistics services to ship goods from China to the United States.

94. Defendants knew of that relationship and intentionally interfered with it by illegally seizing Plaintiff's containers. Plaintiff cannot ship the seized cargo to its clients due to Defendants' actions — Ms. Chen will not tell Ameriway where the cargo is being held. Nor can Plaintiff accept new shipping orders, since Defendants will track and attempt to intercept the inbound containers without Ameriway's authorization.

95. Defendants acted solely out of malice and used dishonest, unfair, or improper means by illegally seizing Plaintiff's containers to recover an alleged past due debt.

### THIRD CLAIM FOR RELIEF
### Unfair Business Practices
### (Against Defendant Chen)

96. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

97. Defendant Chen engaged in an act or practice that was materially deceptive. Specifically, she dissolved Ability in 2018 due to financial problems, but continued to operate the company in Ability's name until Plaintiff filed the present action, after which Ability changed its name slightly to "Ability Custom Brokers, Inc." Defendant Chen kept Ability's dissolution a secret from her customer base, who would never retain services with a financially unstable company. Defendants allegedly collected money from Amerway on behalf of her carriers, but, due to Ability's hidden financial problems, Ms. Chen did not pay the carriers, who then asserted a nationwide lien on Ability's customers' containers. This lien essentially ground Ameriway's operation to a halt.

98. The challenged act or practice was consumer-oriented. Ms. Chen markets her custom brokerage services to the public, specifically to logistics companies, shippers, and manufacturers, including Plaintiff.

99. Ability, a dissolved and financially unstable (perhaps insolvent) company, was unable to pay its carrier partners' fees, as noted. The carriers then allegedly asserted a lien on Plaintiff's

cargo, according to Ms. Chen. Attorney Wolfgram offered to deal directly with the carriers to release the cargo, but Ms. Chen refused to disclose the carriers' identity until Plaintiff paid an allegedly past due debt of approximately $100,000.

100.    Plaintiff would have immediately terminated its relationship with Ability had Ms. Chen disclosed the truth about its dissolution.

## FOURTH CLAIM FOR RELIEF
### Defamation
### (Against Both Defendants)

101.    Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein. Ms. Chen made several false and defamatory statements to Ameriway's carrier partners, customers, CBP, the New York Police Department, and even the FBI that, on information and belief, Ameriway was purposely evading CBP duties and her custom brokerage fees. Specifically, she reported Ameriway as a "bad actor" to the CBP Office in Washington DC, and stated that she was going to file a complaint with her contact in the FBI, with whom she had previous dealings. (EX. M.) On information and belief, she also told other actors in the industry not to work with Ameriway based on these false accusations. In an email dated September 12, 2019 between Ms. Chen and Dawny Shen, one of Ameriway's ocean freight agents, Ms. Chen stated that "I communicated with some other Customs brokers, warehouses, Customs exam sites and we all considered they are organize scam. This is the reason that I have to report to FBI Oakland office." (*See* EX. N). Consequently, Plaintiff's credibility in the shipping industry has been irreparably damaged. On information and belief, Ms. Chen has also defamed Plaintiff's name to its customers, which has directly resulted in a loss of sales.

## FIFTH CLAIM FOR RELIEF
### Fraud
### (Against Both Defendants)

102.    Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

103.   Defendants indicated on numerous occasions that Ability was a legitimate company in good standing.  Specifically, Defendants still represented themselves under the Ability banner until Plaintiff filed this action, including filing papers with CBP and issuing POAs in Ability's name.  As noted, Ability is not a real entity; it was formally dissolved in 2018, a fact deliberately kept secret by Ms. Chen from Plaintiff.

104.   Plaintiff relied on the fact that Ability was a company in good financial and legal standing.  No company would willingly do business with a dissolved entity.  Filing papers under a false company name is a violation of federal law, so CBP may detain those shipments filed by Ability indefinitely.  Ameriway is responsible for its customers' cargo, and could be held liable for damages arising from Ability's fraud.

105.   As noted, Ability was likely dissolved due to financial problems.  Eventually, Ability was unable to pay its carrier partners' fees, which were supposed to be transferred directly from Plaintiff to the carriers.  The carriers then asserted a lien on Plaintiff's cargo, causing financial and reputational damage to Plaintiff.

### SIXTH CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### (Against Both Defendants)

106.   Plaintiff repeats and reaffirms all preceding paragraphs as if fully set forth herein.

107.    A fiduciary relationship existed between Ms. Chen, Ability and Ameriway.  In particular, Plaintiff executed a POA with Ability, giving the latter permission to conduct customs business with CBP on Plaintiff's behalf.  The agents (Defendants) under a Power of Attorney have an overriding fiduciary obligation to make decisions that are in the best interests of the principal (Ameriway).

108.   Defendant Chen used knowledge gained during her close relationship with Plaintiff (shipping schedules, ship manifest numbers, etc.) to illegally seize Plaintiff's containers

over a billing dispute. Specifically, Defendant Chen accessed the CBP database and rerouted Plaintiff's containers (using her authority granted under the POA) to an undisclosed location without Plaintiff's authorization. Defendant Chen never gave any notice to Plaintiff that she would assert the purported implied lien before seizing the containers.

109. Defendant Chen continued to seize Plaintiffs containers even after her POA was explicitly revoked by Plaintiff on August 22, 2019 and Plaintiff hired different customs brokers to clear its containers.

## SEVENTH CLAIM FOR RELIEF
### Federal Civil RICO, 18 U.S.C. 3 1962(c)
### (Against Both Defendants)

110. Plaintiff incorporates by reference all the preceding paragraphs as if fully set forth herein.

111. Defendants violated RICO and Plaintiff was injured as a result.

112. Defendant Chen, the owner of Ability, is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. 1961(3).

113. Each Defendant violated 18 U.S.C 1962(c)) by the acts described in the prior paragraphs, and as further described below.

114. The Enterprise. Defendant Ability forms an association-in-fact for the common and continuing purpose described herein and constitutes an enterprise within the meaning of 18 U.S.C. 3 1961(4) engaged in the conduct of its affairs through a continuing pattern of racketeering activity. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. There may also be other members of the enterprise who are unknown at this time.

115.    The enterprise has engaged in, and their activities have affected, foreign and interstate commerce, particularly regarding invoices on Ameriway's East Coast Shipments, which are transported from the Port of NY to a warehouse in New Jersey.

116.    Pattern of Racketeering Activity. Defendants, each of whom are persons associated with, or employed by, the enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. 6 I96 1 (1 ), 1961 (3, and l962(c). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise.  Defendants had the specific intent to engage in the substantive RICO violation alleged herein, as evidenced by Ms. Chen's frequent denials of taking a commission on the drayage and warehousing services, combined with the false invoices, whose inflated service charges are hidden amongst the regular ones.

117.    Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(I)(B), as more specifically alleged below. Defendants each committed at least two such acts or else aided and abetted such acts.

118.    The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during a period of time beginning in approximately April 2017 and continuing to the present, and there is a continued threat of repetition of such conduct to Defendants' entire customer base.

119.    The association-in-fact enterprise were not limited to the predicate acts and extended beyond the racketeering activity. Rather, it exists separate and apart from the pattern of

racketeering activity for the legitimate business purpose of providing custom brokerage services to Plaintiff and other customers. Defendants have had and do have, upon information and belief, legitimate business plans outside of the pattern of racketeering activity.

120.　Plaintiff specifically alleges that Defendants participated in the operation and management of the association-in-fact enterprise by overseeing and coordinating the commission of multiple acts of racketeering as described below.

121.　<u>Predicate Act: Use of Wires to Defraud Ameriway in Violation of 18 U.S.C. § 1343.</u> Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1343 in that they devised or intended to devise a scheme or artifice to defraud Ameriway or to obtain money from Ameriway by means of false or fraudulent pretenses, representations or promises.  For the purpose of executing their scheme or artifice, Defendants transmitted or caused to be transmitted by means of wire communications in interstate and foreign commerce various writings, invoices, signs and signals. The acts of Defendants set forth above were done with knowledge that the use of the wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

122.　Defendants carried out their scheme in different states and could not have done so unless they used the interstate wires. In furtherance of their scheme alleged herein, Defendants Chen and Ability communicated with Plaintiff and its associated office in China, Liante, in furtherance of the scheme to defraud Plaintiff. These communications were typically transmitted by wire (i.e., electronically).

123.　Specifically, Defendant Ability conducted an illegal freight brokering scheme and used wire to send fraudulent, inflated invoices via email containing hidden charges to

Ameriway. As a matter of its regular course of business, Ability sent the fraudulent invoices to Ameriway's office in Philadelphia, PA over a two-year period. The additional charges are not disclosed in the invoices, and Ms. Chen initially denied being compensated for the drayage an warehousing services, as she is not a licensed freight broker. But Ms. Chen later admitted to Mr. Zhang she had several "contracts" with carrier and warehousing vendors, from which Defendants derive a substantial revenue stream.

124.   The illegal freight broker and overbilling scheme is thus a substantial part of Defendants' business model. It is therefore likely that Defendants are presenting inflated bills via email to induce most of their clients, not just Ameriway, to pay hidden charges in furtherance of their scheme.

125.   Plaintiff has been damaged as a direct and proximate result of Defendants' overbilling scheme (overpaying for carrier and warehousing services).

126.   <u>Continuity of Conduct</u>. Defendants' violations of state and federal law as set forth herein, each of which directly and proximately injured Plaintiff and other market participants, constituted a continuous course of conduct spanning a period from approximately July 2017 to the present, which was intended to obtain money through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. § 1961(l) and (5).

127.   Upon information and belief, Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(c). The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and

continue to cause injuries to Plaintiff in its business. Plaintiff seeks an award of damages in compensation for, among other things, the thousands of dollars Defendants stole from Plaintiff.

128. Plaintiff accordingly seeks an award of three times the damages it sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

### EIGHTH CLAIM FOR RELIEF
### Fraud
### (Against Both Defendants)

129. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

130. Defendants purposely engaged in an illegal freight brokering scheme, in which they induced Plaintiff to pay secretly inflated charges for carrier and warehousing services based on false invoices.

131. Plaintiff relied on the fact that Defendants were not collecting a commission on the freight services based on Ms. Chen's numerous representations. Specifically, Ms. Chen expressly said Ability was legally prohibited from profiting on the freight services because she was not a licensed freight broker. Moreover, Plaintiff relied on the invoices, which do not indicate Defendants were marking up the services; the inflated charges are indistinguishable from the non-inflated ones, and there is no separate internal "handling" fee noted.

132. Only after Defendants illegally seized Plaintiff's containers did Ms. Chen admit she had "contracts" with several carrier and warehousing partners which comprised a valuable revenue stream for Ability. This is consistent with a teleconference, in which the carrier set up by May told Mr. Zhang of Ameriway that he must "go through May" for all pricing issues. He would not even discuss pricing with Mr. Zhang. Defendants were thus profiting from the freight

brokering services, contrary to Mr. Chen's previous denials and in violation of federal law.  She deliberately concealed this fact from Plaintiff for two years.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ameriway prays for the following relief:

133.    $1,827,907.09 for Defendants' conversion.

134.    $2,000,000 for Defendants' tortious interference; Defendants' defamation; fraud; and unfair business practices.

135.    Treble damages for wire fraud under Federal Civil RICO, 18 U.S.C. § 1962(c)) in an amount to be determined at trial.

136.    Prejudgment and postjudgment interest; reasonable attorneys' fees; costs of suit; and

137.    For such other and further relief as the Court in its discretion deems appropriate.

## JURY DEMAND

Plaintiff Ameriway hereby demands a trial by jury on all issues triable to a jury as a matter of right.

Dated: 1/21/20

Xiyan Zhang (Admitted in New York)
Stratum Law LLC
150 Monument Road Ste. 207
Bala Cynwyd, PA 19004
Telephone: (215) 621-8008 (ext. 102)
Email: xzhang@stratumlaw.com

Pete Wolfgram (Pro Hac Vice to be filed)
Stratum Law LLC
150 Monument Road Ste. 207
Bala Cynwyd, PA 19004
Telephone: (215) 621-8008 (ext. 103)
Email: pwolfgram@stratumlaw.com

*Attorneys for Ameriway Corp.*