**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **Ameriway Corporation** |  |
| Plaintiff, |  |
| v. |  |
| **May Yan Chen**, | **19-cv-09407 (VSB) (VF)** |
| **Ability Customs, Inc**., |  |
| Defendants. |  |

**PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION TO DISQUALIFY DEFENDANTS' COUNSEL RICHARD SCHRIER AND WILLIAM SHAYNE, AND FOR DEFAULT JUDGMENT, DISMISSAL, AND ATTORNEYS' FEES FOR FRAUD ON THE COURT**

# TABLE OF CONTENT

I. INTRODUCTION……………………………………………………………..………...1

II. FACTUAL AND PROCEDURAL BACKGROUND…………………………………1

    A. Chen Did Not Produce the Fabricated Lien Document Until November 2021,
       Two Years After Plaintiff Filed this Case…………….………………….…….2

    B. Plaintiff Discovers that Chen's Counsel Fabricated the TCS ..………………..….3

    C. May 2021: Shayne Admits to Fabricating the TCS…………….………….…..4

III. ATTORNEYS SHAYNE AND SCHRIER SHOULD BE DISQUALIFIED
     FOR PRESENTING THE FABRICATED TCS TO THE COURT...………………6

    A. Shayne and Schrier Committed Several Acts of 'Specifically Identifiable'
       Misconduct in Violation of Canons 1 and 9 ………………………...……….….6

    1) Chen's Counsel Presented the Fabricated TCS to the Court <u>Six</u> Times..…..…….7

    2) The April 8 Conference with Judge Freeman: Chen's Counsel Concealed
       Shayne's Authorship of the TCS from the Court…………………...…………8

    3) The False Discovery Responses…………………………………………………11

    4) The May 23 Conference: Chen's Counsel Made False Statements
       to Judge Figueredo…………………………...……………………………...12

    5) The May 26 Conference with Judge Broderick: Chen's Counsel Admitted to
       'Fabricating' the TCS on the Record……………………………………………13

    B. Disqualification of Schrier and Shayne is Warranted Under Rule 3.7(a)…….……14

IV. FRAUD ON THE COURT: CHEN AND HER COUNSEL'S MATERIAL
     MISREPRESENTATIONS AND OMISSIONS WARRANT
     DEFAULT JUDGMENT, DISMISSAL, AND ATTORNEYS'
     FEES PURSUANT TO THE COURT'S INHERENT POWER………….……...18

    CONCLUSION………………………………………………….…………….21

# TABLE OF AUTHORITIES

**Cases**

*Trust Corp. of Montansa v. Piper Aircraft,*
701 F.2d 85, 87 (9th Cir. 1983)……………………………………………………………7

*Brotherhood of Railway Carmen v. Delpro,*
549 F. Supp. 780, 786 (D. Del. 1982)……………………………..………………………7

*Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*,
687 F. Supp. 2d 381, 388 (S.D.N.Y. 2010)…………………………..……………………7

*Kubin v. Miller*, 801 F.Supp.
1101, 1113 (S.D.N.Y. 1992)……………………………………………..………………………14

*Murray v. Metropolitan Life Ins. Co.*,
583 F.3d 173 (2d Cir. 2009). ……………………………………..…………………………15

*Shangold v. Walt Disney* Co.,
2006 WL 71672,  (S.D.N.Y. Jan. 12, 2006)…………………………..…………………………..18

*Aoude v. Mobil Corp.*,
892d F.2d 1115, 1117(1ˢᵗ Cir. 1989)…………………………………..………………………18, 20

*Pope v. Fed. Xpress Corp.*,
974 F.2d 982, 986…………………………………………………………………………18

*Cent. N.Y. Laborers' Health & Welfare Fund v. Fahs Constr. Grp., Inc.*,
No. 170 F. Supp. 3d (N.D.N.Y. Mar. 21, 2016)……………………………………………...……19

**Rules of Professional Responsibilty**

Model Code of Prof'l Responsibility Canon 1………………………………………..……….. 7

Model Code of Prof'l Responsibility Canon 9……………………………………………...…...7

N.Y. Rules Prof'l Conduct. 3.7(a)……. ………………………………………….……………14

## I. INTRODUCTION

It is rare for attorneys to become personally involved in a case by fabricating crucial evidence for their clients. But last month Defendant Chen's counsel, William Shayne and Richard Schrier, were forced to admit doing just that on the record. The record conclusively establishes that both Chen and her counsel lied to the Court and Plaintiff intentionally, repeatedly, and about the central issue of this case: the authenticity of Chen's lien documentation.

Specifically, 1) Shayne manufactured a document that formed the sole basis of Chen's general lien claim over the five cargo containers at issue; 2) Chen's counsel relied on the fabricated lien document in their signed letters to the Court on six occasions between November 2021 and March 2022; 3) Chen relied on the lien document in her sworn affidavit, even though she knew her lead counsel drafted it after Plaintiff filed this case; 4) Shayne attempted to conceal his authorship of the lien document to the Court and Plaintiff over the course of six months (November 2021-May 2022).

## II. FACTUAL AND PROCEDURAL BACKGROUND

Ameriway is a third-party logistics company whose primary business is to ship goods from China to the U.S. Ameriway designated Eagle Trading USA, LLC ("Eagle") as the Importer of Record ("IOR") for every container processed by Ameriway, including the five containers at issue. Eagle is a company engaged in the import/export business.

In April 2017, Ameriway retained Chen as a customs broker by executing a standard Power of Attorney ("2017 POA") form through Eagle. Ex. A. The POA authorized "May Yan Chen, d/b/a Ability Customs Brokers," to conduct customs filings on its behalf with U.S. Customs and Border Protection ("CBP"). Id. Between April 2017 and August 2019, Chen cleared over 400 containers with CBP for Ameriway.

**The 2017 POA is a single page document that contains no payment terms or lien provisions. The document does not even mention the word 'lien.'** Id. The 2017 POA states that Grantor "acknowledges receipt" of the terms and conditions of service pursuant to the POA, but Chen never sent any terms and conditions to Plaintiff or Eagle; nor did her company website contain any terms in 2017. Id.

It is undisputed that in August 2019, Chen directed a carrier, L&H Trucking Company (L&H), to detain five cargo containers at the Port of New York and deliver them to a storage facility in New Jersey without Plaintiff's authorization. Ex. B, p. 5. Chen seized the cargo because she believed Plaintiff owed her a past due balance related to separate and prior shipments. Id., p. 8. However, Chen never notified Ameriway or Eagle of this fact, or issued a written lien notice before taking the cargo. Id.

On August 7, Plaintiff requested the delivery status of the first detained container, Container No. OOCU6964350. Chen falsely claimed that she did not have the container. Instead, she stated that one of the "truck companies" she worked with detained the cargo because _she_ owed them service fees, and Ameriway needed to immediately pay her $100,000 to "assist" in getting the containers released. EX. C, pp. 2, 3. Chen's email reads, in relevant part:

> "Hello! I am terribly sorry that a container from your company has been seized by one of the truck companies that we have business collaboration with, **because of our company's financial issues and the funds shortage situation at the moment. We could not pay off the service fees that we owe them previously**. Id., emphasis added.

This was false. It is undisputed that the third-party "trucking companies" never "seized" the containers; Chen had them the entire time, by her own admission. Ex. B, p. 5. Plaintiff eventually learned this fact and filed the instant action for conversion, fraud, and other claims in October 2019.

**A. Chen Did Not Produce the Fabricated Lien Document Until November 2021, Two Years After Plaintiff Filed this Case**

Plaintiff filed its conversion action in October 2019, asserting Chen did not have a general lien right in contract over the five subject containers. Chen claimed that she had an enforceable lien, but failed to cite any lien terms for <u>two</u> years, even though she had every opportunity and reason to do so.[1] In fact, she filed the single page 2017 POA with the Court on five occasions, but did not state any lien language or include a services agreement.

Finally, on November 1, 2021, **two years** after Plaintiff filed this case, Chen's counsel, Richard Schrier, filed a letter to the Court related to a discovery issue. Dkt. No. 74. Unlike previous occasions in which he just filed the single-page 2017 POA that is silent on lien rights, this time he attached a three-page document titled "Terms and Conditions of Service" ("TCS") to the end of the POA containing a general lien provision at Paragraph 14, thereby representing that the document physically existed in 2017. *See* Dkt. No. 74-1; *see also* Ex. D, pp. 2-4. On five subsequent occasions, Chen annexed the TCS to her letters, motions, pleadings, discovery requests, and affidavits. *See* Dkt. Nos. 77, 83-9, 100-7; *See also*, 1:22-cv-00658, Dkt. Nos. 1-8, 3-9; *see also* Ex. E. <u>Chen produced no other lien documentation or versions of the TCS prior to May 2022</u>. On February 4, <u>2022,</u> Plaintiff served written discovery focused on the authenticity of the TCS. Ex. F. However, <u>Chen's counsel failed to respond to these discovery requests.</u>

---

[1] For example, on July 31, 2020, Chen filed a Third-Party Action against Eagle for breach of contract and other claims based on the 2017 POA and purported "terms and conditions" therein. In dismissing Chen's claim, this Court stated "Chen[] claims that she is owed money "[p]ursuant to the terms of the Power of Attorney" between her and Eagle Trading, (TPC ¶ 106), *but nowhere does she include a copy of that "Power of Attorney" or state its terms*." Dkt. No. 41, emphasis added. Chen filed the single-page 2017 POA with the Court on five other occasions, but again did not include a terms and conditions of service document supporting her lien defense. Dkt. Nos. 17-2, 19-3, 26-4, 28-3, and 38-1.

### B. Plaintiff Discovers that Chen's Counsel Fabricated the TCS

**Chen's counsel, William Shayne, now admits to manufacturing the TCS after Plaintiff filed this case**. But he was forced to do so only after Plaintiff detected this fact over the course of several months and confronted him about it. Shortly after Chen's counsel filed the TCS document for the first time in November 2021, Plaintiff discovered that the TCS is practically identical to another POA form currently used by a non-party customs broker called H.W. St. John and Company ("St. John") based out of the New York area. The 'Terms and Conditions of Service' pages of the two documents have the exact **same font, footers, margins, grammatical and typographical errors**. Ex. G.

St. John's POA was not published until **April 2019**, <u>two years</u> after the 2017 Contract Date. The company's URL link expressly states when St. John uploaded the document to its website: https://www.hwstjohn.com/wp-content/**uploads/2019/04**/POA-plus-terms-and-conditions.pdf. At this point, Plaintiff knew that Chen copied the TCS form from St. John, but did not know who authored St. John's form.

**<u>Then, in late March 2022, Plaintiff inspected the metadata of the St. John POA, which revealed that Chen's counsel, William Shayne ("wshayne"), created the document on August 13, 2018, over one year *after* the 2017 Contract Date.</u>** Ex. H. Plaintiff thus concluded that Shayne also manufactured the TCS, which he simply attached to the 2017 POA to backdate a lien for Chen's affirmative defense.

### C. May 2021: Shayne Admits to Fabricating the TCS

Plaintiff served Shayne a deposition notice with a list of topics relating to his authorship of the TCS. Chen's counsel objected based on work-product grounds and still refused to admit Shayne created the document. Ex. I. Finally, after facing increased pressure from Plaintiff's

counsel, Shayne admitted that he manufactured the TCS document after Plaintiff filed this case, first in a May 6 letter to Plaintiff's counsel and then in a May 9 letter to Judge Figueredo. Dkt. No. 114; *see also* Ex. J. Shayne also conceded that he instructed his client to post the TCS on her company website on August 23, 2021; this was only <u>five days</u> after Plaintiff informed Chen's counsel that it was going to file a summary judgment motion related to Chen's lien defense. *Infra*. at p. 10.

Chen's counsel claimed they did nothing 'nefarious,' and that it was a simple 'misunderstanding' between the parties over which terms were in place as of the 2017 Contract Date. Ex. J. Chen's counsel then produced a **<u>different</u>** lien document, this one including a set of terms 'based on' provisions formulated by the National Customs Brokers and Freight Forwarders Association of America (NCBFAA) in **<u>1994</u>** (the "'94 Terms"). Ex. K. In comparison, Shayne's TCS contains terms "approved by" NCBFAA in **<u>2007</u>.**

**However, it is undisputed that the '94 Terms did not appear in the record until May 6, 2022, <u>after</u> Plaintiff confronted Shayne about manufacturing the TCS, and almost <u>three</u> years into this litigation.** Chen allegedly sent the '94 Terms sheet to her clients since at least 2011 as a matter of course. Ex. J. However, Chen has not provided any electronic evidence (emails) showing that she used the '94 Terms sheet prior to 2017, or at all for that matter.

To the question why Shayne would ever draft the TCS document for his client in the first place, he alleged that he 'reviewed' the single-page 2017 POA, which references a 'terms and conditions of service' when he was retained by Chen. Id., p. 3. Based on Shayne's experience in the customs broker industry, he then *assumed* 1) that Chen had a terms and conditions of service document predating the 2017 Contract Date that contained lien rights, and 2) that Chen's purported lien documentation was out of date. He then "updated/revised" Chen's terms sheet to

"take into account the recommended changes that were made by NCBFAA in 2007." Id. Shayne claims he routinely does this for all his customs broker clients. Id.

Plaintiff's counsel did not consider this to be a legitimate reason for a lawyer to manufacture critical *evidence* in federal *litigation.* In a May 23 discovery conference before Judge Figueredo, Plaintiff's counsel stated that Shayne must have at least <u>received</u> the older version of the terms and conditions (the '94 Terms) from his client *before* deciding to "update/revise" the document. Ex. L., Judge Figueredo Conference Transcript, p. 6. <u>Otherwise he would have no idea that Chen's terms needed to be updated at all</u>. Id., pp. 6-7. Shayne claimed that he did <u>not</u> receive or review the '94 Terms before creating the TCS document. Id. Again, he only reviewed the 2017 POA and *assumed* that Chen had lien rights in place. Id.

In any event, Shayne's very confusing account did not explain why Chen and her counsel asserted the TCS in their signed letters to the Court and Plaintiff <u>six</u> times over a span of five months (November 2021-April 2022) if they knew the document was not the original version. For that, Shayne's co-counsel, Mr. Schrier, blamed his office staff for 'inadvertently' 'downloading' Shayne's TCS into the firm's document management system instead of the '94 Terms, the allegedly "real" version. Id., pp. 6-7. Schrier claimed that the system 'spit out' the "wrong version" of the Terms when "Plaintiff requested it;" and, he only realized the error until quite recently. Id. But again, Schrier never explained how the TCS was filed with the <u>Court</u> multiple times, or why Chen, Schrier, and Shayne each quoted language directly from the TCS in support of Chen's lien defense in their certified letters to the Court when they knew it was not authentic.

## III. ATTORNEYS SHAYNE AND SCHRIER SHOULD BE DISQUALIFIED FOR PRESENTING THE FABRICATED TCS TO THE COURT

### A. Shayne and Schrier Committed Several Acts of 'Specifically Identifiable' Misconduct in Violation of Canons 1 and 9 of the Model Code

A federal district court has responsibility for controlling the conduct of attorneys who practice before it. *Trust Corp. of Montansa v. Piper Aircraft*, 701 F.2d 85, 87 (9th Cir. 1983). In discharging this responsibility, courts look to both state codes of ethics as well as the Model Code in deciding whether an attorney's conduct warrants disqualification because it is unethical. *Brotherhood of Railway Carmen v. Delpro*, 549 F. Supp. 780, 786 (D. Del. 1982).

A court may disqualify an attorney "when there is a <u>reasonable possibility</u> that some 'specifically identifiable' impropriety actually occurred" and "where the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing a party to retain counsel of his choice." *Kitchen v. Aristech Chem.*, 769 F.Supp. 254, 256 (S.D. Ohio 1991.)(emphasis added). Model Code of Prof'l Responsibility Canon 1 concerns "misconduct," and provides that a "lawyer shall not…engage in conduct involving dishonesty, fraud, deceit, or misrepresentation," or "engage in conduct that is prejudicial to the administration of justice." *See also* NY Rule 8.4(c), the New York analogue to Canon 1.

Further, a court may disqualify an attorney for not only acting improperly but also for failing to avoid the *appearance of impropriety*. *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 388 (S.D.N.Y. 2010)(emphasis added.) While courts are typically reluctant to invoke Canon 9 as an independent basis for disqualification, the record shows that actual misconduct occurred in this case, warranting immediate dismissal under Canons 1 and 9.

### 1) *Chen's Counsel Presented the Fabricated TCS to the Court <u>Six</u> Times*

It is undisputed that Shayne fabricated the TCS, but he made this admission only after Plaintiff traced the document back to him via the H.W. St. John metadata, noted above, and confronted him about it. Before then, Chen's counsel knowingly misrepresented the TCS as authentic to the Court on **<u>six</u>** occasions by attaching it to the 2017 POA. *See* Dkt. Nos. 77, 83-9, 100-7, *See also*, 1:22-cv-00658, Dkt. Nos. 1-8, 3-9; *see also* Exs. D, E.

For example, Chen's sworn affidavit filed with her motion for "reargument" in the Third-Party action against Eagle states "Zhang, in executing the POA as COO and on behalf of Eagle *acknowledge[d] receipt* of Chen's terms and condition[s] and *not having made any timely objection*, they became the operative terms of the agreement between Eagle and Chen." Ex. E, p. 3, emphasis added. Chen's affidavit then quotes specific language from paragraphs 11, 13, and 14 of the TCS, which is annexed to the 2017 POA in the exhibit. Id. Further, Chen's supporting brief, *signed by both Shayne and Schrier*, also specifically cites to paragraph 14 of the TCS in support of her purported general lien. Id., pp. 12-13. Chen's counsel obviously knew Plaintiff/Eagle could not "acknowledge receipt" of or make a "timely objection" to the TCS in 2017 **when Shayne didn't create the document until July <u>2020</u>. The TCS didn't physically exist in 2017.**

Further, Chen's Requests for Admission, served on December 14, 2021, states "**[o]n April 11, 2017,** [Plaintiff's counsel] Wolfgram reviewed the power of attorney annexed as exhibit "II" and directed Zhang to sign the power of attorney on behalf of Eagle." Ex. M, pp. 3-9, emphasis added. Again, Exhibit "II" clearly represents Shayne's TCS document attached to the 2017 POA. Thus, Chen's counsel misrepresented the TCS as existing contemporaneously with the 2017 POA. Plaintiff's counsel obviously could not "review[]" a document that didn't exist, and Chen's counsel knew this.

2) ***The April 8 Conference with Judge Freeman: Chen's Counsel Concealed Shayne's Authorship of the TCS from the Court***

During an April 9 conference related to Plaintiff's motion to compel, Magistrate Judge Freeman specifically stated the issue before her was "*this* document called Terms and Conditions of Services, *which was filed by Mr. Schrier in November 2021…*" and that Plaintiff had "given reasons why there is an authenticity issue with *that* document."

Ex. N at 3, Judge Freeman Conference Transcript, p. 23 emphasis added. Schrier then made two false claims to the Court related to central issues: 1) he asserted that the TCS was printed "on the reverse side of the [2017] power of attorney," and 2) he denied knowledge about when Chen posted the TCS on her website:

> THE COURT: -- the plaintiff is seeking to compel responses.
>
> Mr. SCHRIER: If I could. Here's the problem that we're having, Judge, we're trying to figure it out ourselves. **On the power of attorney, <u>on the reverse side of the power of attorney, there are terms and conditions. Those terms and conditions are on the client's website with the power of attorney. So anyone can just go to it.</u> <u>The question is when that website was started</u>** and what the procedure was before it was started in terms of hard copies, what was done and not done in a normal regular course of business. Id. at 4, Transcript p. 25, emphasis added.
>
> MR. SCHRIER: procedurally the powers of attorney were sent, signed and sent back, **and the ones that were sent would have [been] <u>on the rear</u> of the power of attorney <u>this</u> term and conditions.** …Id. at 5, Transcript p. 26.

Schrier undoubtedly knew that Shayne, his co-counsel and legal partner of almost 40 years, drafted the TCS document <u>after</u> Plaintiff filed this case in <u>2019.</u> He knew the TCS didn't physically exist in 2017 and could not have been "on the reverse side" of the 2017 POA, but expressly stated the opposite to Judge Freeman.

  <u>**Significantly, Shayne was on the call with the Court, but deliberately omitted the obvious fact that he authored the TCS long after the 2017 Contract Date**</u>. He knew that his <u>**own**</u> document was the sole focus of Plaintiff's discovery and Judge Freeman's line of questioning. She specifically stated that the issue before her was "*this document* titled 'Terms and Conditions of Service' *filed by Mr. Schrier in November 2021*." Id. at 3, Transcript p. 23. He could have immediately clarified matters by admitting the truth, that he drafted the TCS, but chose to remain silent so as not to implicate himself in a fraud on the Court.

Furthermore, Schrier's statement, "[t]hose terms and conditions are on the client's website with the power of attorney.  So anyone can just go to it…*The question is when that website was started…*" is another falsehood related to a central issue in this case.

Chen's affirmative lien defense requires her to prove that Plaintiff "acknowledged receipt," or had notice of the TCS in 2017.  But since she cannot prove that she sent any terms to Plaintiff by email or otherwise, she needed to establish that the TCS was publically available to Plaintiff on her website in 2017.

On August 18, 2021, Plaintiff's counsel sent a Settlement Offer Letter to Chen's counsel stating that it would soon be filing a motion for partial summary judgment related to Plaintiff's conversion claim and Chen's affirmative lien defense.  Ex. O.  Whether Plaintiff had notice of the terms would obviously be a crucial issue in Plaintiff's impending motion, and Chen's counsel knew this.

**ONLY FIVE DAYS LATER**, **on August 23, Chen created a "Terms and Conditions of Service" webpage on her company site, which contains Shayne's TCS document, including the referenced typos and grammatical errors.**  Ex. P.  It is undisputed that Chen's website, which is over <u>ten</u> years old, did not contain any terms before August 2021.  This cannot be a coincidence.  The electronic evidence shows that Shayne instructed Chen to post the TCS on her website to defend against Plaintiff's motion.

It wasn't until May 6, almost a month after the discovery conference, that Shayne was forced to admit that he told Chen to post the TCS on her website:  "After the instant lawsuit was filed…the updated version was then placed on Defendant's website by Defendant's representative." Ex. J, p. 6, ¶¶ 10, 11.  There is thus no question that Schrier and Shayne falsely denied any detailed knowledge about the 'Terms and Conditions of Service' webpage.

### 3) *The False Discovery Responses*

Chen's counsel's interrogatory responses were overtly designed to conceal Shayne's authorship of the TCS. For example, Plaintiff's Interrogatory No. 15 asks Chen to "describe in detail how the "Terms and Conditions of Service" identified in Exhibits A, B, and C were created, including a) "the date on which the TCS was first created," "name(s) of the person(s) who worked on the TCS," "how the TCS was created," "what software was used to create the TCS," the serial number of the computer on which the TCS was created." Ex. F, No. 15.

Instead of simply admitting that he "worked on" the TCS, which is now undisputed, Shayne dodged the question by giving a general history of the "*basic text*" of the TCS formulated by NCBFAA going back to the early 90's. Id. Shayne knew that Plaintiff requested very specific information about his **own** TCS document, which was the focus of the April 8 conference with Judge Freeman. But he chose to conceal his involvement.

Plaintiff's Interrogatory No. 16(a) requests the "date on which" Chen's referenced Terms and Conditions of Service" webpage was created on her site. Id., at No. 16. Again, the purpose of this question was to determine if the TCS was publicly available in 2017. However, Chen's counsel falsely responded "**unknown**," even though they undoubtedly knew the answer to this question: Shayne personally directed Chen to create the webpage in August 2021, by his own admission.

### 4) *The May 23 Conference: Chen's Counsel Made False Statements to Judge Figueredo*

As noted above, Schrier blamed his office staff for "inadvertently" downloading Shayne's TCS into his firm's database instead of the "real" version (the '94 Terms), and producing the "wrong" version to Plaintiff. He then apologized to the Court:

MR. SCHRIER: **"I take the hit on this, Judge**…__it's actually my staff,__ when plaintiff asked for copies of the, of the power of attorney which has terms and conditions… we just __inadvertently__ **under the impression that it was the three-page version which is what was added by Mr. Shayne**, **and it was put in initially downloaded into our system**, so whenever they asked for terms and conditions we spit it out and we gave them…**[w]hen plaintiff raised the issue and we got into it, I realized our mistake and the plaintiffs, I'm sorry**…" Ex. L, p. 6, emphasis added.

Schrier's vague explanation is implausible because both him and Shayne personally filed the TCS with the *Court* on six occasions under their electronic signature and individual ECF accounts. They also emailed the TCS to Plaintiff from their own email accounts. In addition, Shayne and Schrier quoted language directly from the TCS in their signed letters and pleadings in support of Chen's purported lien when they knew it was not the operative document. Shayne obviously knew that he was quoting language from his __own document__, as opposed to the '94 Terms.

Further, Schrier's statement, [w]hen plaintiff raise[d the] issue and we got into it, I realized our mistake…I'm sorry," is flatly contradicted by the record. Plaintiff's February 4 discovery requests were focused on the authenticity of the TCS, so Chen's counsel were clearly on notice of the issue then. It should have taken ten minutes for them to realize they filed the "wrong" document with the Court and inform Plaintiff. They were then under a duty to correct false evidence under New York Rule 3.3(a)(3). Instead, they attempted to avoid the issue by not responding to Plaintiff's requests by the discovery deadline.

Subsequently, Chen's counsel filed a Motion for Reargument in the Third-Party Eagle action on March 7, 2022, and *again cited directly to the TCS*. Ex. E. At this point, Chen's counsel clearly knew Plaintiff was contesting the TCS's authenticity, but they relied on it anyways. The authenticity of Shayne's TCS "document filed by Mr. Schrier on November 2"

was directly before Judge Freeman during the April 8 hearing, but Shayne concealed his authorship by remaining silent.

Further, the metadata of the '94 Terms states the document was created on **April 7, 2022, almost three years into this litigation and the <u>night</u> before the conference with Judge Freeman**. Ex. K, p. 3. Shayne apparently created the document in preparation for the conference, but chose not to disclose its existence. Instead, he remained silent and left the authenticity issue unresolved for another month. Chen's April 28 discovery responses intentionally omitted Shayne's authorship, and again **did not include the '94 Terms.**

Shayne finally admitted to fabricating the TCS on May 6, but only after Plaintiff discovered the truth and served him with a deposition notice a month prior. This was not a simple clerical "mistake" by Schrier's staff. The record proves that Chen and her counsel knew they were advancing a fabricated document to the Court, and went to great lengths to hide this fact.

5) *The May 26 Conference with Judge Broderick: Chen's Counsel Admitted to 'Fabricating' the TCS on the Record*

Nowhere is the appearance of impropriety greater than Schrier's statement during a May 26 conference before Judge Broderick, in which he expressly admits that Shayne "fabricated" the TCS "after this case started":

> "MR. SCHRIER: <u>**The terms and conditions that Mr. Wolfgram is saying were fabricated by Mr. Shayne, yes, they were fabricated by Mr. Shayne, and they were given to the client after this case started**</u>. It has nothing whatsoever to do with the issues in this case." Ex. Q, Judge Broderick Conference, pp. 4-5.

Schrier attempts to minimize his misconduct, but the record is clear: until a <u>month</u> ago, Chen relied solely on the TCS, which turned out to be fabricated by Chen's lead counsel, Shayne. Chen's counsel did not even mention the '94 Terms until Plaintiff detected the falsity of the TCS. Therefore, Chen's counsel committed repeated acts of 'specifically identifiable'

misconduct between November 2021 and May, 2022 in violation of Canons 1 and 9. Shayne and Schrier's conduct thus far leaves too great a risk that further violations will occur, and they should be disqualified immediately.

### B. Disqualification of Schrier and Shayne is Warranted Under Rule 3.7(a)

The witness-advocate rule, set forth in Rule 3.7 of the New York Rules of Professional Conduct, provides that [a] lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact." N.Y. Rules Prof'l Conduct. 3.7(a). Courts have interpreted [the witness-advocate rule] to require disqualification where the attorney's testimony is "necessary." *Kubin v. Miller*, 801 F.Supp. 1101, 1113 (S.D.N.Y. 1992).

Plaintiff contends that Chen, knowing she did not have a valid lien document in 2017 – she expressly **denied** detaining the containers to Plaintiff, as evidenced by her August 2019 emails—sought the advice of her counsel to fabricate one for litigation. Shayne and Schrier were willing to assist, and worked directly with Chen to fabricate the TCS and pass the document off as an original to the Court. Plaintiff also argues that Shayne and Schrier suborned perjury by instructing Chen to rely on the TCS in her sworn affidavit, even though the parties knew the document was fabricated. This, combined with their demonstrated willingness to make blatantly false statements to the Court about fundamental facts (e.g., whether Shayne created the TCS), strongly indicates that Chen's counsel *also* fabricated the '94 Terms to cover their misconduct. Now they are attempting to substitute one fake document for another.

Thus, to counter, Shayne and Schrier, both of whom had direct, personal involvement in the manufacture and presentation of the TCS, will have to testify and defend their actions. In fact, they have *already* given testimony in the nature of fact witnesses to defend their conduct during the April and May discovery conferences, noted above. *See e.g., supra* at pp. 6-7.

14

Further, Schrier's admission, "yes, [the TCS] were fabricated by Mr. Shayne, and they were given to the client after this case started," is prejudicial to Chen because it contradicts her affidavit testimony that Plaintiff "acknowledged receipt" of the TCS in 2017. In short, Schrier's admission proves that Chen intentionally relied on a fabricated lien document in her sworn affidavit.

Therefore, the risks that Rule 3.7(a) is designed to alleviate are great here. As noted, Shayne and Schrier have already been forced to vouch for their own credibility and defend their conduct to the Court. Their documented misrepresentations and omissions have put Plaintiff in the difficult position of impeaching their credibility during discovery conferences, depositions and at trial. Plaintiff is forced to openly accuse *both* Chen and her counsel of fraud on the Court. Accordingly, there is a real risk that Shayne's and Schrier's testimony will distort the truth as a result of bias in favor of their client *and themselves*. Finally, Chen's counsel's simultaneous representation of Chen and their need to defend their own conduct will "blur the line between argument and evidence [such] that the jury's ability to find facts will be undermined." *See Murray v. Metropolitan Life Ins. Co.*, 583 F.3d 173 (2d Cir. 2009).

Shayne and Schrier both have personal and non-cumulative knowledge about a significant issue of disputed fact, that is, whether they knowingly collaborated with Chen to backdate both the TCS and '94 Terms for this litigation. Specifically, Shayne ought to give testimony about why he failed to disclose his authorship of the TCS document to Judge Freeman during the April 8 hearing and in the April 28 discovery responses; whether Shayne intentionally deleted the TCS's metadata to conceal his hand—whereas the St. John POA form's metadata includes Shayne's name ("wshayne"), Shayne used his printer to scan in the TCS, thereby removing its 'author' metadata and any traces of himself from the document; why he quoted

directly from his own TCS document instead of the '94 Terms in his letters; whether, like the TCS, he modified any content in the '94 Terms sheet; when Shayne received the '94 Terms from his client, and why he didn't produce the document until **_after_** Plaintiff confronted him about fabricating the TCS; why Shayne would ever allow Chen to rely on his own TCS document in her sworn affidavit, when both parties knew it was not the original lien document. This fact alone indicates that the '94 Terms have recently been fabricated. Otherwise Chen would have simply cited to it at the beginning of this case.

In addition, Shayne claims he did not draft the TCS for this litigation, but only as a general client service. However, Paragraph 21 of the TCS document states that California law governs (Chen is based in CA), but <u>does not</u> reference a specific state or federal court in the jurisdiction clause: "the parties irrevocably consent to the jurisdiction of the United States District Court**;**". Ex. G, p. at 3, ¶ 21. In contrast, the H.W. St. John POA form, also created by Shayne, <u>does</u> specify a governing court (New York) in Paragraph 21. Ex. G. This omission appears intentional, especially since a semicolon appears after the word "Court" in the TCS ("United States District Court**;**"). This contextual evidence strongly indicates that Shayne _tailored the jurisdictional clause_ _specifically for this litigation_, which was already instituted in the Southern District of <u>New York</u> before Shayne created the TCS. If Shayne included a California jurisdictional clause after-the-fact, he would have to explain why he did not try to remove the case there at the outset. His solution was to just leave the court out. Accordingly, Shayne must testify about why he did not insert a California court into the jurisdiction clause of his TCS document.

In addition, Shayne claims he simply "updated/revised" Chen's terms sheet to take account of the recommended changes that were made by NCBFAA in 2007. However,

NCBFAA has a copyright on the terms, and "[a]ny unlicensed use of these Terms and Conditions of Service by non-members will be subject to prosecution by the NCBFAA." Ex. R. Chen has never been a member of NCBFAA and is currently in violation of federal copyright laws because Shayne's TCS is on her company website. Ex. F. Def. Respn. To Interrog. No. 19. In contrast, H.W. St. John, for whom Shayne also created a terms and conditions of service document, **is** a paying NCBAA member, presumably on advice of Shayne. NCBFAA's registry lists **the year** in which parties become licensed members—and can therefore legally use the terms. Thus, Shayne likely did not inform Chen to register in 2020, when he created the TCS, because that would clearly indicate the TCS was created long <u>after</u> the 2017 Contract Date, which would undermine Chen's main contention that the TCS was operative in 2017. Shayne ought to explain this discrepancy, and why he assisted Chen in committing copyright infringement.

Schrier must testify about why he quoted directly from the TCS in his letters to the Court; his April 8 statement to Judge Freeman that the TCS document was printed on the "reverse side" of the 2017 POA, even though he knew this was physically impossible; his April 8 statement, in which he falsely denied knowledge about when Chen added the 'Terms and Conditions of Service' webpage to her company site; his May 23 statement to the Court that his staff 'inadvertently' produced Shayne's TCS instead of the '94 Terms, which is false for the reasons stated at *supra*, Part A. Schrier has personal knowledge about his firm's document management systems and procedures, and must testify about how and when the alleged mistakes occurred.

Accordingly, there is little doubt as to the substance of Chen's counsel's testimony. Because both Shayne and Schrier are trial counsel whose testimony goes to the authenticity of Chen's lien documentation, which is central to both Plaintiff's conversion claim and Chen's affirmative defense, disqualification should not await the completion of discovery.

## IV. FRAUD ON THE COURT: CHEN AND HER COUNSEL'S MATERIAL MISREPRESENTATIONS AND OMISSIONS WARRANT DEFAULT JUDGMENT, DISMISSAL, AND ATTORNEYS' FEES PURSUANT TO THE COURT'S INHERENT POWERS

The "Court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process and assure a level playing field for all litigants." *Shangold v. Walt Disney* 2006 WL 71672, at \*4 (S.D.N.Y. Jan. 12, 2006). "Sanctions for fraud are warranted if it is established by clear and convincing evidence that [a party] has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate the action." Id.

Dismissal or entry of judgment under the court's inherent powers is frequently invoked when parties rely on or create forged documents. *See e.g.*, *Aoude v. Mobil Corp.*, 892d F.2d 1115, 1117 (1st Cir. 1989) (dismissal affirmed where plaintiff attached forged document to his complaint and relied upon the document as the "centerpiece" of the litigation); *Pope v. Fed. Xpress Corp.*, 974 F.2d 982, 986 (dismissal affirmed where forged document was attached to complaint and was the "linchpin" of plaintiff's case.)

This case is almost three years old. Until last month, Chen relied solely on the TCS for her lien defense—and Shayne indisputably fabricated it:

> "MR. SCHRIER: The terms and conditions that Mr. Wolfgram is saying were fabricated by Mr. Shayne, **yes, they were fabricated by Mr. Shayne, and they were given to the client after this case started**." Ex. Q, Judge Broderick Conference, pp.4-5.

Chen's counsel aggressively presented the TCS as the operative lien document on <u>six</u> occasions between November 2, 2021 and March 7, 2022, as discussed *supra*. Clear and convincing evidence has thus been presented that Chen and her counsel knowingly advanced the TCS which they knew was not what they represented it to be, and that they relied upon it in their letters, pleadings, and affidavits. They repeatedly attempted to promote the use of the document

in this litigation, even though they knew it was manufactured. Even after Plaintiff openly contested the TCS's authenticity in its February 4 discovery requests, Chen persistently relied on the document in her sworn affidavit filed a month later in the Third-Party action. *See* Dkt. No. 100-7. Further, record evidence shows that Chen and her counsel made at least five material misrepresentations and omissions to Plaintiff and the Court calculated to conceal Shayne's authorship of the TCS. This is discussed at length at *supra*, **Part "A**."

These facts <u>alone</u> rise to the level of 'fraud on the court' warranting terminating sanctions under this jurisdiction's applicable law: "*The essence of fraud on the court is when a party lies to the court and his adversary <u>intentionally</u>, <u>repeatedly</u>, and about issues that are <u>central</u> to the truth-finding process.*" *Cent. N.Y. Laborers' Health & Welfare Fund v. Fahs Constr. Grp., Inc.*, 2016 WL 1106445, at *4 (N.D.N.Y. Mar. 21, 2016) (citation and internal quotation marks omitted) (emphasis added).

Chen's counsel has previously argued that the TCS and '94 Terms have "generally" similar terms formulated by NCBFAA, and thus it basically doesn't matter which document was presented in support of Chen's lien defense. They argue that the evidence of purposeful conduct is sufficiently murky to stay the Court's hand, and that because they withdrew the TCS, they have inflicted no serious harm on the fact-finding process - in essence, 'no harm, no foul.'

But when Shayne manufactured the TCS document, and thereafter when he annexed it to Chen's papers, pleadings, and affidavit, he plainly thought it material, and "is in no position to dispute its effectiveness." *See Aoude,* 892d F.2d at 1115, finding that a "bogus agreement [annexed to the complaint and later withdrawn] clearly had the capacity to influence the adjudication and to hinder [defendant's] presentation of the case…and failure of a party's corrupt plan does not immunize the defrauder from the consequences of his misconduct."

Shayne also thought the TCS was material enough to intentionally conceal his authorship from Plaintiff and the Court over a six-month period through a series of misrepresentations and omissions. The Court would undoubtedly *still* be under the false impression that the TCS was the operative document in 2017 if Plaintiff didn't happen to check the metadata in the St. John POA and link the TCS back to Shayne.

Moreover, **Chen's counsel did <u>not</u> withdraw the TCS on their own**. Rather, they waited until Plaintiff detected that it was false. **Again, Chen represented the TCS—not the '94 Terms—as the linchpin of her lien defense until <u>last month.</u>** Since the TCS was the only lien document on record, Plaintiff was forced to spend a great amount of time and resources investigating its authenticity. Once Chen's counsel realized they were caught manufacturing crucial evidence, they produced the '94 Terms, which had never appeared in the record before, thereby leading Plaintiff and the Court down yet another arduous discovery path. The Court has already held four conferences related to the TCS and '94 Terms, with several more likely to follow. Therefore, Schrier's May 26 statement that Shaye's fabrication of the TCS "has nothing whatsoever to do with the issues in this case" is completely false.

Finally, there is compelling evidence indicating that Chen's counsel falsified the '94 Terms to cover their misconduct related to the TCS, discussed above. *Supra*, Part "B." But even assuming, *arguendo*, the '94 Terms are authentic, this is hardly an excuse for repeatedly lying to the Court; it does not undermine the significance that Chen's counsel knowingly gave false evidence and engaged in a months-long effort to conceal Shayne's authorship of the TCS, thereby interfering with Plaintiff's ability to litigate the case and the Court's ability to render a rightful decision.

## CONCLUSION

For these reasons, it is respectfully submitted that the Court issue its Order for default judgment, dismissal, and attorneys' fees against both Chen and her counsel; and, for disqualification of Shayne and Schrier from participating any further in this case.

Dated: June 24, 2022

Respectfully submitted,

STRATUM LAW LLC.

By: _____
Peter S. Wolfgram
Xiyan Zhang
STRATUM LAW LLC
*Attorneys for Plaintiff,*
*Ameriway Corporation*