**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**AMERIWAY CORPORATION**
                    **Plaintiff,**

      **v.**

**MAY YAN CHEN,**

**ABILITY CUSTOMS, INC.**
                   **Defendants**

**19 -cv-09407 (VSB)**


## <u>MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO DISQUALIFY</u>

### <u>ATTORNEY WILLIAM SHAYNE AND ATTORNEY RICHARD SCHRIER</u>


Respectfully submitted,
Shayne Law Group

By: William Shayne, Esq.
     Richard E. Schrier, Esq.
Attorneys for the Defendants
64 Fulton Street
New York, New York 10038
212-566-4949


To:    Stratum Law LLC (via ECF)
       2424 E. York Street, Ste 223
       Philadelphia, Pa. 19125
       215-621-8008
       Att: Xiyan Zhang, Esq.
          Pete Wolfgram, Esq.

# TABLE OF CONTENTS

Page

**TABLE OF CONTENTS**………………………………………………………... i

**TABLE OF AUTHORITIES**…………………………………………………..ii

**EXHIBITS IN OPPOSITION TO MOTION TO DISQUALIFY**………………...v

**PRELIMINARY STATEMENT AND FACTS** …………………………………....1

    **A.**  BACKGROUND OF THE PARTIES AND THEIR RELATIONSHIPS ..1

    **B.**  CHEN'S SERVICES ON BEHALF OF EAGLE…………………………..2

    **C.**  CHEN EXERCISES HER LIEN RIGHTS…………………………..….. 3

    **D.**  PLAINTIFF'S CLAIMED BASIS TO DISQUALIFY
        SHAYNE & SCHRIER …………………………………………………6

    **E.**  NEITHER SHAYNE NOR SCHRIER INTENTIONALLY MISLED THE
        COURT (WHICH HONEST MISTAKE WAS CORRECTED WITHIN DAYS
        AFTER DISCOVERY) AND MORE IMPORTANTLY BOTH VERSIONS OF
        THE TERMS AND CONDITIONS PROVIDED FOR THE ASSERTION OF
        A GENERAL LIEN ………………………………………………………….7


**POINT I: A VIOLATION OF THE CANONS OF ETHICS IS GENERALLY NOT A
BASIS TO DISQUALIFY COUNSEL** …..……………………………………..15

**POINT II: THE CASES CITED BY PLAINTIFF FOR DISQUALIFICATION BY
REASON OF A VIOLATION OF THE CANONS OF ETHICS DO NOT SUPPORT
THE APPLICATION FOR DISQUALIFICATION** ………..………………....17

**POINT III: THE CASES CITED BY PLAINTIFF FOR DISQUALIFICATION BY
REASON OF "FRAUD ON THE COURT" DO NOT SUPPORT THE
APPLICATION AND FACTUALLY THERE WAS NO FRAUD ON THE
COURT**.…………………………………………………………………….22

**CONCLUSION**.…………………………………………………………….25

**CASES CITED** Page

*Alexander v. Robertson*, 882 F.2d 421, 424 (9th Cir. 1989)………………...23

*Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989)……………21-23

*Archuleta v. Turley*, 904 F.Supp.2d 1185, 1192 (D. Utah 2012)……………16

Bd. of Educ. v. *Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)……………...16-17, 19-20

*Bhd. Ry. Carmen v. Delpro, Co.*, 549 F. Supp. 780, 786 (D. Del. 1982)……..18

*Biocore Med. Techs., Inc. v. Khosrowshahi*, 181 F.R.D. 660, 664
(D. Kan. 1998)…………………………………………………………..16

*Bottaro v. Hatton Assocs.*, 680 F.2d 895, 896 (2d Cir. 1982) ………………..16

*Cent. N.Y. Laborers' Health & Welfare Fund v. Fahs Constr. Grp., Inc.*,
170 F. Supp. 3d. 337, 343 (N.D.N.Y. 2016)…………………………………..24

*Cerruti 1881 S.A. v. Cerruti, Inc.*, 169 F.R.D. 573, 583 (S.D.N.Y. 1996).........22

*In re CFLC, Inc.*, 209 B.R. 508, 515–16 (B.A.P. 9th Cir. 1997),
aff'd, 166 F.3d 1012 (9th Cir. 1999)……………………………………..12

*Dodson v. Runyon*, 86 F.3d 37, 39 (2d Cir. 1996)……………………………..22

*England v. Doyle*, 281 F.2d 304, 309 (9th Cir. 1960)…………………………23

*Enrich v. Binghamton City Sch. Dist.*, 210 F.R.D. 17, 24 (N.D.N.Y. 2002)…...16-17

*Fisher Studio, Inc. v. Loew's, Inc.*, 232 F.2d 199 (2d Cir.), cert. denied,
352 U.S. 836 (1956)……………………………………………………………17

*Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721
(7th Cir. 1982)…………………………………………………………..19

Glueck v. Jonathan Logan, Inc., 653 F.2d 746, 748 (2d Cir. 1981)……………17

*Kitchen v. Aristech Chem.*, 769 F.Supp. 254, 257 (S.D. Ohio 1991)…………..18-19

*Kubin v. Miller*, 801 F. Supp. 1101, 1108-16 (S.D.N.Y. 1992)………….….20

*Kupferman v. Consol. Rsch. & Mfg. Corp.*, 459 F.2d 1072, 1078
(2d Cir. 1972)………………………………………………………………24

*Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir. 1989)………………………...21

*Lassiter v. Hidalgo Med. Servs.*, No. 17-cv-0850 JCH/SMV, 2018 U.S. Dist.
LEXIS 40622, at *6 (D.N.M. Mar. 13, 2018)…………………………………16

*Marshall v. New York Div. of State Police*, 952 F. Supp. 103, 107
(N.D.N.Y. 1997)……………………………………………………………17

*McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445
(S.D.N.Y. 2002)……………………………………………………………21-22, 24

*Meat Price Investigators Ass'n. v. Spencer Foods*, 572 F.2d 163, 165
(8th Cir. 1978)……………………………………………………….…..19

*Murray v. Metropolitan Life Ins. Co.*, 583 F.3d 173, 174-80 (2d Cir. 2009)……20-21

*Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1577
(Fed. Cir. 1984) ……………………………………………………….19

*Parkinson v. Phonex Corp.*, 857 F. Supp. 1474, 1476 (D. Utah 1994)………….16

*Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 393 (S.D.N.Y. 2010)…24

*Pfizer, Inc. v. Int'l Rectifier Corp.*, 538 F.2d 180, 195 (8th Cir. 1976)…………..23

*Pope v. Fed. Exp. Corp.*, 974 F.2d 982, 984-85 (8th Cir. 1992)…………………23

*Revise Clothing, Inc.* v. Joe's Jeans Subsidiary, Inc., 687 F. Supp. 2d 381,
8394 (S.D.N.Y. 2010)………………………………………………………..20

*Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424 (1985)…………………………19

*Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425, 439 (S.D.N.Y. 2002)…………..21-22

*Shangold v. Walt Disney Co.*, 2006 WL 71672 at *9-15 (S.D.N.Y. Jan. 12, 2006)..21-22

Smith v. Whatcott, 774 F.2d 1032, 1035 (10th Cir. 1985)………………………...…16

*Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 836 F.2d 1332, 1336
(Fed. Cir. 1988)……………………………………………………………20

*Tr. Corp. of Montana v. Piper Aircraft*, 701 F.2d 85, 87 (9th Cir. 1983)…………18

*Trial L. Coll. v. Gerry Spences Trial L. Coll.*, No. 1:20-CV-00080-JMC-GJF, 2022 U.S. Dist. LEXIS 116424, at *19-20 (D. Wyo. June 29, 2022)……………...16

*United Bus. Commc'ns, Inc. v. Racal-Milgo, Inc.*, 591 F. Supp. 1172, 1186-87 (D. Kan. 1984)………………………………………………………………………...23

*United States ex rel. Tracy v. Emigration Improvement Dist.*, 717 Fed. Appx. 778, 782 (10th Cir. 2017)………………………………………………………………...16

*United States v. Int'l Tel. & Tel. Corp.*, 349 F. Supp. 22, 29 (D. Conn. 1972), *aff'd mem.*, 410 U.S. 919 (1973)……………………………………………………23

*United States v. Kitchin*, 592 F.2d 900, 903 (5th Cir. 1979)………………………19

*Waters v. Kemp*, 845 F.2d 260, 265 (11th Cir. 1988)………………………………19

*Woods v. Covington Cnty. Bank*, 537 F.2d 804, 813 (5th Cir. 1976)………………19

*W.T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir. 1976)……………………...16-17, 19

**STATUTES AND REGULATIONS CITED**

Page

18 U.S.C.S. § 1962(c) (2022)…………………………………………………..5

19 C.F.R. § 111.24 (2022)…………………………………………………...14-15

**OTHER AUTHORITIES**

13 Am. Jur. 2d *Carriers* § 498 (1964)…………………………………...12

**EXHIBITS IN OPPOSITION TO MOTION TO DISQUALIFY:**

Exhibit A: Certificate of Formation of Limited Liability Company for Eagle Trading USA, LLC;

Exhibit B: Certificate of Incorporation  for Ameriway Corporation;

Exhibit C: Shareholders Agreement for Ameriway Corporation;

Exhibit D:  Ameriway 2018 income tax return (Redacted);

Exhibit E: Ameriway's 2019 income tax return (redacted);

Exhibit F: Power of Attorney signed by Wolfgram and Zhang on behalf of Eagle Trading USA LLC with Defendant Chen to perform customs broker services (Redacted);

Exhibit G: List of invoices sent by Defendant to Eagle/Zhang that are unpaid;

Exhibit H: Copy of 1-page Terms and Conditions of Service applicable to the issues in this case;

Exhibit I:  Copy of 3-page Terms and Conditions of Service prepared by Shayne, given to Defendant, Chen after the lawsuit was instituted and not relevant to the issues in this case;

Exhibit J: Wednesday, April 28, 2022 email from Schrier to Zhang and Wolfgram enclosing Defendant's Responses to Plaintiff's 3rd Request for the Production of Documents and 2nd Set of Interrogatories;

Exhibit K: Tuesday, May 3, 2022 email from Plaintiff's attorney, Wolfgram to Defendant's attorney, Schrier alleging that Shayne created the terms and conditions of service during litigation;

Exhibit L: Friday, May 6, 2022 email with attachments from Defendant's attorney, Schrier to Plaintiff's attorneys, Wolfgram and Zhang advising Plaintiff that the applicable terms and conditions of service in the case was a 1-page terms and conditions and not the 3-page terms and conditions and confirming that the 3-page terms and conditions was in fact prepared by Attorney Shayne and given to Defendant after the litigation was instituted;

Exhibit M:  Monday, May 9, 2022 letter to the Magistrate Judge in which the Court was advised that 1-page terms and conditions was applicable to the issues in the case and that the previously produced 3-page terms and conditions was provided to Defendant by counsel after the institution of the lawsuit (ECF 114, 114-4 and 114-5);

Exhibit N: May 18, 2022 letter from Defendant's attorney Schrier to the Magistrate Judge (ECF 121) in which a detailed recitation of the history of both the 1-page terms and conditions and the 3-page terms and conditions is set forth;

Exhibit O: June 10, 2022 letter to the Magistrate Judge (ECF 138) with a copy of a Supplemental Response to Plaintiff's 3rd set of Request for documents in which four (4) of Plaintiff's clients that received copies of the 1-page terms and conditions are disclosed;

Exhibit P: June 16, 2022 Supplemental Response to Plaintiff's 3rd set of Request for documents in which four (4) of Plaintiff's clients that received copies of the 1-page terms and conditions are disclosed.

<u>**PRELIMINARY STATEMENT AND FACTS**</u>

This memorandum of law, the affidavits of William Shayne ("Shayne") and Richard Schrier ("Schrier"), and the exhibits submitted herewith are being submitted by Defendant in opposition to Plaintiff's application for an order disqualifying both attorney William Shayne and Richard Schrier.

It is Defendant's good faith belief that the facts set forth herein will reveal the lack of merit of Plaintiff's application to disqualify Defendant's counsel William Shayne and Richard Schrier.

**A. <u>BACKGROUND OF THE PARTIES AND THEIR RELATIONSHIPS:</u>**

As this court may recall from the prior motions brought before it, Defendant May Yan Chen D/B/A Ability Customs Brokers ("Chen,") is a licensed customs broker whose business involves the clearance of customers' cargo through U.S. customs, advancing customs duties on behalf of its customers based upon the declared value of the goods as represented by its customers and the making of arrangements for various supply chain services such as trucking, warehousing etc.

Plaintiff, Ameriway Corp ("Ameriway") is a logistics company in which Plaintiff's attorney, Xiyan Zhang ("Zhang") is the president, secretary, and the major shareholder (Annexed as Exhibit "C" is a copy of the Ameriway Shareholders Agreement). The Court's attention is directed to Article 1 paragraph A(6)) of the Shareholders Agreement. In that capacity, Zhang was intimately involved in every aspect of the underlying facts upon which this lawsuit is based. Plaintiff's other counsel, Pete Wolfgram ("Wolfgram"), while not a shareholder of Ameriway, upon information and belief is an officer of Ameriway and was also intimately involved in key aspects of the underlying facts upon which this lawsuit is based.

Zhang, formed Eagle Trading USA, LLC ("Eagle") on June 12, 2015 (see exhibit "A")

For the purposes of importing cargo from China into the United States for sale. Thereafter on

September 28, 2016, Zhang formed United E-Logistics Corp. and amended the name of the

corporation to Ameriway Corp. on February 11, 2017 (see Exhibit "C"). Initially, Zhang, was a

28% owner of Ameriway (see the Shareholders Agreement at Exhibit "C") but later became a

44.5% owner of Ameriway (see tax returns for 2018 and 2019 Exhibit "D" and Exhibit "E").

Pursuant to article I paragraph A(6) of the shareholders agreement (Exhibit "C"), Zhang, is the

President and Secretary of Ameriway, and pursuant to the tax returns, Zhang, is the CEO of

Ameriway (see exhibit "D" and "E").

Defendant, May Yan Chen (hereinafter "Chen") is a licensed customs broker with offices

in California and operates under the trade name Ability Customs Brokers. Eagle by its COO and

managing member, Xiyan Zhang represented to Chen that Eagle was an importer of an array of

products from China. On or about April 11, 2017 Zhang, in his capacity as the COO of Eagle,

executed a power of attorney appointing "May Y Chen d/b/a Ability Customs Brokers'" as

Eagle's representative to import products into United States (a copy of the power of attorney is

annexed as Exhibit "F"). Wolfgram, as Eagle's corporate counsel and as an "officer" of Eagle,

verified Zhang's authority to sign the Customs Power of Attorney (See Exhibit "F")

### B. CHEN'S SERVICES ON BEHALF OF EAGLE:

From the date of the issuance of the Power of Attorney (Exhibit "F") on April 11, 2017

until August 2019 Chen cleared approximately 486 containers of cargo through customs in

which Eagle was identified as the Importer of Record ("IOR") of all the containers.

In all cases, both Zhang and Wolfgram, not as attorneys, but as businessmen were

intimately involved in the importation of the cargo that Defendant had cleared through customs.

Soon after the issuance of the Power of Attorney on April 11, 2017, Chen began clearing containers on behalf of Eagle. Chen invoiced Eagle **and** Zhang for the customs broker services rendered, disbursements related to supply chain services, and the advance payment of taxes in the form of customs duties.

Notwithstanding the fact that Eagle was the Importer of Record and responsible for providing all the information to Chen concerning the cargo being imported, which includes the value of the cargo that is reported to U.S. Customs for the purpose of calculating the proper import duty, Ameriway paid all of the invoices sent to Eagle and Zhang until payments stopped for containers that had cleared customs in March 2019 and thereafter. (In other words, payments continued through June 2019 for containers that had cleared customs through the beginning of March 2019, however no payments were made for any containers that cleared Customs from early March 2019 until Chen ceased performing services or advancing expenses and Customs duties in August 2019).

### C. **CHEN EXERCISES HER LIEN RIGHTS:**

By August 2019, there were 131 unpaid invoices, each for a separate container in which Eagle was the Importer of Record ("IOR") and the outstanding balance owed to Chen was well over $300,000. (See Exhibit "G" for a summary of all unpaid invoices sent by Chen/Ability to Zhang and Eagle). In August 2019, Chen advised Zhang that she was going to cease clearing Eagle's containers through customs unless a substantial payment was made, which did not occur.

At that time there were five (5) containers of goods in which Eagle was the IOR that had cleared customs but had not yet been delivered and were still under Chen's "control". Chen exercised her lien rights resulting from the contractual relationship established between Eagle

and Chen through the execution of the power of attorney Eagle signed with Chen on April 11,

2017 on the following containers of cargo:

| Container # | Customs Entry # | |
|---|---|---|
| BMOU4739454 | 9NK-0010492-5<br><br>Importer of Record: Eagle Trading LLC<br><br>Invoice Purchaser: Eagle Trading LLC<br><br>Bill of Lading Consignee: Eagle Trading LLC | |
| APHU7253481 | 9NK-0010528-6<br><br>Importer of Record: Eagle Trading LLC<br><br>Invoice Purchaser: Eagle Trading LLC<br><br>Bill of Lading Consignee: Eagle Trading LLC | |
| BMOU5390536 | 9NK-0010461-0<br><br>Importer of Record: Eagle Trading LLC<br><br>Invoice Purchaser: Eagle Trading LLC<br><br>Bill of Lading Consignee: Eagle Trading LLC | |
| HLXU8057236 | 9NK-0010498-2<br><br>Importer of Record: Eagle Trading LLC<br><br>Invoice Purchaser: Eagle Trading LLC<br><br>Bill of Lading Consignee: Eagle Trading LLC | |
| OOCU6964350 | 9NK-0010377-8<br><br>Importer of Record: Eagle Trading LLC<br><br>Invoice Purchaser: Eagle Trading LLC<br><br>Bill of Lading Consignee: Eagle Trading LLC | |

In response, Zhang, on behalf of Ameriway, instituted the instant lawsuit on behalf of Ameriway, **not on behalf of Eagle**, the Importer of Record, (*see* ECF 16 and 21) claiming that:

1st Cause:  Chen had converted the above five (5) containers and the cargo and Ameriway (not Eagle) was damaged as a result;

2nd Cause:  Chen had "tortiously interfered" with Ameriway's business relationships by reason of withholding delivery of the above five (5) containers;

3rd Cause:   Chen had engaged in unfair business practices as to Ameriway;

4th Cause: Chen had defamed Ameriway (related to the notification to customs of Eagle's failure to pay the customs duties);

5th and 8th Cause:  Chen had defrauded Ameriway;

6th Cause:  Chen had breached the fiduciary duty Chen allegedly owed to Ameriway;

7th Cause:  Chen had engaged in a scheme to defraud Ameriway and was responsible to Ameriway for treble damages under 18 U.S.C.S. § 1962(c) (2022) (RICO);

Based upon the foregoing allegations by Plaintiff, Plaintiff is claiming that:

1.  Defendant overcharged Plaintiff, Ameriway for various out of pocket expenses invoiced to Eagle with respect to the 486 containers that Chen cleared customs on Eagle's behalf and is seeking damages for the excessive payments allegedly made;

2.  That Defendant did not provide a copy of the terms and conditions of service to Plaintiff that are referred to in the Power of Attorney (Exhibit "F") which terms and conditions of service provided that Defendant had the right to assert a general lien against any cargo in its possession and therefore Ameriway has been damaged as a result of the retention of the cargo in the above five (5) containers.

3.  That because the five (5) containers of cargo are being held, the Eagle cargo could not be sold, that as a result, Ameriway is out of business and Ameriway is claiming damages by

reason thereof. (Upon information and belief, Ameriway had no other "customers" other than Eagle and other "related" business entities in China).

## D. **PLAINTIFF'S CLAIMED BASIS TO DISQUALIFY SHAYNE & SCHRIER:**

The basis for Plaintiff's application to disqualify Shayne and Schrier relates to the Terms and Conditions of Service which provides that Chen has the right to exert a general lien over any cargo in her possession to pay Chen for any outstanding obligations of Eagle. It has been and still is Chen's position that Ameriway has no legal rights with regard to the five (5) containers it is holding pursuant to its exercise of its lien rights pursuant to the power of attorney and the terms and conditions. Further, it is undisputed that all of the customs brokers services, advances paid by Chen for "supply chain services," and advances for customs' duties and taxes were incurred in connection with and in  furtherance of the authority given to Chen by Eagle not Ameriway, where Eagle was the Importer of Record. Despite Ameriway's complaint and allegations to the contrary, at no time was any action taken by Chen on behalf of Ameriway. Ameriway was not Chen's customer and never signed a power of attorney authorizing Chen to act on Ameriway's behalf, nor was Ameriway ever identified as the Importer of Record on any container that Chen performed customs broker services. By reason thereof, Ameriway does not have standing to bring this lawsuit and has not incurred any damages for which Chen would be responsible to pay.

However, notwithstanding the foregoing, as the Plaintiff in this case, in an effort to support the motion to disqualify Shayne and Schrier, Plaintiff has "woven" and cherry-picked individual facts to develop a "storyline" in which it now argues that Shayne and Schrier intentionally attempted to perpetrate a "fraud on the court" by fabricating Terms and Conditions of Service that contain a provision granting Defendant general lien rights over any cargo in her

possession.  More specifically, Plaintiff **has claimed** that Attorney Shayne "fabricated" a three

(3) page Terms and Conditions of Service (the "3-page terms and conditions") which contained a

provision giving Defendant, Chen the right to assert a General Lien against the five (5)

containers of cargo being held by Chen and thereafter, in violation of various cannons of ethics,

represented to the Court that the "fabricated" 3-page terms and conditions were in force and

effect during the period Chen provided services to "Ameriway" and asserted a lien right.  By

reason thereof, Plaintiff argues that both Attorney Shayne, who Plaintiff claims fabricated the 3-

page terms and conditions and Attorney Schrier who made the representations to the Court that

the 3-page terms and conditions were in force and effect during the period Chen provided

services to "Ameriway" should be disqualified from continuing to represent Chen in this case.

However, while Defendant agrees that the 3-page terms and conditions do not apply to

the facts in this case, a one (1) page Terms and Conditions of Service (the "1-page terms and

conditions") does apply and as will be demonstrated, the 1-page terms and conditions also

contains a provision giving Defendant, Chen the right to assert a General Lien against the five

(5) containers of cargo being held by Chen.  As a result, the lien terms contained in the 1-page

terms and conditions yield the same substantive lien rights as the 3-page terms and conditions.

E. **NEITHER SHAYNE NOR SCHRIER INTENTIONALLY MISLED THE COURT (WHICH HONEST MISTAKE WAS CORRECTED WITHIN DAYS AFTER DISCOVERY) AND MORE IMPORTANTLY BOTH VERSIONS OF THE TERMS AND CONDITIONS PROVIDED FOR THE ASSERTION OF A GENERAL LIEN**

The reality is that there was merely a misunderstanding between Shayne's office and

Schrier's office, and that, when realized, the mistake was quickly corrected, and both the Court

and Plaintiff's counsel were notified of the error. Further, the error was substantively irrelevant

in that both "versions" of the Terms and Conditions of Service provided General Lien rights to Chen in the event of non-payment by Eagle and Zhang as the importers of record.

**THE ACCURATE** underlying facts regarding the terms and conditions of service are as follows:

Prior to Chen obtaining her customs brokers license, she was employed by a customs broker in California. When Chen started her own business, she made copies of the various forms that her former employer used in connection with his customs broker business which included the verbiage for both the Power of Attorney and the Terms and Conditions of Service with the only change being that she inserted her name as the customs broker in lieu of her prior employer. A copy of the terms and conditions that Chen utilized when she began her business in 2012 is attached as Exhibit "H." This is the 1-page terms and conditions Chen utilized during the period that included April 2017 to  August 2019 when she was performing customs brokers services for Eagle pursuant to the Power of Attorney signed by Zhang and Wolfgram (Exhibit "F") and the form of the terms and conditions she utilized until she retained Shayne as her attorney after she was sued in this lawsuit.

Paragraph 13 of the 1-page terms and conditions applicable in this case provides:

"…13. General lien on any property. The company shall have a general lien on any and all (and documents relating there too) of the customer, in his possession, custody or control or on route, for all claims for charges, expenses or advances incurred by the company in connection with any shipments of a customer and such claim remains unsatisfied for thirty (30) days after demand for its payment is made, the company may sell at public auction or private sale upon ten (10) days written notice registered mail (R. R. R.) to the customer, the goods, wares, and/or merchandise, or so much thereof as may be necessary to satisfy such lien, and apply the net proceeds of such sale to the payment of the amount due to the company. Any surplus from such sale shall be transmitted to the customer, and the customer shall be liable for any deficiency in the sale…"

To understand the context of the publication of the 3-page terms and conditions, it is essential to  understand Shayne's history in international trade. The Shayne Family has been a

fixture in the customs brokers industry for over 80 years. Shayne's father, Leonard Shayne was the Director of the American Association of Exporters & Importers from 1949-1999, was the president of the National Customs Brokers  and Forwarders Association of America from 1987-1999 and was on the Board of Governors of the New York Forwarders & Brokers Association from 1987-1999. He was a nationally known figure for a half of century and routinely was called upon to testify before Congress on issues involving international trade.

William Shayne "grew up" in the Customs Brokers and freight forwarder business. Prior to law school Shayne worked in his father's business and since graduating law school Shayne has continued in his father's footsteps and has been specializing in Import/Export law for over 40 years.

Shayne has taught Customs and International Trade Law around the country to import/export professionals as well as attorneys for Continuing Legal Credit, as well as to trade associations and brokers and freight forwarder associations. Shayne  has been the author and contributing author of several books on international trade and most recently "Managing Import & Export Opportunities and Risks: An Insider's Guide for the Busy Executive" which is used by both Customs Brokers and Importers. Over the years he has represented several customs brokers associations and continues to represent customs brokers and freight forwarders throughout the United States and abroad.

As an attorney that focuses his practice on customs law, Shayne keeps abreast of all rulings and changes that affect the import and export of products to and from the United States. As a service to his clients as well as to brokers generally (and as a marketing "tool"), Shayne periodically updates a Power of Attorney and a version of Terms and Conditions of Service that he recommends that broker/forwarder clients use. In the regular course of Shayne's business,

whenever he is retained by a new broker/forwarder client for any purpose, he provides the client

with a copy of the most recently updated Terms and Conditions of Service and counsels them to

publish the updated version on their website to put prospective clients of the broker/forwarder on

advance notice. Since customs rulings and statutes are not confined to any one state but apply

nationally, Shayne represents clients at many ports of entry. In this case, Chen's business is

based in California.

When Chen retained Shayne in connection with this lawsuit after she was served with the

Summons and Complaint, Shayne did what he always did with new clients, that is provided Chen

with a copy of the newest version of the Terms and Conditions of Service and advised her to

publish it on her company website, which she did. A copy of the Terms and Conditions of

Service provided to Chen after he was retained in this lawsuit is attached as Exhibit "I."

Paragraph 14 of the 3-page terms and conditions given to Chen by Shayne provides:

"…14. General Lien and Right to Sell Customer's Property

(a). Company shall have a general and continuing lien on any and all property of
customer coming into companies actual or constructive possession or control for monies
owed to company with regard to the shipment on which the lien is claimed, a prior
shipment(s) and/or both;
(b)  Company shall provide written notice to customer of its intent to exercise such lien,
the exact amount of monies due and owing, as well as any on-going storage or other
charges; customer shall notify all parties having an interest in shipment(s) of Company's
rights and/or the exercise of such lien.
(c)  Unless, within 30 days of receiving notice of lien, customer posts cash or letter of
credit at site, or, if the amount due is in dispute, an acceptable bond equal to 110% of the
value of the total amount due, in favor of Company, guaranteeing payment of the monies
owed, plus all storage charges accrued or to be accrued, Company shall have the right to
sell such shipment(s) at public or private sale or auction and any net proceeds remaining
thereafter shall be refunded to customer…"

Schrier, who specializes in corporate litigation, was retained to defend Chen in this

litigation with Shayne's assistance. Although the issue of Chen's right to exert a general lien

over the five (5) containers was contemplated by both of Defendant's counsel, Schrier was

initially unaware of Shayne's course of business of supplying new clients with Terms and Conditions of Service that Shayne periodically updated.

During the course of obtaining literally tens of thousands of pages of documents through discovery in this case, Schrier's office came into possession of the 3-page terms and conditions that Shayne had provided to Chen after he was retained. When disputes arose between the parties regarding the production of documents, Schrier, mistakenly believing that the 3-page terms and conditions was the version that Defendant, Chen was utilizing in 2017-2019 when Chen was importing containers of cargo for Eagle, produced that version in its letter to Magistrate Judge Freeman on November 1, 2021 (See ECF 74). Thereafter, in the Notice to Admit served by Defendant on December 14, 2021, in Defendant's Motion to Reargue on February 1, 2022 (ECF 83-9) and in the Chen Affidavit dated March 7, 2022, Schrier, who prepared all the foregoing documents, attached the 3-page terms and conditions, and represented that that version was in effect and applicable to the facts in this case.

Apparently, knowing that the 3-page terms and conditions was not provided to Eagle and Zhang when Chen was first retained pursuant to the power of attorney in April 2017 (Exhibit "F"), Plaintiff began demanding "native files" for a litany of documents in its discovery demands. In retrospect and based upon this motion, Plaintiff was specifically seeking the "native files" for the 3-page terms and conditions to prove that the 3-page terms and conditions was a "fabrication" and thereby give credence to its position that Plaintiff never received a copy of either terms and conditions of service, which in turn would support its position that the five (5) containers of cargo are not subject to a general lien by Defendant, Chen.

For further context, the Power of Attorney signed by Attorneys Zhang and Wolfgram (Exhibit "F") specifically stated that Zhang "…acknowledges receipt of May Y Chen DBA

Ability Customs Brokers' Terms and Conditions of Service governing all transactions between the parties….".   Because the ability to claim "General Lien Rights" enables a party to recover all monies owed, not just the amount owed with respect to the cargo "liened", it is in Plaintiff's interest if Defendant's lien rights are limited to "Specific Lien Rights".   However, except when there is an ongoing course of conduct, general lien rights are generally obtained via contractual agreement between the parties. *See In re CFLC, Inc.*, 209 B.R. 508, 515–16 (B.A.P. 9th Cir. 1997), aff'd, 166 F.3d 1012 (9th Cir. 1999); 13 Am. Jur. 2d *Carriers* § 498 (1964)).

Therefore, it is assumed that it is in Plaintiff's interest to prove that the 3-page terms and conditions was a recent fabrication which would give credence to Plaintiff's argument that Plaintiff never received any terms and conditions of service and thereby Defendant's lien rights would be limited to "Specific Lien Rights". But the reality is that Eagle (not Ameriway), as the party to the Power of Attorney (Exhibit "F"), did contractually agree to "General Lien Rights".

Defendant's counsel realized the mistake, in answering Ameriway's Third set of Requests for the Production of Documents and Second Set of Interrogatories on Wednesday, April 28, 2022 in which Plaintiff sought "native files" specifically for the 3-page terms and conditions of service. Upon questioning Defendant and Shayne, Schrier realized that the 3-page terms and conditions were not in effect during the period April 2017 to August 2019, but rather that the 1-page terms and conditions were applicable to the issue in this action and therefore responded to the document demand and interrogatories accordingly. Annexed as Exhibit "J" is a copy of the Wednesday, April 28, 2022  email from Schrier to Zhang and Wolfgram attaching copies of Defendants responses to Plaintiff's 2nd set of Interrogatories and 3rd Request of Documents.

While it was Schrier's intention to promptly give Plaintiff formal notice of the error and provide a copy of the 1-page terms and condition, on Monday, May 3, 2022 Wolfgram sent

Schrier an email in which he charged that "…Attorney William Shayne, created native files related to the 'Terms and Conditions of Service' document…during litigation, or in advance thereof—specifically that he formatted the footers, inserted  the California Jurisdictional Clause and Chen's company name into the preexisting Terms and Conditions of Service Form…" . Attached as Exhibit "K" is a  series of emails between counsel for Defendant and Plaintiff concerning Defendant's objections to some of Plaintiff's demands leading to the May 3, 2022 email described above.

This, of course was a serious charge and on Friday, May 6, 2022, Schrier sent a letter via email to Wolfgram (which letter was misdated February 6, 2022), in which Schrier clarified that the terms and conditions the Defendant utilized at the time she performed customs broker services for Eagle during the period 2017 through 2019 was a version that was issued in 1994 based upon terms and conditions issued by the National Customs Brokers and Forwarders Association of America Inc. and which was a version of the terms and conditions that have been utilized by Defendant's prior employer. Attached as exhibit "L" is a copy of the May 6, 2020 email from Schrier to Wolfgram and Zhang, with a copy of the power of attorney and both the 1-page terms and conditions of that was utilized by defendant prior to the institution of the lawsuit and applicable to the issues in this case and a copy of the 3-page terms and conditions prepared by Shayne and provided to defendant after he was retained in connection with this lawsuit.

 Thereafter, on Monday, May 9, 2022 Schrier sent a letter to Magistrate Judge Valerie Figueredo in which he disclosed to the Court that Shayne had prepared and provided updated terms and conditions to the Defendant after the lawsuit was instituted and pointed out that that version was not relevant to the issues in this case (see ECF 114, 114–4 and 114-5 which is also

annexed as exhibit "M"). That same letter to Judge Figueredo was copied to Judge Broderick on May 17, 2022 at ECF 119–4.

Notwithstanding all the foregoing, Plaintiff continued to argue that it never received a copy of the terms and conditions and persisted on arguing that Defendant had a "nefarious" plan to defraud and mislead the Plaintiff and this Court regarding the very existence of the terms and conditions that were in effect when the Defendant was performing customs broker services on behalf of Eagle (See ECF 115 and 118).

As a result, in advance of the scheduled conference on May 19, 2022, Schrier filed a letter on May 18, 2022 (ECF 121) in which he provided a detailed explanation as to the circumstances in which Shayne provided the 3-page Terms and Conditions of Service to Defendant **AFTER THE LAWSUIT WAS STARTED** and that the 3-page version of the terms and conditions produced and provided to Defendant by Shayne post filing of this action was not being claimed to apply to the issues in this case. However, it was also pointed out that the critical provision of both versions of the terms and conditions of service was the provision that gave Defendant the right to assert a "General Lien" on any cargo in her possession to satisfy all outstanding money that was due to her. Annexed as Exhibit "N" is a copy of Schrier's May 18, 2022 letter to Judge Figueredo (ECF 121).

At the ensuing conference with Judge Figueredo, although Defendant, relying on the privilege provided for in 19 C.F.R. § 111.24 (2022), objected to disclosing the identity of her clients that received copies of the terms and conditions, the Court was advised that Defendant had been seeking permission from her clients to waive the privilege so she could disclose their identity and additionally was seeking to locate documentation that would further prove that copies of the terms and conditions were provided to defendants clients in the regular course of

her business. Defendant was directed to provide the identity of any client that would agree to waive the 19 C.F.R. § 111.24 (2022) confidentiality privilege.

On June 10, 2022, a letter was sent to the Magistrate Judge (ECF 138) in which copies of a Supplemental Response to Ameriway's Third Set of Request for Documents was produced which included copies of fax cover sheets and confirmations that copies of the terms and conditions were sent to various clients (whose names were redacted pursuant to 19 C.F.R. § 111.24 (2022)). Additionally, affidavits from four of Defendant's clients were produced verifying receipt of copies of the terms and conditions applicable in this case. A copy of The June 10, 2022 letter, and attachments are annexed as Exhibit "O."

Thereafter on June 16, 2022, a Supplemental Response to Ameriway's Third Set of Request for Production of Documents was served with an additional affidavit of a client of Defendant further verifying receipt of a copy of the Terms and Conditions of Service by Defendant. A copy of said Supplemental Response is attached as Exhibit "P."

It is respectfully submitted that nothing "nefarious" has been perpetrated by either the Defendant or Defendant's counsel. Yes, Defendant's counsel, attorney Schrier produced the 3-page Terms and Conditions in November 2021 wrongfully believing those were the Terms and Conditions that applied in this case. However, as demonstrated hereinabove, when the mistake was identified via the Tuesday, May 3, 2022 email from Plaintiff's attorney, Wolfgram (Exhibit "J"), that Friday (3 days later) Plaintiff's counsel was made aware of the existence of the two different versions of the terms and conditions and that the three page terms and conditions prepared by attorney Shayne (Exhibit "L") and the Court was notified the following Monday, May 9, 2022 (ECF 114 and Exhibit "M"). In both instances it was made clear that the 3-page terms and conditions provided to Defendant after the lawsuit was instituted did not apply to the

issues in this case and was provided to Defendant in the normal course of his business with

customs brokers clients as described above.

## POINT I: A VIOLATION OF THE CANONS OF ETHICS IS GENERALLY NOT A BASIS TO DISQUALIFY COUNSEL

In the recently decided case of *Trial L. Coll. v. Gerry Spences Trial L. Coll.*, (No. 1:20-CV-00080-JMC-GJF, 2022 U.S. Dist. LEXIS 116424, at \*19-20 (D. Wyo. June 29, 2022)), the

court held:

> "As a general matter," however, "a litigant has the 'right to employ counsel of [his] choice.'" *United States ex rel. Tracy v. Emigration Improvement Dist.*, 717 Fed. Appx. 778, 782 (10th Cir. 2017) (unpublished) (quoting Smith v. Whatcott, 774 F.2d 1032, 1035 (10th Cir. 1985)). Consequently, a party seeking to disqualify opposing counsel must "adequately [show] how the participation of [the litigant's] attorney[] for the remainder of the case would taint the litigation." *Id.*8 "As many courts have phrased it, disqualification is an appropriate remedy where the offending conduct 'threatens to taint the underlying trial with a serious ethical violation.'" *Lassiter v. Hidalgo Med. Servs.*, No. 17-cv-0850 JCH/SMV, 2018 U.S. Dist. LEXIS 40622, at \*6 (D.N.M. Mar. 13, 2018) (quoting *Biocore Med. Techs., Inc. v. Khosrowshahi*, 181 F.R.D. 660, 664 (D. Kan. 1998)) (citations omitted); *Tracy*, 717 Fed. Appx. at 781-82. "Typically, ethical violations that require disqualification involve (1) a conflict of interest that prevents zealous advocacy or (2) the potential use of privileged or confidential information about one party that would give an unfair advantage to a present client.'" *Id.* at 782 (quoting *Archuleta v. Turley*, 904 F.Supp.2d 1185, 1192 (D. Utah 2012)); *see also Archuleta*, 904 F.Supp.2d at 1192 (explaining that "motions to disqualify are granted rarely unless an ethical violation has occurred that would *taint the underlying trial*" (emphasis added)). In deciding a motion to disqualify counsel, courts may "balance a number of factors," such as "society's interest in ethical conduct," "the prerogative of parties to choose their own counsel," "the hardship of disqualification," and "whether the party seeking disqualification was prejudiced by the violation." *Lassiter*, 2018 U.S. Dist. LEXIS 40622, at \*6 (citations omitted). Nevertheless, "[t]he essential issue to be determined ... is whether the alleged misconduct taints the lawsuit." *Tracy*, 717 Fed. Appx. at 781 (quoting *Parkinson v. Phonex Corp.*, 857 F. Supp. 1474, 1476 (D. Utah 1994)); *Lassiter*, 2018 U.S. Dist. LEXIS 40622, at \*6-7…"

The court in *Enrich v. Binghamton City Sch. Dist.*, 210 F.R.D. 17, 24 (N.D.N.Y. 2002)

recognized that **misconduct** disputes often arise at the outset of a lawsuit, and the courts have

cautioned that not every ethical violation requires disqualification. *W.T. Grant Co. v. Haines, 531 F.2d 671, 677 (2d Cir. 1976)*. Accordingly, courts should employ:

> "…a restrained approach, limiting disqualification to situations where continued representation will taint the case. *Bottaro v. Hatton Assocs.*, 680 F.2d 895, 896 (2d Cir. 1982) (citing *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)). Despite the necessity of discretionary restraint, disqualification is warranted in situations involving conflicts of interests, and those where an attorney is potentially in a position to unfairly advantage his current client through the use of privileged information. *Nyquist* 590 F.2d at 1246; *Marshall v. New York Div. of State Police*, 952 F. Supp. 103, 107 (N.D.N.Y. 1997). In fact, the Circuit has stated that the risk of taint "is encountered when an attorney represents one client in a suit against another client, in violation of Canon 5, or might benefit a client in a lawsuit by using confidential information about an adverse party obtained through prior representation of that party, in violation of Canon 4." *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981) (*internal quotations omitted*)…"

The court in *W.T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d. Cir. 1976) held that an attorney is not automatically disqualified for violating a rule in the Code of Professional Responsibility (*see Fisher Studio, Inc. v. Loew's, Inc.*, 232 F.2d 199 (2d Cir.), cert. denied, 352 U.S. 836 (1956)) and held that the lower court was correct in denying the employee's motion to disqualify a law firm for violating the Code of Professional Responsibility by communicating with the then unrepresented appellant. The law firm's misconduct did not taint the trial.

Plaintiff has argued that Defendant's counsel has violated the Code of Professional Responsibility and therefore should be disqualified. There is no dispute that the "Shayne 3-page version of the Terms and Conditions of Service" are not applicable in this case. Therefore, regardless of whether this Court agrees with Plaintiff's claim of misconduct, the case is not going to be "tainted" by the initial production of the 3-page version rather than the one (1) page version of the Terms and Conditions that Defendant was actually using during the period 2017 to 2019.

By reason of the foregoing, Plaintiff's application to disqualify Attorney Shayne and Schrier should be denied.

## POINT II: THE CASES CITED BY PLAINTIFF FOR DISQUALIFICATION BY REASON OF A VIOLATION OF THE CANONS OF ETHICS DO NOT SUPPORT THE APPLICATION FOR DISQUALIFICATION

In the case of *Tr. Corp. of Montana v. Piper Aircraft*, 701 F.2d 85, 87 (9th Cir. 1983) cited by Plaintiff, the defendant's counsel ("law firm") previously represented the deceased-plaintiff in a divorce and several business matters and the defendant's counsel had access to decedent-plaintiff's confidential financial information. The court held that it is well settled that a former client who is entitled to object to an attorney representing an opposing party on the ground of conflict of interest but who knowingly refrains from asserting it promptly is deemed to have waived that right. The factual situation of an attorney previously representing the opposing party does not apply in this case and therefore is not relevant to Plaintiff's claim that Attorneys Shayne and Schrier should be disqualified.

In the case of *Bhd. Ry. Carmen v. Delpro, Co.*, 549 F. Supp. 780, 786 (D. Del. 1982) cited by Plaintiff, the defendant filed a motion to disqualify the plaintiffs' lawyer and his firm because "it was likely" that the lawyer would be a witness regarding a substantive issue in the case. In Delaware, local DR 5-102(B) calls for an attorney to be disqualified when it is likely that the attorney "ought to testify on behalf of the client". The Court held that in applying the Code to a particular case, an attorney should only be disqualified when it is determined on the facts of the particular case that disqualification is an appropriate means of enforcing the applicable disciplinary rule. In the case at bar, there is no disciplinary rule that needs to be enforced. Further, neither Shayne nor Schrier has any firsthand knowledge of any relevant facts in this case. As a result, disqualification is not appropriate.

The Court in *Kitchen v. Aristech Chem.*, 769 F.Supp. 254, 257 (S.D. Ohio 1991) cited by

Plaintiff, denied the motion to disqualify, holding that even assuming arguendo that the

plaintiffs' counsel violated the rules of professional conduct by communicating with the

defendant's former employee, this conduct did not warrant disqualification. The court held that

acts that appear to violate the Code of Professional responsibility do not confer upon the trial

court the unfettered discretion to disqualify. An attorney should be disqualified "only when there

is 'a reasonable possibility that some specifically identifiable impropriety' actually occurred and,

in light of the interest underlying the standards of ethics, the social need for ethical practice

outweighs the party's right to counsel of his own choice." *United States v. Kitchin*, 592 F.2d 900,

903 (5th Cir. 1979) (quoting *Woods v. Covington Cty. Bank*, 537 F.2d 804, 813 n.12 (5th Cir.

1976)).

> The *Kitchen*, supra court went on to hold that: "…Motions for attorney disqualification 'should be
> viewed with extreme caution for they can be misused as a technique of harassment...'" *Panduit
> Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1577 (Fed. Cir. 1984) (quoting *Freeman v.
> Chicago Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir. 1982)), *disapproved on other
> grounds by Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424 (1985).
>
> The *Kitchen*, *supra* court went further and held that a "…violation of the rules of professional
> ethics does not automatically necessitate disqualification of the attorney involved. *W.T. Grant Co.
> v. Haines*, 531 F.2d 671, 677 (2d Cir. 1976); *see also Meat Price Investigators Ass'n. v. Spencer
> Foods*, 572 F.2d 163, 165 (8th Cir. 1978). When determining whether an attorney should be
> disqualified due to a violation of DR 7-104, three competing interests must be considered: "1) the
> client's interest in being represented by counsel of its own choice; 2) the opposing party's interest
> in a trial free from prejudice due to disclosures of confidential information; and 3) the public's
> interest in the scrupulous administration of justice." *Meat Price Investigators Ass'n.*, 572 F.2d at
> 165…".

The Second, Eleventh, and Federal Circuits have held that the appearance of impropriety is

not ground for disqualification. *See, e.g.*, *Waters v. Kemp*, 845 F.2d 260, 265 (11th Cir. 1988). It

is considered "simply too slender a reed on which to rest a disqualification order except in the

rarest cases." *Board of Educ. v. Nyquist*, 590 F.2d 1241, 1247 (2d Cir. 1979).

Disqualification is therefore ordered in two situations, neither of which applies to the instant case: 1) where an attorney's conflict of interest undermines the court's confidence in the vigor of an attorney's representation; or 2) where an attorney is at least potentially in a position to use privileged information concerning the opponent gained through prior representation, thus giving his present client an unfair advantage. *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 836 F.2d 1332, 1336 (Fed. Cir. 1988); *Nyquist*, 590 F.2d at 1246.

The case of *Revise Clothing, Inc.* v. Joe's Jeans Subsidiary, Inc., 687 F. Supp. 2d 381, 8394 (S.D.N.Y. 2010) cited by Plaintiff was a trademark infringement case in which the plaintiff sought to disqualify defendant's counsel because the law firm had previously done work for the plaintiff on an unrelated matter. The court denied the motion to disqualify because there was no showing of a substantial relationship between the two matters nor was there a continuing attorney-client relationship between the law firm and the manufacturer. Neither the facts nor the rule of law in the *Revise Clothing, Inc.*, *supra* case have any relationship to the underlying facts of the case at bar.

In the case of *Kubin v. Miller*, 801 F. Supp. 1101, 1108-16 (S.D.N.Y. 1992) cited by Plaintiff, the defendants' lawyer had unique knowledge about the parties' decision to create a shareholder's agreement and personally drafted the agreements (which was the subject of the litigation). The plaintiff moved to disqualify the law firm representing the defendants because the (1) defendants' lawyer ought to be called as a witness on behalf of the defendants; (2) the law firm formerly represented the plaintiff in matters substantially related to this action; and (3) that its continued representation of the defendants would create an appearance of impropriety.

The facts in the case at bar bear no resemblance to the facts in *Kubin*, *supra* and the holding is therefore not relevant to Plaintiff's motion to disqualify.

The case of *Murray v. Metropolitan Life Ins. Co.*, 583 F.3d 173, 174-80 (2d Cir. 2009) cited by Plaintiff addresses disqualification when the attorney will be a witness. In the first instance, unlike both Plaintiff's counsel (Zhang and Wolfgram), neither Shayne nor Schrier has any first-hand knowledge of any issue in the case. The issue that Plaintiff is trying to argue is that Shayne could be a witness as to the fabrication of the 3-page Terms and Condition, which was published by Defendant after the case started. This, as set forth at length hereinabove, is a "red herring" in that both parties agree that the 3-page terms and conditions do not apply in this case.

In addressing the "Witness-Advocate Rule" the *Murray*, *supra* court held that Rule 3.7 lends itself to opportunistic abuse. "…Because courts must guard against the tactical use of motions to disqualify counsel, they are subject to fairly strict scrutiny, particularly motions" under the witness-advocate rule. *Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir. 1989). The movant, therefore,"…bears the burden of demonstrating specifically how and as to what issues in the case the prejudice may occur and that the likelihood of prejudice occurring [to the witness-advocate's client] is substantial." *Id.* "Prejudice" in this context means testimony that is "sufficiently adverse to the factual assertions or account of events offered on behalf of the client, such that the bar or the client might have an interest in the lawyer's independence in discrediting that testimony." *Id.* There is no dispute that the 3-page terms and conditions do not apply here.

**POINT III: THE CASES CITED BY PLAINTIFF FOR DISQUALIFICATION BY REASON OF "FRAUD ON THE COURT" DO NOT SUPPORT THE APPLICATION AND FACTUALLY THERE WAS NO FRAUD ON THE COURT**

In the case of *Shangold v. Walt Disney Co.*, 2006 WL 71672 at *9-15 (S.D.N.Y. Jan. 12, 2006) cited by the Plaintiff in support of its application for disqualification, the court held that:

"…Fraud on the court must be established by clear and convincing evidence. *See Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989); *Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425, 439 (S.D.N.Y. 2002); *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002). The Second Circuit, however, has "…long recognized that dismissal is a harsh remedy, not to be utilized without a careful weighing of its appropriateness . . . [and] repeatedly noted that one of the factors that should inform a trial court's decision is the suitability of lesser sanctions…" *Dodson v. Runyon*, 86 F.3d 37, 39 (2d Cir. 1996); *Cerruti 1881 S.A. v. Cerruti, Inc.*, 169 F.R.D. 573, 583 (S.D.N.Y. 1996). "…Because dismissal sounds the death knell of the lawsuit, district courts must reserve such strong medicine for instances where the defaulting party's conduct is correspondingly egregious..." *Aoude*, 892 F.2d at 1118 (internal quotation and citation omitted).

The *Shangold*, supra. court held that in determining the appropriate sanction for fraud on the court, courts in this district have considered:

"(1) whether the misconduct was the product of intentional bad faith; (2) whether and to what extent the misconduct prejudiced the other party; (3) whether there is a pattern of misbehavior, rather than an isolated instance; (4) whether and when the misconduct was corrected; and (5) whether further misconduct is likely to continue in the future." *McMunn*, 191 F. Supp. 2d at 446; *see also Scholastic, Inc.*, 221 F. Supp. 2d at 444. "When a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process, it can fairly be said that he has forfeited his right to have his claim decided on the merits." *McMunn*, 191 F. Supp. 2d at 445.

In the case at bar:

a. The production of the 3-page terms and conditions of service was not the product of intentional bad faith by Schrier or Shayne but rather a misunderstanding by Schrier, which was quickly remedied when discovered;

b. Both the 3-page terms and conditions given to Defendant by Shayne after he was retained in this lawsuit and the 1-page terms and conditions utilized by Defendant during the period April 2017 to August 2019 when Defendant performed customs brokers services contain a provision permitting Defendant to assert a general lien against the five (5) containers of cargo that are being held pursuant to Defendant's

lien rights. As a result, Plaintiff was not prejudiced in any way by the initial production of the "wrong" version of the terms and conditions of service;

c.  The production of the "wrong" version of the terms and conditions of service was an isolated incident;

d.  On Wednesday, April 28, 2022 the error of producing the "wrong" version of the terms and conditions of service was realized by Schrier (see Exhibit "J") and by Friday, May 6, 2022 the issue was corrected by advising the Plaintiff and producing the "correct" terms and conditions of service (Exhibit "L"). Thereafter on Monday, May 9, 2022 Defendant notified the Court of the mistake and identified the 3-page terms and conditions of service as provided to Defendant after the lawsuit started as not relevant to the issues in the case and produced the 1-page terms and conditions and identified which "version" was relevant and applicable to the issues in the case (Exhibit "M");

e.  Finally, there is absolutely no basis to believe that there will be any representations made by Defendant or her counsel that are untrue in the future.

By reason thereof, even if this Court views the production of the "wrong" version of

the terms and conditions of service as a "fraud on the court," based upon the foregoing,

Plaintiff's application for disqualification should be denied.

In the case of *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1117-21 (1st Cir. 1989) cited by

the Plaintiff, the court held that:

"…**"[F]raud on the court"** occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense. *See, e.g.*, *Alexander v. Robertson*, 882 F.2d 421, 424 (9th Cir. 1989); *Pfizer, Inc. v. Int'l Rectifier Corp.*, 538 F.2d 180, 195 (8th Cir. 1976); *England v. Doyle*, 281 F.2d 304, 309 (9th Cir. 1960); *United Bus. Commc'ns, Inc. v. Racal-Milgo, Inc.*, 591 F. Supp. 1172, 1186-87 (D. Kan. 1984); *United States v. Int'l Tel. & Tel. Corp.*, 349 F. Supp. 22, 29 (D. Conn. 1972), *aff'd mem.*, 410 U.S. 919 (1973).

In *Aoude*, *supra* the plaintiff concocted and backdated a bogus agreement with different

terms than the "real agreement". In the case at bar, the 3-page terms and conditions substantially

contained the same "general lien" provisions as the 1-page terms and conditions. Unlike the plaintiff in *Aoude*, *supra*, there was no "scheme calculated to interfere with the judicial system's ability to impartially adjudicate the case or to unfairly hamper the presentation…" of the Plaintiff's defense to Defendant's counterclaims.

In the case of *Pope v. Fed. Exp. Corp.*, 974 F.2d 982, 984-85 (8th Cir. 1992) cited by Plaintiff, similar to the facts in *Aoude*, *supra*, the plaintiff manufactured a document with the intent to mislead the court. In the case at bar, there was no such intent since both documents contained the same "general lien" provisions.

In the case of *Cent. N.Y. Laborers' Health & Welfare Fund v. Fahs Constr. Grp., Inc.*, 170 F. Supp. 3d 337, 343 (N.D.N.Y. 2016) cited by Plaintiff, the relevant document (a collective bargaining agreement) was a forgery, but the court found that no party had knowledge of the forgery nor relied upon the agreement in the case. [In the case at bar, before depositions were even held, during document discovery, the existence of the 1- page terms and conditions that was applicable to the issues in the case came to light and no party was thereby prejudiced.] The court held that:

> "…The essence of fraud on the court is 'when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process." *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 393 (S.D.N.Y. 2010) (quoting *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002)). "Fraud on the court, therefore, does not merely 'embrace any conduct of an adverse party of which the court disapproves;' rather, it 'embrace[s] only that species of fraud which does[,] attempts to defile the court itself." *Id.* at 394 (quoting *Kupferman v. Consol. Rsch. & Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972)).

## CONCLUSION

It is respectfully submitted that the facts in this case do not rise to the level of the definition of "Fraud on the Court" as defined by the cases cited by Plaintiff in support of its application to disqualify. The initial production of the 3-page terms and conditions was merely a mistake by Attorney Schrier, as described above, and corrected as soon as the mistake was realized. Nothing "nefarious" was intended by Shayne when he provided Defendant with a copy of the updated 3-page terms and conditions which was placed on Defendant's website. Further, as a practical matter, the provision that concerns the issues in this case, to wit: the "General Lien" provision, appears in both versions. Therefore, logically, neither Defendant nor Defendant's counsel had or could have an "ulterior motive" to produce the "wrong" version of the terms and conditions of service to enhance its chance of being successful in this case.

By reason thereof, it is respectfully requested that this Court deny Plaintiff's application to disqualify Defendant's counsel and for such other and further relief as to this Court may seem just and proper.

Respectfully submitted,

Shayne Law Group

*/s/ William Shayne*
By: William Shayne, Esq.
Attorneys for the Defendants
64 Fulton Street, Suite 1000
New York, New York 10038
212-566-4949