M5QHAmeC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  AMERIWAY CORPORATION,

4              Plaintiff,

5         v.                          19 Civ. 9407 (VSB)

6  MAY YAN CHEN, et al.,

7              Defendants.
                                      Telephone Conference
8  ------------------------------x
                                      New York, N.Y.
9                                     May 26, 2022
                                      11:00 a.m.
10
   Before:
11
                   HON. VERNON S. BRODERICK,
12
                                      District Judge
13

14                      APPEARANCES

15 PETER SCOTT WOLFGRAM
        Attorney for Plaintiff
16      -and-
   STRATUM LAW LLC
17      Attorneys for Plaintiff
   BY:  XIYAN ZHANG
18
   SCHRIER, FISCELLA & SUSSMAN, LLC
19      Attorneys for Defendants
   BY:  RICHARD ERIC SCHRIER
20      -and-
   SHAYNE LAW GROUP, P.C.
21      Attorneys for Defendants
   BY:  WILLIAM C. SHAYNE
22

23

24

25

1           (The Court and all parties present remotely)

2           THE COURT:  If we could go on the record, and I could

3    ask, beginning with plaintiff's counsel, if you could please

4    identify yourself for the record, and then defense counsel.

5    And please remember thereafter to state your name first before

6    you speak so that we can make sure that we have an accurate

7    record.

8           For the plaintiff?

9           MR. WOLFGRAM:  Pete Wolfgram, counsel for plaintiff.

10          MR. ZHANG:  Xiyan Zhang, counsel for plaintiff.

11          MR. SCHRIER:  Richard Schrier, counsel for defendant.

12          THE COURT:  All right.

13          MR. SHAYNE:  William Shayne, counsel for defendant.

14          THE COURT:  OK.  Thank you.

15          So this matter is on for a conference with regard to

16   defendant's letter to seek leave to file a motion to disqualify

17   plaintiff's counsel.  Let me ask, is the status quo still the

18   same as it was in connection with the letters that have been

19   exchanged?

20          MR. SCHRIER:  Yes, your Honor.  This is Richard

21   Schrier.

22          Yes, your Honor.  Nothing's changed.

23          THE COURT:  Is that consistent with your understanding

24   from plaintiff's counsel, Mr. Wolfgram?

25          MR. WOLFGRAM:  Your Honor, we also request leave to

1   file a motion to qualify defendant's counsel for the reason

2   stated in our response.

3           THE COURT:  Let me ask the following:  With regard,

4   first, to defendants' motion, which I assume is based on the

5   witness advocate rule, is that correct?

6           MR. SCHRIER:  This is Richard Schrier again.

7           Yes, it's based upon the witness advocate, but also in

8   this case Mr. Zhang for sure -- and we've been looking through

9   our records.  We think Mr. Wolfgram may come under this.

10  Mr. Zhang is actually the client himself.  He owns the -- at

11  least the major shareholder in the Ameriway Corporation, is the

12  main officer of the company.  I believe he's the president of

13  the company.  And we think that under all those circumstances

14  it's -- even for pretrial proceedings we think it's

15  inappropriate for Mr. Zhang, and he's the one who's really done

16  most of the interaction or had most of the interaction with our

17  client, Ms. Chen.

18          THE COURT:  Let me ask this:  The case has been

19  pending since 2019.  Based upon what you said, you've known

20  that Mr. Zhang held that position, isn't that right?

21          MR. SCHRIER:  Actually, no.  We've gotten some

22  documentation, but there's things that have happened more

23  recently that has brought this to the fore.  Specifically,

24  there's some issues that we didn't really care about, and we

25  knew that he -- at least we believed he was the principal of

1    the company.  A number of months ago we got the shareholders

2    agreement where we saw what we saw, which we identified to the

3    Court, but what's happened is this, Judge:  There's been two

4    main issues in the case.  One is really come to the fore now.

5    One of them is that we think that the plaintiff is not the

6    proper party to bring the action because the -- our client, for

7    all the import of the containers of cargo, was with a company

8    by the name of Eagle Trading U.S.A., LLC, which Mr. Zhang also

9    happens to be the principal of, and he signed the power of

10   attorney allowing my client to act as the customs broker as the

11   COO of Ameriway.  However, in the power of attorney, there's a

12   provision that specifically states that the parties have read

13   the terms and conditions that were applicable to the power of

14   attorney.  The terms and conditions -- and the defendant has

15   more recently taken the -- I'm sorry, the plaintiff has taken

16   more recently the position that they never received a copy of

17   the terms and conditions.

18        The reason why that's important is that when the

19   plaintiff -- actually, when Eagle Trading was owed

20   approximately $400,000 of unpaid fees for services and it also

21   included moneys that were advanced for custom duties and

22   out-of-pocket expenses for supply chain expenses, such as

23   trucking, etc., we -- my client exercised her lien rights

24   against those five containers, and we're still holding those

25   containers, or the cargo of those containers actually works out

1  now, in a New Jersey warehouse.

2        We have a specific lien against that because we are

3  holding those goods, and the importer of record, Eagle, did not

4  pay the moneys that were owed specifically on those items.  But

5  we also -- in the terms and conditions, there's a specific

6  provision that allows us to have a general lien over those

7  goods as well, which would then permit us to exercise our

8  rights and get payment for the full amount of money that was

9  owed for the various other containers that were cleared and

10  released to the -- into the possession of the importer of

11  record, which is Eagle.

12        Ameriway is in this case because their claim is that

13  they paid all the bills that were issued to Eagle and

14  Mr. Zhang, as it works out, and that was true.  Those that were

15  paid, we know that they -- that Eagle did -- I'm sorry,

16  Ameriway did make those payments, and they take the position

17  that it was their -- as a logistics company, that was their

18  job, but it's now become very relevant as to the -- whether the

19  terms and conditions were actually given to Eagle and/or

20  Ameriway, for that matter, in this case, and also Mr. Wolfgram

21  countersigned the power of attorney as not only the attorney

22  but as an officer of Eagle and made representations that the --

23  in the signed power of attorney, which no one disputes that was

24  signed, that the members of the Eagle had the authority to

25  enter into this power of attorney agreement with Ms. Chen, the

1    customs broker, the defendant in this case.

2           Based on that, it's become such a sharp issue we feel

3    it's inappropriate for either Mr. Wolfgram, but particularly

4    Mr. Zhang, to continue as counsel in this case, and that's

5    basically the crux of why we asked to make this motion.  We

6    haven't had depositions yet, and we've basically done pretty

7    much the tail -- we may have a few minor things, but,

8    basically, the exchange of documentation is complete virtually

9    complete, and we're actually at the deposition stage, and then

10   after that we'll be doing the discovery with regard to experts.

11          At this point I think it's critical that the two

12   attorneys not be representing the defendant -- the plaintiff,

13   Ameriway, in this case.

14          THE COURT:  Let me ask -- well, let me just go back to

15   my original question, because my understanding of what you said

16   is that your client's main interaction was Mr. Zhang, with

17   Mr. Zhang, is that not accurate?  Isn't that what you said?

18          MR. SCHRIER:  Well, actually, we've been going through

19   the records since last week on this, and we believe -- and we

20   won't know for sure until we take the depositions -- but we

21   believe that Mr. Wolfgram was also involved in some of the

22   day-to-day operations that involved the issues in the case.

23   There's -- Mr. Wolfgram has utilized --

24          THE COURT:  Counsel.

25          MR. SCHRIER:  I'm sorry.

1          THE COURT:  Counsel, I apologize for interrupting, but

2     my question was I thought you had said that our client had

3     interactions, her main interaction, was with Mr. Zhang.  I'm

4     not saying that that doesn't preclude that some other person,

5     Mr. Wolfgram or somebody else, wasn't also personally involved

6     in some of the underlying incidents, but I'm trying to get to

7     just to confirm what I thought I heard.

8          MR. SCHRIER:  Yes, that was correct, that the main

9     critical issues were definitely interacted -- interactions with

10    Mr. Zhang.

11         THE COURT:  OK.  All right.  Let me ask Mr. Wolfgram,

12    Mr. Zhang, first, are there any other -- assuming, again, and

13    I'm not weighing in, but assuming that defendant wishes to take

14    your depositions, are there other attorneys in your firm who

15    could represent or be there as counsel for your client?

16         MR. WOLFGRAM:  Your Honor, this is Pete Wolfgram for

17    plaintiff.

18         It's just the two of us in our firm right now that I

19    know that could take these depositions.

20         THE COURT:  OK.  Let me also ask with regard to the --

21    again, I'm not weighing in -- but with regard to what

22    Mr. Schrier has said, is there a potential conflict between

23    yourself, Mr. Wolfgram, and Mr. Zhang, and your client?

24         MR. WOLFGRAM:  Your Honor, I don't see a potential

25    conflict, at least with respect to me.  Everything that I know

1    Mr. Zhang knows.  He's the CEO of the company.  So -- and

2    Mr. Zhang represents the entire company.  I don't know how a

3    conflict would arise there.

4         THE COURT:  Let me ask -- and, again, I don't know the

5    exact specifics, but Mr. Schrier seemed to be indicating that

6    there were certain documents signed either by yourself or

7    Mr. Zhang which indicated that certain other documents were

8    reviewed.  I assume those documents were signed on behalf of

9    your client in some form and that there is now a claim that

10   certain underlying terms and conditions weren't reviewed

11   despite signatures that might, I think the argument Mr. Schrier

12   is making, might suggest that they were, in fact, reviewed.

13        Again, does that present an issue if there was a

14   signature that indicated that something had occurred and it

15   actually hadn't, which could impact your client?

16        MR. WOLFGRAM:  Your Honor, this is Pete Wolfgram

17   again.

18        The document that Mr. Schrier's referring to, the

19   terms and conditions of service, it is our position, it's

20   Mr. Zhang's position, that this document never existed.  The

21   power of attorney, the single-page power of attorney form which

22   references the terms and conditions of service, but we believe

23   that's boilerplate, standard boilerplate, and we never received

24   any terms and conditions.  And Mr. Zhang will testify to that.

25   So there's really nothing we can testify, that any of our

1    clients signed any other terms and conditions or reviewed any

2    other terms and conditions because they didn't exist.  And this

3    would relate to our request to file a motion against

4    defendants' counsel to get disqualified because it came to

5    light quite recently that the defendants' counsel actually

6    drafted the terms and conditions of service document for their

7    client, quoted specific language in it, and then filed that

8    document with the court from November 2 of last year to March

9    of this year on five separate occasions.

10         So there is an issue of -- our position is that there

11   are no terms and conditions attached to the power of attorney

12   granting any lien rights to defendant.  It is also our position

13   that defendants' counsel worked with their client to create or

14   fabricate this document for litigation.  Further, now they're

15   asserting a new document.  Once we had discovered that

16   Mr. Shayne, defendants' counsel, created this document, it took

17   us a long time to wrangle it out of him, but as of May 6, three

18   weeks ago, he admitted that he did create the document.  Now

19   they're alleging that's not the document that their client

20   used.  They used another document, a prior document.  And they

21   pulled another document out of their hat, so to speak, and now

22   they're asserting that document.

23         So I don't believe, from our end, that there is any

24   conflict because there simply are no terms and conditions that

25   we reviewed.  We've -- oh, go ahead, sir.

1    THE COURT:  The one question I have is, again, the

2    power of attorney that the parties are talking about, did it

3    reference another document called "Terms and Conditions"?

4    MR. WOLFGRAM:  It said that the grantor acknowledged

5    receipt of the terms and conditions of service, but there were

6    none -- no terms were sent.  There were none on her website.

7    And for the record, your Honor, that document, it says,

8    plaintiff acknowledged receipt -- I'm sorry, that Eagle

9    acknowledged receipt of the terms and conditions of service,

10    and then defendants produced or created for this litigation a

11    document entitled "Terms and Conditions of Service" that was

12    actually -- that actually did not exist until two years after

13    the contract date.  So that language in the power of attorney

14    is impossible that -- obviously, we can't receive a document

15    that didn't exist.

16    THE COURT:  Let me ask just a follow-up with regard to

17    you saying that document was created two years later.  Is that

18    something you know because you looked at metadata looking at

19    the underlying document?  What is the basis for that statement?

20    MR. WOLFGRAM:  Yes, your Honor.  First, Mr. Shayne,

21    who's on the call today, he created the document, and he admits

22    that he created it after the contract date.  But I had to piece

23    together the story bit by bit through electronic evidence.

24    They produced this document, the terms and conditions of

25    service document, for the first time on November 2 of last year

1    in a letter to Magistrate Judge Freeman.  Prior to that point,

2    defendants had been asserting a general lien, but they did not

3    state any specific or general lien terms or produce any

4    supporting documentation.  So we were naturally wondering where

5    their lien was coming from.  They finally produced it in

6    November of last year.

7           The document I found was exactly like another document

8    online used by a nonparty customs broker called HW St. John.

9    So we suspected the authenticity of defendants' terms and

10   conditions of service document, number one, because of the

11   belated production and, second, because it was exactly like

12   another document.  And through the metadata analysis of that

13   document, the document the defendants copied, I found out that,

14   number one, that document was not created until 2018, and it

15   was not published until 2019.  Then I went back again and

16   looked deeper into the metadata, and I found that Mr. Shayne

17   actually created that document for this nonparty.

18          So then I linked it back to Mr. Shayne.  I issued a

19   deposition notice for him.  I publicly -- I went on the record

20   with Magistrate Judge Freeman, and I said I think that the

21   defendants have fabricated critical evidence here, and they're

22   not being truthful in their discovery responses.  And then I

23   requested a privilege log.  In our interrogatories, which were

24   issued early February before I found out that Mr. Shayne had

25   created this document, I specifically asked who worked on this

1    document, and he did not -- he did not admit to working on the

2    document, to creating the document.  Then, finally, after we

3    put some pressure on him, he admitted just three weeks ago

4    that, yes, he did create this document.  But, in fact, now

5    they're claiming it's not the real document that their client

6    was using.  They were using a prior version of the terms and

7    conditions, and now that's the document that they're asserting

8    in this case.  And we believe that document is also fabricated.

9         So we believe that defendants, just by virtue of

10   creating a critical document in this case, and they have

11   personal knowledge of that, obviously, because they created it

12   and they filed it with the court on five separate occasions and

13   cited specific language from their own document in support of

14   their client's claims and defenses, that they are subject to

15   disqualification.

16        But, again, from our point of view, we never received

17   any terms and conditions of service prior to November 2 of last

18   year.  So I don't believe there's any conflict on our end, but

19   I can't say the same for defendant's counsel.

20        THE COURT:  All right.  Let me ask, Mr. Schrier, is

21   there evidence in the record that terms and conditions were

22   transmitted to someone at either plaintiff or at Eagle?

23        MR. SCHRIER:  Actually, Judge, that's exactly the --

24   where we are with the discovery, but I need to -- if I may?

25        THE COURT:  Yes.

1          MR. SCHRIER:  This is really a red herring, and

2     it's -- Mr. Wolfgram has created this whole scenario and is

3     advancing it, but it's a simple situation.

4          Ms. Chen, before going into business herself in 2012,

5     worked for another customs broker.  In the normal course of

6     business, a customs broker needs to have a power of attorney

7     signed, as you probably know, to be able to represent someone

8     at the customs on their behalf.  And with that there are terms

9     and conditions.  Ms. Chen used the form that was used by her

10    employer when she opened up her own business after receiving

11    her license as a customs broker.  She'll be testifying, and

12    we've said as an offer of proof, that her -- that she got that,

13    gave it to a local printer, they printed up the forms for power

14    of attorney and the terms and conditions, and it was one-page

15    terms and conditions.

16         Mr. Shayne is -- his specialty is international

17    import/export law.  He's been working in this field for 30,

18    almost 40 years, I think, and whenever -- and we represent

19    quite a number of customs brokers.  In the normal course of

20    Mr. Shayne's business, he keeps abreast of the continuing

21    decisions related to customs brokers and the import of

22    products, and as a result what he's done over the years, in the

23    normal course of his business is he updates the terms and

24    conditions.  Whenever he gets a new client, he doesn't even

25    bother looking at the terms and conditions they use because it

1   doesn't matter.  He just says:  Here's the new one.  Start

2   using it.  And he's known in the field to be an expert in this

3   area.

4            When Mr. Shayne was first retained by Ms. Chen, which

5   was after the summons and complaint was filed in this case, he

6   did precisely what he did with all his other clients and said:

7   Here's the new terms and conditions.  Start using it.  And they

8   started using it, put it on their website.

9            The terms and conditions that Mr. Wolfgram is saying

10  were fabricated by Mr. Shayne, yes, they were fabricated by

11  Mr. Shayne, and they were given to the client after this case

12  started.  It has nothing whatsoever to do with the issues in

13  this case.  The issues in this case revolve around the initial

14  one.

15           Now, with regard to the specific question, at the last

16  conference that we had with the magistrate judge, which was

17  earlier this week, the magistrate judge asked us to go back and

18  ask our client to see if he could find -- backtrack for a

19  second.  I'm sorry.

20           They asked for the identity of all the clients who

21  we've previously given these terms and conditions, as we claim

22  that they were sent the terms and conditions, and they claim

23  they were not.  That's the key issue.  So with all the

24  discussion by Mr. Wolfgram, there is a sharp issue.  They say

25  they didn't get it; we say they did.  It's a sharp issue, and

1  the issue is important because the terms and conditions, both

2  of them, by the way, the ones that are updated and the one that

3  Ms. Chen started using 12 years ago, have a provision that says

4  that any money that's owed is subject to a general lien.

5  Different wording a little bit, but it's basically the same

6  concept that's in both.

7           And so the magistrate judge asked us to go back to our

8  client and see if she can either find any kind of proof that it

9  was sent to either the client or any other client and also

10  speak to whatever clients.  There's a provision of the CFR that

11  prohibits a customs broker from providing the identity of any

12  of their other clients to anyone else, and we've cited that as

13  a privilege.  But as a compromise, what we've done is we've

14  agreed to ask our various clients, various clients of Ms. Chen

15  if they would agree to identify who they are so they have -- so

16  that plaintiff can question them about it.  We've gotten a

17  positive response from five of those people.  I don't know how

18  many people she asked, but we've gotten a positive response

19  from five of those.  We have waivers that I'm waiting to have

20  come back so that they waive their -- the confidentiality

21  rights, and then we're going to provide the names to these --

22  we're trying it in that respect.

23           So to answer your question specifically, we're in the

24  middle of doing precisely what you just asked to see if we can

25  provide them documentation that it was done with other clients,

1    other customers of Ms. Chen, and additionally, anything we can

2    show that shows the transmission.  We don't believe there was

3    an email transmission.  What I think there was was a fax

4    transmission, but I don't know that for a fact yet.  I don't

5    want to make that representation until we get more information.

6    We're trying to go through their records to see what they have

7    in that regard.

8            But regardless of that, that's the -- that's our view

9    of the world, that's their view of the world, but the issue

10   that we have right now is whether there's a conflict, and

11   despite what Mr. Wolfgram said, there is a clear, sharp

12   conflict because, as Mr. Wolfgram said, in the power of

13   attorney that was signed by Mr. Zhang and countersigned by

14   Mr. Wolfgram, it says specifically, and I'm reading it:

15   "Grantor acknowledges" -- grantor being the -- Mr. Zhang on

16   behalf of the company -- "Grantor acknowledges receipt of May

17   Y. Chen, d/b/a Ability Customs Brokers, terms and conditions of

18   service governing all transactions between the parties."

19           So these are two lawyers that both signed this, and

20   our position is they must have seen it, or why would they sign

21   something like that?  And if they want -- if we get to a jury,

22   it's going to be a question of fact as to whether they received

23   it or not.  They say they didn't; we say they did.  There's --

24   the trier of fact is going to make that determination.  But

25   that has become a sharp issue in this case, and as a result of

1  that, we believe that there's a conflict with both Mr. Wolfgram

2  and Mr. Zhang because both of them signed this document, and

3  it's critical in this case.

4        THE COURT:  All right.  Anything else, Mr. Wolfgram,

5  Mr. Zhang?

6        MR. WOLFGRAM:  Yes, your Honor.  This is Pete

7  Wolfgram.

8        I just want to circle back to Mr. Schrier's comments.

9  He's basically saying that his colleague, Mr. Shayne, updated a

10  document for his clients that he never saw before, and that he

11  created a document and cited specific language from his own

12  document on five separate occasions in support of his client's

13  lien defense.  Yet last conference, last -- on Monday with

14  Judge Figueredo, Mr. Schrier said that his staff made a mistake

15  and filed the wrong version of the terms and conditions of

16  service.  That he should have -- that they meant to file the

17  other version that they're now asserting.  But that is

18  implausible because defendants' counsel cited specific language

19  from a document that they created and then signed their name

20  and attached it to the pleadings and letters.  That's not a

21  clerical mistake; that's an intentional decision to base claims

22  on a document, a specific document.

23        Mr. Schrier is also saying that they have no

24  electronic evidence supporting any evidence of use, emails or

25  records, that they used this document prior to 2017, the

1  contract date.  We're going -- 2017 is not that long ago, as

2  Judge Figueredo pointed out.  All the correspondence that

3  defendant Chen had with plaintiff was through emails.  We have

4  thousands of emails, and she sent the 2017 single-paged power

5  of attorney form by email in April of 2017.

6         So there are a lot of issues here that we, you know,

7  respectfully request to brief this and lay it out in full to

8  the Court, and it does put defendants' counsel squarely in the

9  middle of a critical issue of fact.  That's all I have on that.

10         THE COURT:  All right.

11         MR. SHAYNE:  Your Honor, this is William Shayne.  May

12  I chime in on this a minute?

13         THE COURT:  Yes.  Go ahead, Mr. Shayne.

14         MR. SHAYNE:  OK.  There are fairly standard terms and

15  conditions which are used by customs brokers, and they've been

16  in fairly consistent use, with slight variations, since at

17  least the 1970s, and everybody uses the same basic ones.  The

18  National Customs Brokers Association issues updated versions

19  sometimes every few years, sometimes once a decade, right?  So

20  what happens is when new ones come out, sometimes those are

21  given out to various import clients.  And we, as all the

22  attorneys in this field, will basically distribute those and

23  make those available to their clients.  OK?

24         The customs broker in this case was using an older

25  version.  We don't have to review their old versions to know

1   that they're not up to date.  So we just routinely give them

2   basically camera-ready artwork of the more recent things.  The

3   fact is the terms and conditions that we gave them are based

4   upon a version that was issued by the National back in 2013,

5   the most recent ones that were given.  It's up to them what

6   they do with it in terms of posting it.

7           But what has remained fairly consistent, varying only

8   a little bit by language, are certain basic premises within all

9   of those terms and conditions, going back again to the 1970s,

10  was a broker's right to a general lien.  But the reason that

11  those contracts, in terms of which ones you want to look at, in

12  my view, are a red herring is because the right of a specific

13  lien was not by contract.  OK?  The right of the specific lien

14  comes basically under common law.  And the five containers that

15  are at issue, those liens were specific liens under common law,

16  not under the terms and conditions.  And regardless of which

17  one, OK, it wouldn't affect the general -- the basic language

18  of a common law lien holding possession for things that were

19  services that were not paid for.  That's why we look at that

20  some of as a red herring.

21          THE COURT:  All right.  Thank you.

22          This is what I'm going to do:  At this stage I'm going

23  to take it under advisement, and I'm going to issue a short

24  order indicating whether I'm going to grant briefing with

25  regard to both parties' intended motion, as well as I'm going

1  to -- because, obviously, there's been some water under the

2  bridge previously before Judge Freeman and then, more recently,

3  before Judge Figueredo who inherited the case from Judge

4  Freeman when Judge Freeman retired.  So I'm going to issue an

5  order.  It will either hit the docket later today or tomorrow.

6          Let me ask, without indicating one way or the other,

7  had the parties at all discussed any briefing schedules with

8  regard to their intended motions?

9          Mr. Wolfgram?

10          MR. WOLFGRAM:  No, your Honor, we have not.

11          THE COURT:  Mr. Schrier?

12          MR. SCHRIER:  No, we have not, Judge.

13          THE COURT:  All right.  So let me do some thinking on

14  this, and I'll issue an order shortly with my decision.

15          Let me ask, with regard to discovery, my understanding

16  is there's still some paper discovery ongoing, and the parties

17  have not yet started depositions.

18          Is that accurate, Mr. Wolfgram?

19          MR. WOLFGRAM:  Yes, it is, sir.

20          THE COURT:  Mr. Schrier, is that consistent with your

21  understanding?

22          MR. SCHRIER:  I agree, yes, that's consistent.

23          THE COURT:  Have any notices of deposition been

24  issued, Mr. Wolfgram?

25          MR. WOLFGRAM:  Yes, your Honor.  To defendant Chen and

1    to attorney Shayne.  We plan on also issuing one to attorney

2    Schrier.

3            THE COURT:  OK.  From defendants' perspective,

4    Mr. Schrier, have any notices been issued by the defense?

5            MR. SCHRIER:  Yes.

6            THE COURT:  All right.  I will, as I said, take it

7    under advisement, and I'll issue an order to the parties

8    indicating what the next steps will be.

9            Let me ask Mr. Wolfgram, is there anything else that

10   we should take up today?

11           MR. WOLFGRAM:  Yes, your Honor.  There's one other.

12   In the third-party action, we filed a 12(b)(6).  The defendants

13   filed kind of a hybrid motion.  They filed a response as well

14   as a request for summary judgment.

15           THE COURT:  Yes.

16           MR. WOLFGRAM:  So we don't know -- we're kind of

17   confused about our deadline for that one, if it's two weeks or

18   seven days.

19           THE COURT:  Well, with regard to the summary judgment,

20   and this is going to hit the docket anyway in light of the

21   current posture of that case and this case, quite frankly,

22   under the federal rules, it's my understanding that a certain

23   amount of discovery -- the adversary would be entitled amount

24   of discovery before summary judgment could be filed.  So I've

25   denied that request for summary judgment at this stage, and

1   that endorsement should hit the docket later today or, at the

2   latest, tomorrow.

3           So with regard to any timing, you don't have to be

4   concerned because I've denied the motion at this stage.  OK?

5           MR. WOLFGRAM:  OK, your Honor.

6           THE COURT:  All right.

7           MR. SCHRIER:  Judge, there's something I would like to

8   add, if I could.

9           THE COURT:  Yes.  Who is --

10          MR. SCHRIER:  I'm sorry.  Richard Schrier, the

11  defendant in this case.

12          I know the Court's aware that Ms. Chen has instituted

13  an action against Eagle -- eagle's not part of the Ameriway

14  case, as you know -- and against Mr. Zhang, and there's been a

15  12(b)(6) motion made with regard to that.  We've just responded

16  to that the other day, and there's going to be a reply, I

17  assume, the next week or two.  And in this case, the Ameriway

18  case, we have a motion to reargue the prior order of the Court,

19  and that's still pending.

20          The only thing I would ask and request is that the

21  12(b)(6) motion in the Chen v. Eagle case be heard and decided

22  simultaneously with the motion to reargue in this case.

23          THE COURT:  OK.  When you say "reargue," is it a

24  motion for reconsideration?  What --

25          MR. SCHRIER:  Yes.

1    THE COURT:  I apologize.  I just have not --

2    MR. SCHRIER:  Yeah.  What happened, just to be brief

3  about it, there was a motion to dismiss the third-party

4  complaint, and that was against Eagle and Mr. Zhang.

5  Mr. Shayne -- there was discovery -- very extensive discovery

6  disputes at the time, and Mr. Shayne had sent a request to the

7  Court to have a briefing schedule because all the plaintiffs in

8  the case -- I'm sorry, the third-party defendants in the case

9  represented by defense counsel had raised these issues but had

10  only served a memo of law as a motion, not a notice of motion

11  with any return date.  So Mr. Shayne asked for a briefing

12  schedule.  And because of the dispute with discovery, you had

13  ordered that we file a joint letter identifying all the

14  outstanding disputes, which was done, I believe, February 5, I

15  believe, of 2020 -- '21, I'm sorry.  And subsequent to that,

16  you assigned the case to Magistrate Judge Freeman who was

17  handling all the discovery.

18    You know, she's done actually a good job.  She was

19  really great.  But that was hanging out there, and you had

20  issued an order dated December 27, if my memory's correct, of

21  2021, saying that the motion to dismiss the 12(b)(6) motion was

22  granted without opposition.  And we, of course, had opposition,

23  because we think we have a good, meritorious claim for the

24  money that's owed for the work performed and money advanced,

25  and we've made a motion to reargue that decision and ask that

1    we -- that the motion, the 12(b)(6) motion, be decided on the

2    merits.  And they've now made pretty much the same motion,

3    12(b)(6) motion, in this case which alleges basically the same

4    things that was alleged in the third-party complaint, and we're

5    opposing it, obviously.

6          So we're asking that both the motion to renew and

7    reargue and this motion now be heard simultaneously because

8    it's the same things, except in this case the complaint was

9    much more -- was more extensive to the extent that all the

10   backup documentation proving the meritorious claim was the

11   annexed as exhibits to the complaint.  They were not annexed to

12   the exhibits in the third-party complaint, and therefore, we

13   just ask that it be decided on the merits, that's all.

14         THE COURT:  All right.  Well, again, I haven't focused

15   on this, but I don't have a problem with simultaneously ruling

16   on the 12(b)(6) motion in the other case and whatever motion

17   has been made here, whether it's -- again, I'm not sure if it's

18   for reconsideration or exactly what the legal -- you say

19   "reargument," but I'm not sure what that legal basis is.  But

20   in any event, I will decide them together in light of what

21   appears to be overlap in the issues.

22         MR. SCHRIER:  Right.  Just to add to it, I don't want

23   to speak for the -- for Mr. Wolfgram and Mr. Zhang in this, but

24   they're essentially in this case, in the Chen case, basically

25   arguing *res judicata*, collateral estoppel argument that because

M5QHAmeC

1  of the dismissal without opposition, that produced an order of

2  the court, and therefore this case is no longer viable because

3  of the prior decision.  That's why it's important for them to

4  be heard together.

5          THE COURT:  All right.  As I said, I don't -- I think

6  that that will be fine, and I don't know whether -- is the

7  briefing on the case that's currently -- that's here for

8  reargument, or however it's styled, is that fully briefed?

9          MR. SCHRIER:  The case -- in the Ameriway case, that

10  motion has been fully briefed and submitted.  The one that's --

11  I'm sorry?

12          THE COURT:  Waiting on mine in the 12(b)(6)?

13          MR. SCHRIER:  Correct.

14          THE COURT:  All right.  Thank you.

15          All right.  Anything else, Mr. Wolfgram?

16          MR. WOLFGRAM:  No, your Honor.  Appreciate it.

17          THE COURT:  All right.  Mr. Schrier, anything else?

18          MR. SCHRIER:  No.  We appreciate the Court's time.

19  Thank you so much.

20          THE COURT:  OK.  Thank you very much, everybody.

21  We'll stand adjourned.  Please, everyone, stay safe.

22          (Adjourned)

23

24

25