**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**Ameriway Corporation**

                              Plaintiff,

              v.

**May Yan Chen**,                              **19-cv-09407 (VSB) (VF)**
**Ability Customs, Inc**.,

                              Defendants.


**PLAINTIFF'S BRIEF IN SUPPORT OF ITS SECOND MOTION FOR DEFAULT
JUDGMENT, DISMISSAL, AND ATTORNEYS' FEES FOR FRAUD ON THE COURT**

**TABLE OF CONTENTS**

I.   INTRODUCTION…………………………………………………………………………1

II.  FACTUAL BACKGROUND: CHEN AND COUNSEL
     SUCCESSIVELY ASSERTED TWO LIEN DOCUMENTS TO THE COURT……….…..2

     A. Chen and Counsel Presented the First Lien
        Document (the "TCS") to the Court……………………………………………....2

     B. Ameriway Discovered that Chen's Counsel Fabricated the TCS………………..….…4

     C. Chen and Her Counsel Asserted the Second
        Lien Document (the "94 Terms") to the Court..…………………………………….…5

III. ARGUMENT:  CHEN AND HER COUNSEL INTENTIONALLY SUBMITTED
     THIRTEEN FABRICATED EMAILS TO JUDGES FIGUEREDO AND
     BRODERICK TO SUPPORT THE FALSE '94 TERMS LIEN DOCUMENT…...………….6

     A. Chen and Counsel Deliberately Submitted the First Set
        of Fabricated Emails to Judge Figueredo in August 2022……………………..…….7

     B. Chen and Counsel Deliberately Submitted the Second Set
        of Fabricated Email Printouts to Judge Broderick in January 2023……………….…..11

     C. PCC Logistics's Original Email Files Conclusively Prove
        that Chen and Counsel Fabricated the Printouts…………………………………………12

IV.  TERMINATING SANCTIONS ARE NECESSARY
     TO PROTECT THE INTEGRITY OF THE COURT…………………………..…………16

     A. Sanctions Pursuant to Fed. R. Civ. P. 11………………………………….…………16

     B. Sanctions Pursuant to 28 U.S.C. §1927…………………………………….…………..17

     C. Sanctions Pursuant to the Court's Inherent Powers……………………….……..18

     D. Chen and Her Counsel Deliberately Presented the Fabricated TCS to the Court………..19

     E. Chen Fabricated the '94 Terms and Email Printouts to Cover for the False TCS……….25

CONCLUSION……………………………………………………………………………..26

# TABLE OF AUTHORITIES

**Cases**

*Lawrence v. The City of New York*,
No. 15-cv-8947, 2018 WL 3611963, at *6 (S.D.N.Y. July 27, 2018)…………………...…6, 26

*Fin. Mgmt. Grp. v. Parson Ctr. Pharm., Inc.*, 432 F. App'x 25, 25 (2d Cir. 2011)…………..…6

*Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425 (S.D.N.Y. 2002)………………………………7

*Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989)…………………………...…7

*W.K. Webster & Co. v. Am. President Lines, Ltd.*, 32 F.3d 665, 670 (2d Cir.1994)…………..…16

*Constr. Corp. v. City of N.Y.*, 762 F.2d 243, 254 (2d Cir. 1985)……………………………. …..…16

*Sec. & Exch. Comm'n v. Smith*, 798 F. Supp. 2d 412 (N.D.N.Y. 2011)…………………...…17

*Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir.2000)……………………………………………17

*Milltex Indus. Corp. v. Jacquard Lace Co.*, 55 F.3d 34 (2d Cir.1995)…………………………17

*Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 148 n.5 (2d Cir. 2012)………………..……17

*Rossbach v. Montefiore Medical Center*,
No. 19 Civ. 5758 (DLC), 2021 WL 3421569 at *1-*3 (S.D.N.Y. Aug. 5, 2021)……………17,18

**Statutes**

Fed. R. Civ. P. 11……………………………………………………………………16, 17

28 U.S.C. § 1927……………………………………………………………………… …17, 18

III

## I. INTRODUCTION

Plaintiff Ameriway Corporation ("Ameriway" or "Plaintiff"), by and through its undersigned counsel and in accordance with the applicable Federal Rules of Civil Procedure, hereby files this Second Motion for Default Judgment, Dismissal, and Attorneys' Fees against May Yan Chen and Ability Customs Brokers, Inc. ("Chen" or "Defendants") and her counsel William Shayne and Richard Schrier. Chen, assisted by her counsel, submitted two set of email "printouts" to the Court in August 2022 and January 2023 as substantive evidence to support a critical lien document related to the five cargo containers at the center of this case. However, evidence from the official U.S. Customs Border and Protection ("CBP") agency website and independent, third-party sources conclusively establish the email printouts are fabricated.

This is the **second** false lien document Chen has submitted to the Court. She initially relied on a document titled "Terms and Conditions of Service" ("TCS") **six** times in her letters, motions, and pleadings to establish her general lien defense. Upon investigation, Plaintiff discovered the TCS was personally created by Chen's lead counsel, William Shayne, after Plaintiff filed this case. Chen's repeated reliance on the fabricated TCS, and her counsel's calculated efforts to conceal Shayne's authorship of the document from the Court, is addressed in Plaintiff's first motion for default judgment, dismissal, and attorneys' fees for fraud on the Court ("First Motion"), filed June 24, 2022 and currently pending. Dkt. No. 146.

In total, Chen and counsel have knowingly asserted two false lien documents eleven times with the Court. Dkt. Nos. 74-1, 77, 83-9, 100-7, 114-4, 119-2, 142-2, 144-5, 151-8, Civ.1:22-cv-00658, Dkt. Nos. 1-8, 3-9. They have supported the false lien documents with thirteen (13) fabricated emails (Dkt. Nos. 157-1, 157-2, 157-3, 163-1), along with two affidavits

containing materially false statements designed to prevent discovery of the fabrication (Dkt. Nos. 148, 148-1).

## II. FACTUAL BACKGROUND: CHEN AND COUNSEL SUCCESSIVELY ASSERTED TWO LIEN DOCUMENTS TO THE COURT

### A. Chen and Counsel Presented the First Lien Document (the "TCS") to the Court

Plaintiff assumes the Court's familiarity with the underlying facts presented in the First Motion, which is hereby incorporated by reference. However, a summary is necessary to provide context for the email printouts at-issue.

Ameriway is a third-party logistics company whose primary business is to ship goods from China to the U.S. Dkt. No. 146, p. 1. Ameriway designated Eagle Trading USA, LLC ("Eagle") as the Importer of Record ("IOR") for every container processed by Ameriway, including the five containers at issue. Id. Eagle is a company engaged in the import/export business. Id. In April 2017, Ameriway retained Chen as a customs broker by executing a standard Power of Attorney ("2017 POA") form through Eagle. Id. at 2. The POA authorized "May Yan Chen, d/b/a Ability Customs Brokers," to conduct customs filings on its behalf with U.S. Customs and Border Protection ("CBP"). Between April 2017 and August 2019, Chen cleared over 400 containers with CBP for Ameriway. Id.

**The 2017 POA is a single page document that contains no payment terms or lien provisions.** Id., p. 2. **The document does not even mention the word 'lien.'** Id. The 2017 POA states that Grantor "acknowledges receipt" of the terms and conditions of service pursuant to the POA, but Chen never sent any terms and conditions to Plaintiff or Eagle; nor did her company website contain any terms in 2017. Id.

It is undisputed that in August 2019, Chen detained the five cargo containers having an estimated fair market value of two million dollars at the Port of New York and delivered them to

a storage facility in New Jersey without Plaintiff's authorization.  First Motion, Ex. B, p. 5.

Chen seized the cargo because she believed Plaintiff owed her a past due balance related to

separate and prior shipments.  Id., p. 8.  However, Chen never notified Ameriway or Eagle of

this fact, or issued a written lien notice before taking the cargo.  Id.  When Plaintiff inquired into

the status of the missing containers, Chen falsely claimed that she did not have them.  Instead,

she stated that her third-party carrier detained the cargo because *she* owed them service fees, and

Ameriway needed to immediately pay her $100,000 to "assist" in getting the containers released.

Id., Ex. C, pp. 2, 3.  Chen's email, dated August 7, reads in relevant part:

> "Hello! I am terribly sorry that a container from your company has been seized by one of
> the truck companies that we have business collaboration with, **because of our company's
> financial issues and the funds shortage situation at the moment. We could not pay off
> the service fees that we owe them previously**."  Id., emphasis added.

This was false. It is undisputed that the "trucking companies" never "seized" the

containers; Chen had them the entire time, by her own admission.  Plaintiff eventually learned this

fact and filed the instant action for conversion, fraud, and other claims in October 2019.

Plaintiff's conversion claim asserted that Chen did not have a general lien right in

contract over the five subject containers.  Chen claimed that she had an enforceable lien, but

failed to state any terms or produce supporting documentation for <u>two</u> years.  Finally, on

November 1, 2021, Chen's counsel presented to the Court a document titled "Terms and

Conditions of Service" (the "TCS") annexed to the 2017 POA, which contains lien language in

paragraph 14.  Dkt. No. 74.  Chen affirmatively relied on the TCS five more times in her letters,

pleadings, and motions, including once in her sworn affidavit included in her third-party

Complaint against Eagle.  *See* Dkt. Nos. 77, 83-9, 100-7; *See also*, 1:22-cv-00658, Dkt. Nos. 1-8,

3-9; *see also* First Motion, Ex. E.

**B. Ameriway Discovered that Chen's Counsel Fabricated the TCS**

Plaintiff doubted the authenticity of the TCS because Chen waited so long (two years) to produce it—Plaintiff had never seen the document before November 2021. On February 4, 2022, Plaintiff served written discovery focused solely on the TCS's authenticity, seeking ESI in native file format to determine when the TCS was created, and by whom. First Motion, Ex. F. However, Chen's counsel disregarded these discovery requests, and did not submit a response by the discovery deadline.

Plaintiff subsequently discovered the TCS is practically identical to another POA form currently published on the website of a non-party customs broker called H.W. St. John and Company ("St. John"). First Motion, Ex. G. The "Terms and Conditions of Service" pages of the two documents have identical font, footers, and margins. Id. They even have the same grammatical and typographical errors. Id. But St. John's POA was not published until April 2019, two years after the 2017 POA date. Id. At this point, Plaintiff knew that Chen copied the TCS form from St. John's website, but did not know who authored St. John's form.

**Then, in late March 2022, Plaintiff inspected the metadata of the St. John POA, which revealed that Chen's counsel, William Shayne ("wshayne"), created the document in August 2018, over one year *after* the parties executed the 2017 POA.** First motion, Ex. H.




The author metadata led Plaintiff to conclude that Shayne also manufactured the TCS during this litigation. Chen and counsel simply attached the TCS to the 2017 POA to give the

false impression that the TCS was in force and effect in 2017, i.e., to backdate a lien. Plaintiff tried repeatedly to get Shayne to admit his authorship of the TCS on the record. For instance, Plaintiff's counsel directly accused Chen's counsel of fabricating the TCS during an April 8 discovery conference before Magistrate Judge Freeman. *Infra*, pp. 23-24. But Shayne omitted his authorship of the document to the Court, choosing to remain silent instead. Id.

On May 3, Plaintiff demanded a privilege log related to a request for native files of the TCS, which would have disclosed Shayne's authorship in any event, and threatened to bring the matter to the Court's attention in the "*following days*." First Motion, Ex. W, pp. 1-2, emphasis added. Two days later, Chen's counsel submitted a letter to Plaintiff, which finally admitted that Shayne created the TCS after Plaintiff filed this action. First Motion, Ex. J. Chen's counsel formally withdrew the TCS, but then introduced *a second* lien document (the "'94 Terms") on the record, which Plaintiff had never seen before. The '94 Terms, the subject of the instant motion, also contains a general lien clause. Chen then relied on the '94 Terms five (5) times in her subsequent papers to the Court. Dkt. Nos. 114-4, 119-2, 142-2, 144-5, 151-8.

### C. Chen and Her Counsel Asserted the Second Lien Document (the "94 Terms") to the Court

Chen's counsel claimed the '94 Terms is the actual version Chen "regularly" sent to her customers since 2011; and, Chen's counsel meant to rely on the '94 Terms all along, but had mistakenly proffered Shayne's TCS to the Court on **six** occasions due to a misunderstanding between Shayne and his co-counsel, Richard Schrier, as to which was the operative lien document in this case. Dkt. No. 148, 148-1. In their affidavits, submitted with Chen's Response to Plaintiff's First Motion, Shayne and Schrier explained how this mistake allegedly happened. *Infra* at pp. 19, 20. Exs. FF, GG.

Convinced that Chen's counsel were simply trying to substitute one false lien document with another, Plaintiff filed its First Motion for terminating sanctions because Chen and her counsel knowingly presented the TCS to the Court six times as substantive evidence even though they knew it was false, and took purposeful steps to conceal Shayne's authorship over the course of several months.  While the First Motion was pending, Plaintiff requested native versions of emails, or any evidence that Chen ever sent the second lien document, the '94 Terms, to her customers during her business from 2011 to the present.  To date, Chen has not produced a single native file to support the '94 Terms.  Rather, Chen submitted thirteen email "printouts" purporting to authenticate the '94 Terms in letters to Magistrate Judge Valerie Figueredo and Judge Vernon Broderick in August 2022 and January 2023, respectively.  However, overwhelming evidence from independent, objective sources conclusively establishes the email printouts are false, like the TCS.

## III.   ARGUMENT:  CHEN AND HER COUNSEL INTENTIONALLY SUBMITTED THIRTEEN FABRICATED EMAILS TO JUDGES FIGUEREDO AND BRODERICK TO SUPPORT THE FALSE '94 TERMS LIEN DOCUMENT

### A.   Chen and Counsel Deliberately Submitted the First Set of Fabricated Emails to Judge Figueredo in August 2022

Courts in this Circuit have consistently held that the submission of fabricated evidence constitutes sanctionable fraud on the Court, especially where the document in question is central to the case. *See, e.g., N.Y. Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharm., Inc.*, 432 F. App'x 25, 25 (2d Cir. 2011) (affirming sanctions for fraud on the Court because "[f]alsifying evidence is sanctionable conduct").  Chen claims the '94 Terms is a standard document that she regularly sent to new customers during her business from 2011 to the present.  To support this claim, on August 16, 2022, Chen's counsel submitted a "Status Report" to Magistrate Judge Valerie Figueredo, including three "Exhibit email[s] to New Client[s]" "clear[ly] referenc[ing]…the transmission of

a copy of the terms and conditions" (the '94 Terms) as early as December 2012. Ex. X; *see also* Dkt. Nos. 157-1, 157-2, 157-3. The exhibits are scanned PDFs of email printouts—not native files—which Chen claims to have recently found in storage "boxes" in her office warehouse. Id.

Chen's first email printout, attached to the Status Report, is dated **January 8, 2013**, and represents Chen purportedly sending the '94 Terms to one of her customers in an attachment. Ex. X, p. 6, Dkt. No. 157-1. Chen's second email printout is dated earlier, on **December 12, 2012**, and also represents the '94 Terms being sent as an attachment. Id.; *see also* Dkt. 157-2. Both printouts contain a footer stating, "**U.S. Customs & Border Protection (CBP) will commence full ISF enforcement on July 9, 2013, and will issue liquidated damages against the importer for non-compliance…**" Id.

For context, CBP initiated the Importer Security Filing (ISF) or "10+2" rule on January 26, 2009 for the purposes of enhancing U.S. Port security. *See* C.A. Seah & Company, Inc., "CBP TO BEGIN ISSUING LIQUIDATED DAMAGE CLAIMS FOR ISF NON-COMPLIANCE COMMENCING JULY 9, 2013", published July 1, 2013, available at https://www.cashea.com/2013/07/cbp-to-begin-issuing-liquidated-damage-claims-for-isf-non-compliance-commencing-july-9-2013/. Under ISF, importers are required to electronically submit (10) data elements to CBP before cargo is laden on board a vessel destined to the United States. Id. CBP may assess a claim for liquidated damages for ISF non-compliance violations in the amount of $5000 per violation. Id. Although this requirement has been in effect since 2009, CBP adopted a "measured and commonsense" approach to ISF enforcement before fully assessing the liquidated damages portion of the rule. Id. This "grace period" officially ended on July 9, 2013 when CBP began full enforcement of ISF, and started to issue liquidated damages against ISF importers and carriers for ISF non-compliance. Id.

However, CBP did not announce the <u>exact</u> July 9, 2013 start-date of the "full ISF enforcement" policy until <u>JUNE 7, 2013</u>, **more than six months after Chen purportedly sent her January and December emails, when it issued administrative message CSMS# 13-000298 from its official website**.[1]  Ex. Y, herein, pp. 1-2.  CSMS# 13-000298 is a public record expressly titled "**<u>Initiation Date</u> for Liquidated Damages for ISF Non-Compliance**," and states "on July 9, CBP will begin full enforcement of ISF, and will start issuing liquidated damages for non-compliance."  Id., emphasis added.



Ex. Y, p. 1.

The trade industry had been anticipating CBP to announce the effective date in the months leading up to June 7.  For example, one article covering CBP's June press release states, "U.S. Customs and Border Protection (CBP) has announced that they will begin full enforcement of the Importer Security Filing (ISF) "10+2" on July 9th, 2013…**we have been anticipating this announcement as the Final Rule was due to come into effect in February of 2013."**  Ex. Y, p. 6, emphasis added.

---

[1]*See* https://www.cbp.gov/newsroom/national-media-release/cbp-enters-next-phase-importer-security-filing.

Other members of the trade industry, including major ports, logistics companies, customs brokers, and law firms, published their own articles about CBP's June 7 announcement. Ex. Y, pp. 3-12. The following are just a few examples, with the first article literally being titled "Start date of liquidated Damage Charges for ISF Non-Compliance announced":

- "Please note US Customs and Border Patrol (CBP) has announced effective July 9, 2013 they will begin full enforcement of Importer Security Filing (ISF or 10+2)." OOCL, "**Start date of Liquidated Damage Charges for ISF Non-Compliance announced.**" Id., p. 4, emphasis added.

- "CBP <u>announces</u> start date of Liquidated Damage Charges for ISF (10 + 2) Non-Compliance," APL, **published June 17, 2013**. Id., p. 6, emphasis added.

- "The news this week revolves around the <u>announcement</u> from Customs and Border Protection (CBP) that full enforcement of Importer Security Filings (ISF) will go into effect on July 9th," Yusen Logistics (Americas) Inc., "10 + 2 - $5000," **published July 2013**. Id., p. 12, emphasis added.

This is not an exhaustive list. Exhibit "Y," attached hereto, contains several more articles from June/July 2013 relating to CBP's June 7 announcement, including one from the Port of San Francisco. Ex. Y, p. 4. Further, a simple Google search of "ISF enforcement CBP July 9, 2013" generates <u>dozens</u> of similar articles published in June/July 2013 from the trade industry.

Plaintiff's expert Declarant, Attorney James Holbein, conducted exhaustive research into the issue whether "there was notice prior to June 7, 2013, of an impending update to the CBP filing requirements for ISF forms such that the Defendant in this matter could have placed a footnote in emails to clients as early as January 2012 referencing the effective date." Ex. Z, Declaration of James Holbein ("Holbein Declaration"). Holbein has held numerous positions in the areas of international trade and customs law in government and the private sector for more than 40 years, including as the Director of the Office of Tariff Affairs and Trade Agreements, U.S. International Trade Commission. Id., p. 1. He served as Adjunct Assistant Professor of Law

for 15 years in the International Masters Program, Washington College of Law, American University, and as U.S Secretary, NAFTA Secretariat, U.S. Department of Commerce. Id.

Holbein found "no Federal Register notices relevant to the ISF between January 1, 2012 through September 30, 2013." Id. The Federal Register constitutes the official notice of agency actions for all government agencies. Id. Further, Holbein searched the Automated Customs Environment ("ACE") system, which provides notice from CBP to ACE users of impending actions or problems to be resolved, and found "no other relevant messages between January 1, 2012 through September 30, 2013, that would enable anyone to provide a specific date for the change to ISF filing rules other than the June 7, 2013 notice provided by Plaintiff to the court." Id.

Holbein also searched notices referring to the ISF in the Customs Bulletin, a specialized publication by CBP for providing notices of impending official actions and official rulings concerning imported goods, and again did not find any results related to the question before the Court. Id. Holbein concluded there was "**no basis for the claim that there was notice prior to June 7, 2013, provided to the public or customs brokers about the impending change to the ISF procedures that would warrant a statement by anyone that CBP was going to fully enforce ISF procedures on July 9, 2013**." Id., p. 2, emphasis added.

Furthermore, the following article, published January 10, 2013, indicates that CBP could not set an effective date for full ISF enforcement until the "Final Rule" was published (expected in February 2013) and updates to the ACE electronic filing system were complete:

**Publication of Final Rule on ISF**

Posted on January 10, 2013 by tfli.com

According to a Broker Power article on CBP's regulatory agenda, the Final Rule on ISF is expected in February of 2013. CBP has indicated that ACE deployment for AMS and publication of the Final Rule needed to be in place before CBP could proceed with full enforcement of ISF and begin assessment of liquidated damages. With the Final Rule scheduled to be published in February 2013, liquidated damages for ISF could be on the near horizon. Through our involvement with the NCBFAA ISF Sub-committee, CBP continues to stress that there will be a CSMS message to the trade at least 30 days prior to full enforcement of ISF.

Ex. Y., p. 20, emphasis added.

Note that the statement "CBP continues to stress that there will be a CSMS message to the trade at least 30 days prior to full enforcement of ISF" proved to be completely accurate: CBP ultimately followed through on its stated promise six months later when it gave the industry "at least 30 days" notice of the July 9 effective date via CSMS# 13-000298. Because Chen obviously could not have known the exact effective date before the rest of the trade industry, including CBP and the Port of San Francisco, the footer at-issue is anachronistic evidence establishing that Chen digitally manipulated the email printouts to support the false '94 Terms.

### B. Chen and Counsel Deliberately Submitted the Second Set of False Email Printouts to Judge Broderick in January 2023

CSMS# 13-000298 and the trade articles conclusively established the printouts sent to Judge Figueredo were forged, but rather than admit the fraud to reduce the adverse consequences of the misconduct, Chen doubled down by submitting more falsified printouts to Judge Broderick in January 2023.

Responding to Plaintiff's September letter motion four months later, Chen's counsel submitted a "Letter Motion To Continue" to Judge Broderick, including an expert report from a forensic examiner, Linda L. Mitchell. Ex. AA; *see also* Dkt. No. 163. Attached to Mitchell's report are ten (10) additional printouts—not native files—of emails allegedly sent by Chen to various customers before CBP made the June announcement. The footer at-issue referencing the exact July 9, 2013 Initiation Date appears once again in the email printouts. Based solely on her

review of these printout "samples," Mitchell generally concluded that the Initiation Date reference is not evidence of digital manipulation, but "part of the predetermined signature affixed to certain outgoing emails in the regular course of [Chen's] business."  Dkt. No. 163-1, pp. 18-27.

However, Mitchell does not address how Chen could have known the exact date more than six months before CBP announced it to the public in the first place.  **She makes no attempt to reconcile her findings with CSMS# 13-000298 or the dozens of trade articles,** which flatly contradict her conclusion as a matter of public record.  In fact, Mitchell's report indicates that she did not even receive this contrary evidence.  Her analysis was exclusively based on "the sample documents [scanned email printouts] supplied to [her]" by Chen's counsel.  Id., p. 5. CSMS# 13-000298 is not mentioned anywhere in her report.  During a May 24 conference before Judge Broderick, Chen's counsel confirmed they did not send Mitchell the CBP materials. Ex. BB, p. 12.  In any event, independent, third-party evidence from one of Chen's customers establishes that the printouts reviewed by Mitchell are fabrications designed to cover the false printouts previously submitted to Judge Figueredo.

### C. PCC Logistics's Original Email Files Conclusively Prove that Chen Fabricated the Printouts

Plaintiff set out to investigate the authenticity of the email printouts in Mitchell's report. A comparison between the printouts and the corresponding email files obtained directly from the email recipients, Chen's customers, would quickly reveal whether the printouts are authentic, i.e., whether the footer at-issue appears in the customer's original email file.  However, Chen's counsel claimed that the customer information in the printouts was privileged, and redacted practically all the identifying information, thereby preventing Plaintiff from obtaining email files directly from Chen's customers.

But Chen's counsel left a piece of customer information in Mitchell's report unredacted, apparently by mistake.  One printout includes an email exchange, dated <u>January 3, 2013 at 1:43 PM and 11:49 AM</u>, between Chen's purported employee, "Lily," and a "Cyntra Giboney," "CES/CET Supervisor."  Ex. AA., p. 4, Dkt. No. 163-1 at 20.  While Giboney's employer name is redacted, a Google search revealed that she was once employed by PCC Logistics ("PCCL") based out of San Leandro, California.  Chen is also based out of San Leandro.

PCCL agreed to assist Plaintiff's discovery efforts, and produced the specific January 3 email string between Defendant and Giboney as represented in Chen's printout, down to the precise minutes:  1:43 PM and 11:49 AM.  *See* Ex. CC, Declaration of Brian Howver ("Howver Declaration").  **PCCL's files confirm that Defendants' original email to Giboney never contained the disputed footer.**  Id.

```
Happy new year! Please find enclosed check copy and please process the
release. The check will send to your office today. Please let me know if you
have any questions.




Best Regards,

May


Ability Customs Brokers

13910 Doolittle Drive

San Leandro, CA  94577

Tel:  (510)347-5555

Fax: (510)347-1555

www.abilitycb.com

ability logo small


From: Cyntra [mailto:Cyntra@pcc.cc]
Sent: Thursday, January 03, 2013 11:49 AM
To: info@abilitycb.com
Cc: 'Sharon Wong'; Teeda
Subject: KKFU1526317
```

Ex. DD.

Brian Howver, the COO of PCCL, executed a declaration confirming the authenticity of PCCL's email files.  Ex. CC, "Howver Declaration."  PCCL, a third-party without a stake in this case, confirms that it has no records between Lily and Giboney dated January 3, 2013 at 11:49 AM and 1:43 PM.  Ex. HH.  **Furthermore, PCCL also produced a set of <u>SIX</u> (6) additional emails**

from Chen's email address (info@ability.com) dated between February 2013 and April 2013.  Ex. HH.  <u>**None of these emails contain the footer at-issue.**</u>

Aside from the footer, there are several other discrepancies between PCCL's email files and the printouts, as shown in Ex. DD, herein.  For example, the PCCL file shows Giboney sending an email to "May" Chen to Defendants' corporate email address, "info@abilitycb.com," on January 3 at **11:49 AM**.  Ex. DD.  In contrast, the printout represents Giboney sending the same email, written in <u>identical</u> language, to Lily at the same company email address (info@abilitycb.com), and at precisely the same minute (11:49 AM).  Id.

And while PCCL's file shows May replying to Giboney's email from the corporate email address a couple hours later at **1:43 PM**, Chen's printout has Lily responding to Giboney, again precisely at **1:43 PM**, from the same corporate email address, "Info." Id.  The language in Lily's email to Giboney is slightly different from that of May's, but the content is essentially the same. On May 24, Judge Broderick asked Chen's counsel to provide an explanation for the email discrepancy.  Chen's counsel, Schrier, provided the following response:

SCHRIER: "But the way their system works is they have -- first of all, I don't remember how many, but they have a number of people in the office. There's not one or two people. There's a group of people in the office. When e-mails come in under the info, which is the general company e-mail, each of the people, they also have computers, and they are set up with their footers and so forth. **The one on the left is not from -- is May's personal e-mail, not her company e-mail. If you notice, it's from May Chen, but it says e-mail to -- e-mail at -- in reply to the info e-mail. That's the company e-mail. The one on the right is the info e-mail. That's the company e-mail. The company e-mail is set up so they have the footer, her personal e-mail was not set up that way at the time**. I don't think it is set up that way this way either. Why she did it? There's an e-mail that came in, if you notice, one is to May and one was to Lilly, which means that -- why -- I mean, it's two different people, obviously. **But the one to May went to her personally, or she -- it went to info but it's addressed to May.  So when it came -- we're guessing. This happened ten years ago, but it came to her, to her attention, and she replied from her personal e-mail. Well, it happened at the same time. I just question the answer also, that they both saw it, and they just happened to be done. It's that much of a coincidence**. I don't know the answer, Judge. I can tell you it came from two different

-14-

computers. One was addressed to Lilly and one was addressed to May." Ex. BB, Conference with Judge Broderick, dated May 24, 2023, pp. 10-11, emphasis added.

This explanation is completely unrealistic, as confirmed by Plaintiff's forensic computer analyst, Kristian Lars Larsen of Data Navarro. *See* Ex. EE, "Larsen Declaration," ¶ 8. Schrier asserts that the explanation for the presence of nearly identical emails from May and Lily is that on January 3, 2013 at 11:49 am, within a 60-second time span, Giboney composed and sent separate emails to both May and Lily using the **info@abilitycb.com** email**,** with each email using a different salutation. Id. Schrier then asserts that May and Lily, working independently of each other, sent similar replies to Giboney exactly 1 hour 54 minutes later at 1:43 pm, again within a 60-second time span, from separate email accounts, one account being the company's info account and one account being May's personal account. Id. Not only is the explanation implausible, it is directly refutable. PCCL has found no correspondences that include Lily and Giboney from this time-period. Id.

PCCL's electronic file unequivocally shows that May sent the email from the company email address (info@abilitycb.com, "Info"), not from her personal address.

```
        for <Cyntra@pcc.cc>; Thu,  3 Jan 2013 16:43:18 -0500 (EST)
Reply-To: <info@abilitycb.com>
From: "May Chen <info@abilitycb.com>
To: "'Cyntra'" <Cyntra@pcc.cc>
References: <003501cde9eb$6aac8550$40058ff0$@pcc.cc>
In-Reply-To: <003501cde9eb$6aac8550$40058ff0$@pcc.cc>
Subject: RE: KKFU1526317
Date: Thu, 3 Jan 2013 13:43:20 -0800
Organization: Ability Customs Brokers
Message-ID: <004701cde9fb$59df9360$0d9eba20$@com>
```

**Original Email Sent from Defendant to PCC Logistics**

```
From: May Chen [mailto:info@abilitycb.com]
Sent: Thursday, January 03, 2013 1:43 PM
To: 'Cyntra'
Subject: RE: KKFU1526317
```

Ex. CC, Attachment A at 1.                    Ex. DD

Moreover, Larsen confirms that May did not send the email from her personal email address because the <u>forwarding information</u> is absent in PCCL's email files: "For Mr. Schrier's assertion to be correct, the reply email from May would show May's personal email address in the FROM field, not the company's info email address. **Additionally, the body of the email**

**would contain forwarding information from the company's info email to May's personal email account. This forwarding information is not present**." Ex. EE, Larsen Declaration, ¶ 7, emphasis added.

After more than nineteen months, this authenticity issue has now become very simple: if the email printouts are genuine, the footer would appear in PCCL's files. The footer is obviously absent, so the printouts must be false. Chen repeatedly relied on the false printouts to support the '94 Terms, the centerpiece of her defense. Terminating sanctions are thus required in this case.

## IV. TERMINATING SANCTIONS ARE NECESSARY TO PROTECT THE INTEGRITY OF THE COURT

### A. Sanctions Pursuant to Fed. R. Civ. P. 11

A pleading, motion or other paper violates Rule 11 either when it "has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well-grounded in fact and warranted by existing law" *W.K. Webster & Co. v. Am. President Lines, Ltd.*, 32 F.3d 665, 670 (2d Cir.1994) (*quoting Eastway Constr. Corp. v. City of N.Y.*, 762 F.2d 243, 254 (2d Cir. 1985)). If a court determines that Rule 11(b) has been violated, Rule 11(c) authorizes the court to "impose an appropriate sanction" sufficient "to deter repetition of the conduct or comparable conduct by others." Fed. R. Civ. P. 11(c)(4). Egregious conduct such as filing false documents in bad faith can result in dismissal. *See, e.g., Sec. & Exch. Comm'n v. Smith*, 798 F. Supp. 2d 412 (N.D.N.Y. 2011) (sanctions imposed for filing a false affidavit).

### B. Sanctions Pursuant to 28 U.S.C. § 1927

Section 1927 of Title 28 of the United States Code provides that "[a]ny attorney or other person admitted to conduct cases in any court of the United States . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy

personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. To impose Section 1927 sanctions, "a court must find clear evidence that (1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith—that is, 'motivated by improper purposes such as harassment or delay.'" *Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir.2000). The Second Circuit and its district courts have interpreted the statute to permit the imposition of Section 1927 sanctions against law firms. *See Enmon v. Prospect Capital Corp.,* 675 F.3d 138, 148 n.5 (2d Cir. 2012) (citing supporting cases); *Reichmann v. Neumann*, 553 F. Supp. 2d 307, 327–28 (S.D.N.Y. 2008).

## C. Sanctions Pursuant to the Court's Inherent Powers

Default, dismissal, and attorneys' fees are the appropriate sanction because, as shown above and in the First Motion, Chen and her counsel perpetrated an intentional and sustained fraud on the Court. In determining the appropriate sanction to impose, courts take into consideration the following factors: "(1) whether the misconduct was the product of intentional bad faith; (2) whether and to what extent the misconduct prejudiced the other party; (3) whether there is a pattern of misbehavior, rather than an isolated instance; (4) whether and when the misconduct was corrected; and (5) whether further misconduct is likely to continue in the future." *McMunn*, 191 F. Supp. 2d at 461, *citing Skywark,* 1999 WL 1489038, at *15 (collecting cases). Consideration of all of these factors in this case shows that default judgment, dismissal of Chen's remaining claims, and an award of attorneys' fees is not only warranted, but the only appropriate sanction.

In *Rossbach v. Montefiore Med. Center*, this Court sanctioned the plaintiff, her attorney, and her attorney's law firm, due to plaintiff's fabrication of critical evidence (cell phone

data), her related perjury and spoliation, and her counsel's failure to properly address Plaintiff's misconduct. *Rossbach v. Montefiore Medical Center*, No. 19 Civ. 5758 (DLC), 2021 WL 3421569 at *1-*3 (S.D.N.Y. Aug. 5, 2021). Judge Denise Cote found plaintiff's attorney and law firm jointly and severally liable for attorneys' fees under the Court's inherent powers and 28 U.S.C Sec. 1927 for willingly turning a blind eye to the fabricated evidence: "At many points in this litigation, [Plaintiff's attorney] had an opportunity to conduct a reasonable investigation of his client's claims and to ensure that he was not misleading either his adversary or the Court." Id., at __. The misconduct in this case is far more severe and willful. Chen's counsel actively participated in the fraud by carefully creating the false TCS to advance Chen's case, and then concealed the fraud through more lies in their affidavit testimony.

### D. Chen and Her Counsel Deliberately Presented the Fabricated TCS to the Court

The main issue in Plaintiff's First Motion was whether Chen and her counsel intended to misrepresent the TCS as authentic to the Court when they knew it was false, or whether they filed the document by mistake. In Chen's response, Shayne and Schrier each submitted affidavits to explain their actions, presenting a joint mistake defense. Shayne claimed that he routinely provides his new clients with updated terms and conditions, and did the same for Chen by preparing the TCS after Plaintiff filed this case. Ex. FF, Shayne Affidavit, pp. 9-10. Shayne's TCS document allegedly got mixed up in the discovery papers and accidentally sent to the office of his co-counsel, Schrier, who took the "lead" in responding to discovery disputes, and who allegedly did not realize that Shayne created the document.

> "During the course of obtaining literally tens of thousands of pages of documents in this case, I would send selective documents to Schrier's office. One of the documents that was sent, among the thousands sent to Schrier, was the 3-page terms and conditions that I had provided to Chen after I was retained. When disputes arose between the parties regarding the production of documents, Schrier took the lead to respond to those disputes." Id., p. 11, emphasis added.

Shayne further states that <u>Schrier</u>'s office was responsible for repeatedly misrepresenting the TCS as genuine to the Court under the mistaken belief that Shayne's TCS document was attached to the 2017 POA:

> "We now know that Schrier, mistakenly produced the 3-page terms and conditions in a letter to Magistrate Judge Freeman on November 1, 2021 believing it to be the terms and conditions referred to in the April 11, 2017 power of attorney (which it was not)." Id.

> "Plaintiff argues that because I allegedly fabricated the 3-page terms and conditions and *Schrier made representations* to the Court that the 3-page terms and conditions were in force and effect during the period Chen provided services to "Ameriway…." Id., p. 7, emphasis added.

After relying on the TCS six times over the course of almost six months (November 1, 2021-April 28, 2022), Chen's counsel allegedly realized they had been using the "wrong" version of the terms and conditions on Wednesday, April 28, 2022 while Schrier was preparing discovery responses. Shayne states the following:

> "[I]n answering Ameriway's Third set for Requests for Production of Documents and Second Set of Interrogatories on Wednesday, April 28, 2022 in which Plaintiff sought "native files" specifically for the 3-page terms and conditions of service, Schrier questioned me about the "native files" for the terms and conditions. When I reviewed the documents that Plaintiff was inquiring about, I realized that we had been using the wrong version of the terms and conditions." Id., p. 12.

In essence, Chen's counsel claim the right hand didn't know what the left hand was doing for nearly half a year, during which time Shayne's TCS was the centerpiece of Chen's lien defense. Shayne claims he was totally oblivious of the fact that Schrier asserted his TCS document six times during this period. Nor did Schrier allegedly have any idea that his co-counsel and longtime legal partner personally created the most critical piece of evidence in this case at the time. Schrier Affidavit, Ex. GG, p. 8-15.

There are several glaring inconsistencies with this account. As an initial matter, Chen's counsel have worked closely together in a small law firm (three attorneys) for over ten years.

That they could have both been so mutually confused about the TCS, which coincidentally pertains to a key issue of liability for their client, over the course of six months is not credible. The existence of Chen's lien documentation has been the main issue in this case since day one.

Additionally, their mistake defense cannot be squared with the record and metadata of the filings at-issue, which establish Chen's intent to rely on the false TCS. Shayne's name appears in the "author" metadata of four out of the six papers that affirmatively rely on the TCS, as noted in Plaintiff's reply.



*See* Plaintiff's Reply in First Motion, Dkt. No. 154, Ex. S.

The author metadata establishes that **<u>Shayne</u>**—not Schrier—misrepresented the TCS as being "in force and effect" in 2017 because he *drafted* the papers on his own computer. First Motion, Ex. H. Shayne quoted specific lien language (Paragraph 14) from the TCS in his papers to the Court. **Shayne also <u>signed</u> the papers at-issue as Chen's lead counsel,** certifying to the Court that he reviewed the contents. This could not have been accidental.

Moreover, the author metadata, combined with the fact that Shayne signed the papers, also disproves Schrier's claim that his office was solely responsible for misrepresenting the TCS as authentic unbeknownst to Shayne. Schrier must have known that *he* didn't draft and sign the papers that relied on the TCS, Shayne did.

While Shayne and Schrier claim they didn't realize they were using the "wrong" version of

the terms and conditions until April 28, 2022, the record shows they knew Plaintiff was aggressively contesting the authenticity of the TCS as early as **February 2, 2022**. Chen's counsel had numerous opportunities to correct the record, but, time and again, they used every legal tool at their disposal to conceal Shayne's authorship of the TCS.

First, on February 2, 2022**,** Plaintiff served discovery requests focused <u>exclusively</u> on the origin of the TCS. Shayne knew that Plaintiff was seeking answers and ESI related to a document that *he personally created*. Plaintiff's Interrogatory No. 15 specifically asks "the date on which the TCS was first created," and the "name(s) of the person(s) who worked on the TCS…" First Motion, Ex. F, Plaintiff's Interrogatory No. 15. It should have taken ten minutes for Shayne to realize that his own document was the sole object of Plaintiff's discovery requests. He was then obligated to admit his authorship and correct the record as an officer of the Court. But Chen's counsel completely ignored Plaintiff's discovery requests, and did not file a response by the discovery deadline.

Chen's counsel were put on notice of the authenticity issue a *second* time during a March 9 Rule 26(f) meet-and-confer conference, but Chen's counsel refused to respond to Plaintiff's discovery requests again.

On March 16, Plaintiff filed a Letter Motion to Compel Discovery Responses to Magistrate Judge Freeman, which listed "*several discrepancies in the record casting serious doubt on the authenticity of the terms and conditions*." Dkt. No. 105, p. 3. Plaintiff expressly accused Chen of fabricating the TCS during this litigation: "*Either Defendants created the terms and conditions solely for litigation, which is improper*, or they are withholding native files related to the terms and conditions created at an earlier date for some unknown reason." Id. Chen's counsel were thus put on notice of the authenticity issue a *third* time, but they elected to

ignore Plaintiff's March 16 letter motion, never mentioning anything about a mistake or filing error.

On April 8, Judge Freeman held a discovery conference related to "*this* document called Terms and Conditions of Services, which was filed by Mr. Schrier in November 2021… and that Plaintiff had "given reasons why there is an authenticity issue with *that* document." First Motion, Ex. N, Judge Freeman Conference Transcript, emphasis added. By this time, Plaintiff discovered that Shayne created the TCS, and openly accused Chen's counsel of manufacturing the "specific" terms and conditions form: "We also believe that this terms and conditions of service form, *this specific form was created by defendants' counsel sometime in 2018 in connection with another one of his clients and then asserted in this case after we filed the action*..." Dkt. No. 137 pp. 31-32, emphasis added.

**Shayne appeared at the teleconference. He knew Plaintiff's counsel was referring to a document that he personally created. At this point, there could be no doubt Shayne knew the TCS was on record as critical evidence in this case. <u>That was the whole reason for the conference in the first place</u>. However, Shayne elected to omit his authorship from the Court, choosing to remain silent for the entire hearing instead. This raises the obvious question why Shayne didn't just tell Judge Freeman that he drafted the TCS if it was really filed by accident. Again, Chen's counsel did not mention anything about a mistake, miscommunication, or filing error to Judge Freeman.**

On April 14, Plaintiff served a deposition notice on Shayne for his "role in creating, modifying, or altering any part of the referenced "Terms and Conditions of Service," thereby putting Chen's counsel on notice a *fifth* time. First Motion, Ex. U, Depo Notice to Shayne. There was no way Shayne didn't know his document was placed on the record at this point. Plaintiff wanted to depose him about the matter. Refusing to disclose his authorship once again,

Shayne asserted attorney-client privilege on two separate occasions, April 14 and 19, to prevent being deposed.  First Motion, Ex. I., p. 2.

Chen's counsel claim they realized the alleged mistake while preparing answers to Plaintiff's discovery requests on Wednesday, April 28.  If that were true, then those answers submitted to Plaintiff would have disclosed Shayne's authorship, but they did not.  Again, Plaintiff's Interrogatory No. 15 asks Chen to "describe in detail how the [TCS] was created, including a) "the date on which the TCS was first created,"… [and] "**name(s) of the person(s) who worked on the TCS**…"  First Motion, Ex. F, Plaintiff's Interrogatory No. 15, emphasis added.  Of course, Shayne knew the answers to these questions because he personally created the TCS, but refused to disclose his authorship for the *sixth* time.

On May 3, Plaintiff's counsel demanded a privilege log to support Chen's work-product objection to Plaintiff's request for native files related to the TCS, accused Shayne of manufacturing the TCS once again, and threatened to bring the "specific matter" to the Court's attention "in the following days:"  "Your work product privilege requires that you must disclose whether Attorney Shayne created this document in a privilege log.  **We will raise this specific matter with the Court in the following days**."  First Motion, Ex. W, pp. 1-2, emphasis added.

Knowing that it was a matter of time before the Court learned that Shayne created the TCS, Chen's counsel finally admitted his authorship on May 5, but then introduced the second lien document ('94 Terms) to replace the TCS.  Schrier claims he intended to tell Plaintiff that Shayne authored the TCS all along, but Plaintiff simply beat him to it: "[B]efore I could draft a suitable letter advising Plaintiff of the error and providing a copy of the 1-page terms and conditions" (the '94 Terms), Plaintiff's counsel already accused Shayne of fabricating the document in a May 3 email."  Schrier Affidavit, p. 15.

This is far too convenient.  The record shows Chen and her counsel had at least **six**

chances to disclose Shayne's authorship. Plaintiff openly accused Chen and counsel of fabricating the TCS **four** times on the record, including once before Judge Freeman during the April 8 conference. Their calculated and sustained actions were not those of someone who makes an innocent filing error. If Chen's counsel did in fact file the TCS by accident, they would have fixed the issue immediately after receiving Plaintiff's February 4 discovery requests. But Chen's counsel had no intention of admitting Shayne's authorship until they were completely out of options, at which point they tried to replace the TCS with the second false lien document in this case, the '94 Terms.

### E. Chen Fabricated the '94 Terms and Email Printouts to Cover for the False TCS

Plaintiff's September 2022 letter motion established by clear and convincing public record evidence (CSMS# 13-000298 and the trade articles) that the three printouts submitted to Judge Figueredo in support of the '94 Terms were fabricated. Chen was thus faced with a difficult dilemma: either admit the printouts were forged, which would strengthen Plaintiff's claim that she and her counsel also falsified the TCS, or try to conceal the fabrication by manufacturing more evidence.

Chen chose the second option, and fabricated ten additional printouts to give the false impression that the footer regularly appeared in her emails before June 2013, even though **CSMS# 13-000298 and the referenced trade articles *still* proved this to be impossible**. Chen's counsel then sent the printouts to their forensic expert, Mitchell, for review. However, Mitchell would naturally conclude the printouts are fabricated if she considered the CBP materials. Chen's counsel solved this problem by simply withholding this contrary evidence from her, leaving Mitchell to review the printouts in a vacuum.

Chen's counsel also redacted the customer information from the email printouts to prevent Plaintiff from conducting any third-party discovery directly with Chen's customers. Plaintiff obtained the PCCL email files anyways, which conclusively established, *down to the minute*, that "Lily's" January 8 email to Giboney never existed. Undeterred, Chen's counsel offered a completely implausible explanation to account for the email discrepancy during the May 24 conference with Judge Broderick, even though they knew or it was obvious that the printouts are false.

However, the pattern of fraud goes back to the beginning of this case, over three years ago, when Chen and her counsel knowingly asserted a baseless affirmative general lien defense "pursuant to the terms and conditions of the [customs broker] power of attorney executed between the parties on April 11, 2017." *See* Chen's Answer to Plaintiff's Original Complaint, Dkt. No., 11. Chen knew the "terms and conditions" did not exist when she raised this defense. She falsely <u>denied</u> seizing the containers in her August 2019 email to Ameriway: "Hello! I am terribly sorry that a container from your company has been seized by one of the truck companies that we have business collaboration with…" *See supra* at p. 2.

This case is now approaching its fourth year, and Plaintiff has caught Chen and her counsel asserting two false lien documents in succession eleven times to the Court. *Supra* at 1. They've supported the fabrications with thirteen sets of forged emails, false affidavit testimony and lies directly to Judges Freeman, Figueredo, and Broderick. Chen's misconduct will certainly continue in the future if this action is permitted to go forward, making terminating sanctions necessary to protect the integrity of the Court. *See Almeciga v. Ctr. for Investigative Reporting, Inc*., 185 F.Supp.3d 401, 435 (S.D.N.Y. 2016) (Given the plaintiff's "knowing fabrication of the critical allegations underlying the complaint that plaintiff must prove

in order to recover, it would be pointless to allow the case to proceed. *Dismissal is virtually required under such circumstances.*")

## CONCLUSION

Plaintiff respectfully requests the Court to issue an Order granting default judgment as to each claim stated in Ameriway's Second Amended Complaint (Counts I-VIII), with a damages inquest to be held at a later date; dismissing Chen's counterclaims (Counts I-V) in the instant case with prejudice; dismissing Chen's third-party Complaint (1:22-cv-00658) in its entirety against Eagle Trading, LLC (Counts I-VII) with prejudice; granting Plaintiff attorneys' fees and costs associated with the instant case (1:19-cv-09407) and Chen's third-party lawsuit (1:22-cv-00658); and, holding Defendant Chen, Counsel William Shayne and Counsel Richard Schrier jointly and severally liable for the attorneys' fees and costs.

Dated: June 9, 2023

Respectfully submitted,

STRATUM LAW LLC


By: _____
Peter S. Wolfgram
Xiyan Zhang
STRATUM LAW LLC
*Attorneys for Plaintiff,*
*Ameriway Corporation*
