1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   AMERIWAY CORPORATION,

4                   Plaintiff,

5              v.                        19 CV 9407(VSB)

6   MAY YAN CHEN, ABILITY CUSTOMS,
    INC., et al.,
7
                    Defendants.
8
    ------------------------------x
9                                       New York, N.Y.
                                        May 24, 2023
10                                      2:00 p.m.

11  Before:

12                  HON. VERNON S. BRODERICK,

13                                      District Judge

14                       APPEARANCES

15  PETER S. WOLFGRAM
         Attorney for Plaintiff
16
    SCHRIER, FISCELLA & SUSSMAN, LLC
17       Attorney for Defendants
    BY:  RICHARD E. SCHRIER
18
    –and–
19
    WILLIAM C. SHAYNE
20       Attorney for Defendants

21

22

23

24

25

1          (All parties appearing telephonically)

2          THE COURT:  If we could go on the record?  And if I

3    could ask the parties to please identify themselves for the

4    record, beginning with counsel for the plaintiff, Ameriway

5    Corporation.

6          MR. WOLFGRAM:  Yes, your Honor, this is

7    Peter Wolfgram.  I'm joined by Xiyan Zhang, co-counsel.

8          THE COURT:  Thank you.  And counsel for defendants

9    May Yan Chen and Ability Customs Inc.

10          MR. SCHRIER:  This is Richard Schrier, and I have with

11    me William Shayne.

12          THE COURT:  Okay.  Thank you.  So this matter is on

13    today, so we can discuss certain issues related to the

14    application of plaintiff to file a second motion for sanctions.

15          There are certain issues that I think I do have some

16    questions about, and then we can talk about the -- that relate

17    to the proposed motion.

18          First let me ask defense counsel, with regard to the

19    Customs and Border Protection regulation that is referenced in

20    the footer of the various e-mails, does the defense dispute

21    that the announcement of that regulation was in June of 2013

22    and then became affective, I think, in July?

23          MR. SCHRIER:  To answer the question, because I want

24    to answer it correctly, the formal announcement that you're

25    referring to was made in June.  However -- and I asked my

1  co-counsel, Mr. Shayne, he's a customs attorney, he does --

2  this is what he does for a living.  But the short answer is, as

3  the Court is well aware, the government doesn't do anything

4  quickly.

5      The knowledge of the date that is the commencement of

6  that provision was known many, many, many, many months before.

7  It was talked about at a hearing -- hearings, meetings of

8  different members, the trade meetings and trade talks, if you

9  will.  And it was something that was well -- if I might add, in

10  the cargo import and export industry, most things are on the

11  ships; nothing happens fast.  The customs -- the brokers that

12  get involved in this have to do things way in advance.  So when

13  something is -- for example, as with China, it could be four or

14  five months before it gets to customs.  So they need to have

15  advanced knowledge of all these things.

16      So while the formal announcement was made in June of

17  2013, as plaintiff references, it was well known in the

18  industry well before that that the -- that there could be a

19  limitation of that provision.

20      THE COURT:  Let me ask a follow-up question relating

21  to that.  That was Mr. Wolfgram?

22      MR. SCHRIER:  No.  That was Mr. Schrier, the

23  defendant.

24      THE COURT:  Oh, okay.  Mr. Schrier.

25      I should have mentioned this.  When you do speak, if

1   you could please identify yourself by name for the record so we

2   make sure we have an accurate record.

3           All right.  Let me ask Mr. Schrier, with regard to

4   that, are you saying that this footer was created in advance of

5   the June 2013 announcement?

6           MR. SCHRIER:  Absolutely.

7           THE COURT:  Well, has your client submitted an

8   affidavit in connection with that?

9           MR. SCHRIER:  Judge, we haven't had depositions in

10  this case.  We -- this case has been on hold because of the

11  pending motion for, frankly, over a year at this point.  We

12  haven't had any discovery at all.  The case has been -- so

13  these things are taken, I believe, out of context.

14          We can go piece by piece, and I can address each of

15  the points that have been raised.  But the plaintiff has spent

16  a lot of time trying to parse out things that he thinks are --

17  you know, make the -- he's trying to make it seem that there's

18  been some issue here that there's been some -- some purposeful

19  changing of evidence to hurt the plaintiff in this case.

20  That's so far from the truth.

21          All these things, if we just had our depositions,

22  would come out very clearly as to what and why these things

23  exist.  The depositions that have been raised from the Court, I

24  mean I can address each one with you.  I'm happy to do that.

25  But, frankly, the affidavit, we haven't gotten to that point

1   yet.  We're not there.  This is all -- this is all way before

2   we've even had depositions.

3              THE COURT:  Well, I guess my question is is that there

4   are various motions that are currently pending for which both

5   parties have submitted information.  Am I to understand that,

6   for example, in connection with the -- if there is a motion, a

7   second motion related to sanctions, would your client submit an

8   affidavit in connection with that to explain the appearance of

9   the footer on the January 8, 2013 -- the earlier e-mail?

10             MR. SCHRIER:  The answer is absolutely.  And what I

11  would like to add, we're going to be -- once we get discovery

12  going, we're going to be identifying someone in the field who

13  is familiar with the processes of the government when it comes

14  to this thing, to act as a witness.  Absolutely.  This is

15  nothing that's new in the industry.

16             THE COURT:  Let me ask, my understanding is that the

17  e-mail -- that your client has no electronic versions of these

18  e-mails; is that correct?

19             MR. SCHRIER:  No.  There's a certain period of time

20  where they changed their systems, and we've been trying to get

21  as many e-mails as we can.  They're actually going through

22  their old physical box to find e-mails.

23             As an example, they just pointed out in their last

24  letter to you several discrepancies between two e-mails, except

25  if the Court would notice, the e-mail comes from two different

1    parties.  One happens to be from the personal address of our

2    client, who doesn't have the footer, and the other is from the

3    company e-mail address which is info@, and that does have a

4    footer.  So, again, they tried to create a storyline which has

5    an easy explanation, but, again, that would come out at

6    depositions or trial.

7         But these people, they have whatever the number of

8    staff are, but they do literally hundreds of e-mails a day,

9    each person.  And they don't have -- from back then, they don't

10   have access to a lot of this.  They have changed their systems,

11   and some of it they do, but a lot of it they don't.  And we've

12   been trying -- the people go through literally hardcopy, you

13   know here are banker boxes of hard records that they keep for

14   seven years.  At this point, they keep them longer because the

15   lawsuit started.

16        THE COURT:  So I guess what you're saying is that for

17   certain -- is there some delineation in terms of time frame

18   when they -- or documents they have electronically versus

19   documents that they don't?

20        MR. SCHRIER:  I'm just going to defer to my co-counsel

21   because he's been dealing with it more directly, Bill Shayne.

22   Bill, do you know what the --

23        MR. SHAYNE:  Your Honor, this is William Shayne.  The

24   answer is, we don't have a clear delineation because we never

25   asked the question to them in that particular way.  I simply

1    know from requests for the things that I've requested, which go

2    back to this period, given that most customs brokers only keep

3    records for five years.  We're just lucky they kept anything

4    that's older than that.

5           And I know that they have yelled at me, if you will,

6    okay, because they have to have somebody go into a warehouse

7    and manually go through the files.  So I do know that at least

8    when we get back this far, there's -- I don't know that there's

9    anything available electronically.  I will pose that question

10   to them, but it was not one that I asked that way because it

11   wasn't necessary.

12          THE COURT:  Let me ask, is there an objection -- the

13   plaintiff has asked me to take judicial notice on the date on

14   which the June 7, 2013, date, which is the date of the

15   announcement of the Customs and Border Protection regulation.

16   Is there an objection to that?  And if so, what is the basis?

17          MR. SCHRIER:  I don't understand.  I don't follow what

18   you're asking.

19          THE COURT:  I guess my understanding is it sounds like

20   you happen to agree that it may have been announced on -- my

21   understanding of what you had just said, Mr. Schrier, was that

22   although that was announced on June 7, 2013, that people in the

23   industry were aware that it was going to happen, is that what

24   you're saying?

25          MR. SCHRIER:  Yes, yes, that it was -- that there

1    were -- there was not a formal announcement, but there was a --

2    it was industry-wide known that there was going to be a change

3    in the regulation.  So I'm not disputing the formal

4    announcement at the date of whatever it was, June 7, I believe

5    it was, 2013.  But it was a known situation in the industry

6    before that.

7              I've actually asked my client to see if they can find

8    whatever meetings they went to or seminars they went to, if

9    they could get me anything that would indicate that.  That's

10   just more recently that that happened.  So they haven't gotten

11   anything yet.  But I've asked that that be searched, so we

12   could put aside this issue.

13             THE COURT:  Let me ask, with regard to the -- and it's

14   Document 164-1, Exhibit A to plaintiff's filing, was this

15   email, as I understand it, this version of the e-mail was a

16   hard copy?  Is that correct, Mr. Schrier?  And I'm sorry --

17             MR. SCHRIER:  I'm just pulling it up, Judge.  Let me

18   take a look.

19             THE COURT:  It may also be document 157-1.  I'm not

20   sure.

21             MR. SCHRIER:  Yes, it's 157-1.

22             I'm going to ask my co-counsel just to confirm it, but

23   I believe the answer is it was a hard copy.

24             MR. SHAYNE:  Yes, your Honor.  William Shayne.  Hard

25   copy.

 1      THE COURT:  So as I understand what Mr. Schrier, what

 2  Mr. Shayne were being said, the reason for the footer is

 3  because your client, I guess back in January when this e-mail,

 4  the e-mail of January 2013, when this e-mail was purportedly

 5  sent, had already changed per the system such that when they

 6  sent e-mails, it would -- the footer would appear on the

 7  e-mail, is that my understanding of what is being said?

 8      MR. SCHRIER:  That is accurate.  And I believe the

 9  discovery -- I don't remember if we provided a copy to counsel,

10  but we've -- I found, if you will, a number of e-mails

11  unrelated to our issue, but we found other e-mails that

12  predates this that has nothing to do with our case but that had

13  the footer on it.

14      And we're either going to have to deal with it at

15  trial or depositions or motion, over my copies.  Or, frankly,

16  if you ask me to, I'll provide copies to counsel.  I have no

17  problem with that.  But we found others with the same footer on

18  it that had nothing to do with this case.

19      THE COURT:  All right.  Let me ask, was that

20  Mr. Schrier?

21      MR. SCHRIER:  That was Mr. Schrier.  I'm sorry, yes,

22  Mr. Schrier, yes.

23      THE COURT:  Let me ask, with regard to the email --

24  let me just reference the docket number.  It is at Docket

25  164-3, which is the e-mail, I think, to a different customer.

1   And are you saying, Mr. Schrier, that there were two e-mails

2   sent to this customer on the same day, at the same time, and

3   one of them came from someone, Lilly, and someone came from

4   May.  And the one that came from Lilly was sent from the

5   corporate address, and that's why the footer appears of the --

6           MR. SCHRIER:  Yes, it's my understanding.  I'm

7   concerned about the time, Judge.  And I've questioned the

8   client about it.  And they're trying to go through their old

9   e-mails on that to see.

10          But the way their system works is they have -- first

11  of all, I don't remember how many, but they have a number of

12  people in the office.  There's not one or two people.  There's

13  a group of people in the office.  When e-mails come in under

14  the info, which is the general company e-mail, each of the

15  people, they also have computers, and they are set up with

16  their footers and so forth.  The one on the left is not from --

17  is May's personal e-mail, not her company e-mail.  If you

18  notice, it's from May Chen, but it says e-mail to -- e-mail

19  at -- in reply to the info e-mail.  That's the company e-mail.

20  The one on the right is the info e-mail.  That's the company

21  e-mail.  The company e-mail is set up so they have the footer,

22  her personal e-mail was not set up that way at the time.  I

23  don't think it is set up that way this way either.

24          Why she did it?  There's an e-mail that came in, if

25  you notice, one is to May and one was to Lilly, which means

1    that -- why -- I mean, it's two different people, obviously.

2    But the one to May went to her personally, or she -- it went to

3    info but it's addressed to May.  So when it came -- we're

4    guessing.  This happened ten years ago, but it came to her, to

5    her attention, and she replied from her personal e-mail.

6         Well, it happened at the same time.  I just question

7    the answer also, that they both saw it, and they just happened

8    to be done.  It's that much of a coincidence.  I don't know the

9    answer, Judge.  I can tell you it came from two different

10   computers.  One was addressed to Lilly and one was addressed to

11   May.

12        Obviously, you know, this letter is the first time --

13   we haven't done discovery, but I'm certainly going to want to

14   contact this client, which I don't know if they're still a

15   client or still in business anymore.  I have no idea.  Again,

16   this is 10 years ago.  But it's clearly from different e-mails,

17   that's all I can tell you at this point.

18        THE COURT:  Let me ask with regard to the issue

19   relating to the knowledge of the -- in other words, what was

20   happening in the industry?  Is that something that, in any of

21   the submissions that I've gotten, that argument has been made

22   by the defendant?  Defendants, Mr. Schrier?

23        MR. SCHRIER:  I'm not sure what you're asking, Judge.

24   Again, I don't believe the issue of what was done in the

25   industry was -- well, I'm going to stop there.  I'm going to

1    ask Mr. Shayne.  Bill, do you remember anything like that that

2    was done in this case so far?

3         MR. SHAYNE:  I can't remember anything like that that

4    has been made.  I simply know from -- your Honor, this is

5    William Shayne.  I simply know from four decades in the

6    industry, both working in the industry as opposed to just as a

7    lawyer, that these types of things were commonly addressed and

8    known.  They always knew it well in advance.  It's just the way

9    the nature of the industry works.  But, however, I do not

10   recall that we've ever raised that question in any of our

11   pleadings.

12        THE COURT:  Okay.  Or in response to anything the

13   plaintiffs have filed relating to the initial discrepancy in

14   the e-mails or in connection with their initial sanctions

15   motion?

16        MR. SHAYNE:  That is correct, your Honor.  What we did

17   instead was that the focus was on other documents that had also

18   been sent out during that time frame that also had the same

19   information on it, and we obtained the use of a document, you

20   know, document specialist who was experienced in this field.

21   And that was her, you know, expert opinion that we sort of

22   submitted, and we figured that was -- went to the issue as to

23   whether the documents themselves were manipulated, and her

24   conclusion was that they weren't.  So we did not go into the

25   source of the date.

1            THE COURT:  Okay.  Let me now ask first for

2    plaintiff's counsel for any response to what defense counsel

3    has said with regard to the two issues that I had raised.

4            MR. WOLFGRAM:  Your Honor, this is Pete Wolfgram for

5    plaintiff.

6            First, with regard to the CBP notice, there was

7    nothing -- defendants haven't cited a single independent public

8    source that references the exact July 9, 2013, start date.  I

9    looked on the docket, on the web, I couldn't find anything

10   before the June 7 announcement from CBP.  Nothing announces the

11   July 9 -- the specific July 9, 2012, start date.

12           The defendants are saying this was common knowledge

13   that there would be a policy change in the future, but there's

14   nothing in the public realm which discusses the exact July 9

15   date, and that is the whole point.  And so they might get an

16   affidavit from an expert saying, well, you know, people in the

17   industry knew that this policy change was going to go into

18   effect in the coming months, and that is true.  Members in the

19   industry were anticipating an announcement from CBP to state

20   exactly when, which date, the new policy would take effect.

21   And that's the whole purpose of CBP's June 7 announcement, to

22   give an exact date to the industry.

23           We also provided a link to the agency's website.  And

24   if you do a simple Google search relating to this, CBP -- I

25   provided some search terms in our letter.  A simple Google

1   search of ISF enforcement, CBP July 9, 2013, will generate

2   literally dozens and dozens of articles from members from the

3   transportation industry, including major ports, major law

4   firms, customs brokers, carriers, picking up this news story

5   from CBP about the exact start date because they wanted to give

6   their customers notice of when it would begin to avoid these

7   penalties.

8           So there's no way that defendant Chen could have known

9   the exact date six months in advance before CBP even issued the

10  message.  There's just no way she could have known that.  And

11  that's corroborated, of course, by the e-mail, which we cited

12  from Chen's customer, which, from this -- excuse me.  I'm just

13  trying to get the date here, January 3rd, 2013, e-mail to

14  TCPL Logistics.

15          That's -- you know, so defendants submit their expert

16  report to try to rebut our CBP evidence, which we submitted in

17  September in a letter motion to the Court.  Four months later,

18  May responded with this expert report with the -- the forensic

19  expert, Ms. Mitchell, and included ten additional e-mail

20  printouts, not native files, but printouts, once again.  And

21  she generally concluded that the footer was authentic, but she

22  did not address the CBP evidence.  I don't even think she

23  received it.  Her report doesn't even indicate that she

24  received this obvious contrary evidence from defendant's

25  counsel.

1          And so we were forced to investigate the authenticity

2     of this new batch of e-mails sent to your Honor in early

3     January, January -- I think 3rd or 4th of this year.  And the

4     e-mail printouts are redacted.  Defendant does redactions in

5     all of these e-mail printouts, you know, purging all of the

6     customer information based on the pretext of the

7     confidentiality of CFR regulations.  We think the defendants

8     are just trying to stop us from independently investigating the

9     printouts' authenticity as to third-party discovery.

10          In any event, as I explained in my letter, some of

11     the -- they left this Cyntra Giboney name, and I tracked it to

12     PCCL Logistics, and talked to their legal counsel, who was

13     fully cooperative, and I asked them to look for this exact

14     e-mail string down to the minutes, if they could on PCCL's

15     server, and they found it, down to the minute.

16          Mr. Shayne and Mr. Schrier is trying to dance around

17     it by saying that it came from two different sources, but the

18     recipient, Cyntra Giboney, is the same, on the same minute.

19     And the contents of her e-mail was also the same.

20          I also have -- after I submitted our letter, I also

21     have an affidavit from COO PCCL Logistics, Brian Howver

22     attesting to the authenticity of PCCL's original e-mail file.

23     It's an objective independent third-party.  There's no -- they

24     can't -- their file cannot be seriously disputed.  They don't

25     have any other file from defendants' standing on this exact

1  minute as Mr. Schrier claims.  It's just impossible.  And when

2  you consider this evidence in light of the CBP evidence, it's

3  just overwhelming.  The printouts are fabricated.

4          And, I mean, this issue keeps -- this authenticity

5  issue has been going on for 18 months.  Defendants' counsel

6  keeps saying we went to get into depositions and all that,

7  well, the evidence is here.  I don't think they could explain

8  anything that would overcome this.

9          So that's why we are looking to ask the Court to take

10 judicial notice of the CBP bulletin and then file another

11 motion for sanctions.  I don't really think it's necessary

12 given the weight of the evidence here, but if we have to, we

13 will.

14         THE COURT:  Okay.  As I understand what you're saying

15 is that although known in the industry — in other words, that

16 this was coming down the pike, in other words, the regulation,

17 the exact date of when it was going to be enforced was not

18 known.  And that only became known on June 7, 2013, to the

19 public when CBP announced the regulation and basically said it

20 would be enforced beginning in July of 2013.  Is that an

21 accurate statement, Mr. Wolfgram?

22         MR. WOLFGRAM:  Yes.  That's exactly correct.

23         And if the Court -- the Court has an interest

24 obviously in investigating whether a fraud is being perpetrated

25 on, and if the Court uses those search terms I provided in

1    my -- our letter, it will see literally dozens of articles from

2    members of the trade industry, like I said, talking about the

3    CBP's June 7 announcement.  Nobody knew it before.  Nobody knew

4    the exact date before then.  Otherwise, somebody would have

5    published it, and defendants haven't produced a single

6    objective -- not an affidavit from their client, but an

7    objective source, records of the specific July 9 start date.

8    And that's the whole point.

9                THE COURT:  Sorry.  Who --

10               MR. SCHRIER:  This is Richard Schrier.

11               THE COURT:  Mr. Schrier, go ahead.

12               MR. SCHRIER:  So he said we haven't done anything,

13   they haven't given any affidavits or anything.  Discovery has

14   been put on hold if, I'm not mistaken, since April of 2022.  We

15   haven't done any discovery.  There's no -- we can't do document

16   exchange.  We can't do document requests.  We can't take

17   depositions.  He's making all these judgments.

18               This is -- at this point, it's, from my view, at worst

19   a question of fact.  Let's do discovery.  Let's do that.  Let's

20   take the depositions.  We will get the affidavits.  Then when

21   the dust settles, if he still thinks there's a fraud on the

22   Court, he can make his application at that point.  It's

23   premature at this point to do that.  There are reasons, but we

24   haven't gotten into them because the case has been put on hold

25   because of the pending motions for -- with regard to the

1    whether counsel should be removed on both sides.  You know,

2    there are cross-motions on that.

3              So I would ask that the Court rule on those, and then,

4    hopefully -- I mean, there are reasons for plaintiff's counsel

5    to be removed.  We could get into that.  But the plaintiff's

6    counsel is the principal -- Mr. Zhang is the principal of

7    Ameriway, and Eagle, which is the real party that -- Ameriway

8    is the right party.  As far as defendants' concerned, we

9    intended to address that once we finish deposition.  But we

10   can't get to that point until we get to the heart of discovery.

11   We just -- I've being document discovery, and it stopped a year

12   ago.  So I would request that what the Court may do, hold on

13   until we finish discovery, and then raise the issue if it

14   really exists at that point.

15             THE COURT:  This is what I'll --

16             MR. SHAYNE:  Your Honor, this is what --

17             THE COURT:  One moment.  I'll allow you to speak.  Is

18   that --

19             MR. SHAYNE:  William Shayne.

20             THE COURT:  Mr. Shayne.  Why don't you go ahead,

21   Mr. Shayne, since that was Mr. Schrier, if you want to complete

22   a thought.

23             MR. SHAYNE:  The point, as I look at it, okay, is they

24   want to establish by using the question as to the date, okay,

25   whether the e-mail itself that they were sent with notices was

1    routinely issued and was, in their views, falsified.  So then

2    the question is, are they prepared to show that every one of

3    the documents that we submitted to our expert, the expert

4    opined upon, they're saying that because they have that date,

5    that every one of the documents is false.

6         THE COURT:  Well, I mean, I'm not sure that -- and I'm

7    not going to get into it, but what I will say is the following.

8    If I make a determination, in essence, that I hold in abeyance,

9    even if I grant Mr. Wolfgram and what I may do is give you the

10   option of filing the second sanctions motion now or waiting.

11   But typically, what I typically do with regard to the sanctions

12   motions is I do await a certain amount of discovery.

13        However, what I will say here is that if I ultimately

14   conclude that the e-mails either were not necessarily

15   fabricated, but generated more recently than back in 2013 or

16   that they are not somehow legitimate, either because there are,

17   in fact, electronic copies or not, the sanctions -- well, I

18   would consider an application with regard to whatever the

19   damages might be, which could include the cost, basically, of

20   the discovery process because counsel for plaintiff has raised

21   this issue early in the litigation.

22        But as I understand, the defendant said there are

23   explanations, but that the explanations, some of which have

24   been made to me, but others have not, in any way that -- and by

25   that I mean through affidavits of applying, other than the

1  expert reports, which I have, haven't been necessarily

2  supported.

3          So if counsel is -- and all I have to go on is

4  representations with the belief that these are all these

5  explanations for it, then I guess what you'll say,

6  Mr. Wolfgram, I'll give you the opportunity to file the second

7  sanctions motion.  I'll give the defendants an opportunity to

8  respond.  And in that response, if they -- I would expect to

9  see something in the form of an affidavit from the client, or

10  someone at the client, indicating that they were aware of the

11  July 9, 2013, enforcement date at least by January 8 of 2013,

12  if not earlier.  Because as I understand it, there were some

13  e-mails produced to me that may go back as far as December of

14  2012 that contain the footer.

15          So I expect any response to correctly address that

16  issue in an affidavit of somebody with personal knowledge.  Or

17  if there is independent -- I know without going to into what my

18  chambers may have done to look into the issue, if there is

19  public information that predates the June 7, 2013, date

20  announcement by CBP, then counsel should include that in the

21  response to the second sanctions motion also.

22          In other words, if there is something in the public

23  domain, public record, indicating that the July 9, 2013, date

24  was going to be the date of enforcement of the Customs Bureau,

25  then that should be included also.

1          I have currently before me the motions to disqualify,

2    which I will decide.  But I would say the following in terms of

3    the motion -- well, let me ask plaintiff's counsel first a

4    question.

5          In regard to the disqualification motion --

6          MR. WOLFGRAM:  Yes.

7          THE COURT:  -- as I understand it, the allegation is

8    that Mr. Zhang is a potential witness.  Let me first confirm,

9    Mr. Schrier --

10         MR. SCHRIER:  Yes, he's the principal of both

11   companies.

12         THE COURT:  But is the disqualification -- well, let

13   me ask Mr. Wolfgram in connection with Mr. Zhang.  My

14   understanding is that Mr. Zhang will not be trial counsel; is

15   that correct?

16         MR. WOLFGRAM:  That's correct, your Honor.

17         THE COURT:  And what would be the position of

18   plaintiff to Mr. Zhang possibly being subject to discovery; in

19   other words, depositions and the like?

20         MR. WOLFGRAM:  He's agreed to be deposed.

21         THE COURT:  Okay.  So as I said, I currently have the

22   motions to disqualify, and I will decide those.

23         But, Mr. Wolfgram, I understand that you were saying

24   earlier that, well, even on the record, you're not sure that a

25   second motion is necessary, but I'm giving you the opportunity

1   at this stage to file it, the second motion, based upon the

2   second round of documents that were sent.  And give, as I've

3   outlined, the defendants the opportunity to respond to that but

4   with actual affidavits and things that they believe would rebut

5   it, which would be helpful to me in making terminations

6   concerning the timing of any decision on the sanctions motion.

7   As I said, my normal course is to wait.  Having said that, I do

8   think I need some additional information before I make that

9   assessment.

10          But I'm not making a ruling on the motion to

11  disqualify right now.  I won't issue that, a decision on that

12  based on the papers that have been submitted.

13          MR. WOLFGRAM:  Your Honor, this is Pete Wolfgram for

14  plaintiff.

15          Our motion is also -- it's a motion for

16  disqualification, and it's actually our first -- it's also a

17  motion for dismissal of attorneys' fees.  It's also a

18  terminating sanctions motion because our first motion, the

19  e-mail printout here concerns the secondary documents that

20  defendant Chen relied on in this case.

21          Our first motion concerns a different document that

22  defendant Chen submitted in this case, and upon investigation,

23  we learned that Mr. Shayne, defendant's counsel, created the

24  document itself.

25          So our first motion for sanctions is against Chen and

1   her counsel for fabricating the first main documents, and then

2   concealing the fabrication over the course of several months.

3   So this is the story.  This is Part 2 of the story.  This is --

4   Part 1 concerns the main documents that defendant Chen

5   originally relied on.

6           MR. SCHRIER:  This is Richard Schrier.  I'd like to

7   actually respond to this, Judge.

8           THE COURT:  Yes, Mr. Schrier.

9           MR. SCHRIER:  In the papers, just to backtrack,

10  Mr. Shayne is in the field, as I mentioned.  When the defendant

11  came to him to be retained, as he does with every single

12  client, he updates a lot of their documents relating to their

13  business.  We represent -- I don't know how many dozens and

14  dozens and dozens of customs brokers -- that is Mr. Shayne's

15  main business, actually.  And he, in the regular course of

16  that, has a power of attorney with terms of conditions that's

17  updated based upon rulings and so forth, and he gives that to

18  all of the clients as a matter of course when they are

19  retained.  And he recommends that they put that on their

20  website, which happened in this case.

21          When -- and I do trial work.  I don't do much in the

22  import/export field except in a case like this.  When certain

23  demands were made, not realizing I went to the file -- it's my

24  fault.  It was one of my juniors that was working with me at

25  the time, attached the new one instead of the one that was in

1    effect.  We didn't realize that first that's what happened.

2    Plaintiff argued what he's arguing, but when I looked into it,

3    I realized that we had inadvertently done that.  I took

4    responsibility for it because that was my fault, and then it

5    was produced.  I got the correct one.  I notified the

6    magistrate judge at the time, which I believe she's now

7    retired, explained the situation, produced it as quickly as I

8    could.  And that's the terms and conditions that were in effect

9    in 2017 when these -- not Ameriway because Ameriway was never

10   retained.  They were retained -- the plaintiff as the broker.

11   Rather when Mr. Zhang, as the COO of Eagle, retained the

12   defendants as the Customs broker -- the importer of record of

13   all these goods.

14           So that was me.  I fessed up very quickly as soon as I

15   realized the mistake.  It didn't impede any of the discovery.

16   I put that in my affidavit.  But Mr. Wolfgram feels compelled

17   that that's -- he made that motion, notwithstanding, after we

18   went through that exercise.  And, obviously, he has the right

19   to do it, and we replied.  Obviously, the Court can decide on

20   the papers.  But that's the basis of it.

21           Mr. Shayne had nothing to do with it.  It was my

22   oversight and the staff that works with me in litigation, and

23   that's what happened.  If that's a basis to be disqualified,

24   then, well, I assume that's in the Court's discretion.  But

25   that wasn't done intentionally or anything to subvert that --

1    anything that would be improper in a court proceeding.

2              THE COURT:  Okay.

3              MR. SCHRIER:  Having said that, there's one other

4    issue I'd like to raise with the Court after there's anything

5    else, if anyone wants to raise anything else with the Court.

6              THE COURT:  Before we get to that, let me ask

7    Mr. Wolfgram, how much time would you like to submit for the

8    motion?

9              MR. WOLFGRAM:  Two weeks.  I'd like to do it as

10   quickly as possible.

11             THE COURT:  Mr. Schrier, Mr. Shayne, how much time

12   would you like to oppose it?

13             MR. SCHRIER:  Good question.  We have to get

14   affidavits and do some research.  Frankly, I'd like until the

15   second week of July to oppose, if possible.

16             THE COURT:  Okay.  Let me just look at the calendar.

17             Why don't we say with the second motion, Mr. Schrier,

18   why don't we say a little bit more than two weeks, so by

19   June 9, Mr. Schrier.

20             MR. SCHRIER:  I'm the defendant --

21             THE COURT:  I'm sorry.  I'm sorry.  Mr. Wolfgram,

22   June 9.

23             MR. WOLFGRAM:  June 9 is fine.  That's good, your

24   Honor.  That's good with, your Honor.

25             THE COURT:  Great.  And then for the reply by July 14?

1        MR. SCHRIER:  That would be fine, Judge.

2        THE COURT:  Opposition, I should say.

3        Mr. Wolfgram, do you want an opportunity to reply?

4        MR. WOLFGRAM:  Yes, your Honor.

5        THE COURT:  Would one week be sufficient?

6        MR. WOLFGRAM:  That's sufficient.

7        THE COURT:  So July 21 for reply on the second

8    sanctions motion.

9        I apologize, Mr. Schrier, you had another issue you

10   wanted to raise?

11       MR. SCHRIER:  This is an issue -- we haven't sent the

12   letter to the Court, and if needs be, I'll follow up with a

13   letter application.  But in the case, there are five containers

14   of cargo which the defendants asserted a lien on.  Part of the

15   case is whether the -- well, we don't have to get into that.

16   There was an inspection over a year ago, and the cargo was put

17   into a warehouse in New Jersey, which it still is, which still

18   exists, and the containers were returned to whatever their

19   respective owners were.

20       Since this is a case that is taking quite a long time,

21   if we're actually going to try the case, my suggestion is

22   instead of having the goods sit there, that maybe we can make

23   some sort of arrangement to arrange for the sale of the goods

24   and the money be deposited in Court.  This way, whoever is

25   entitled to whatever money, it can be -- it will be a little

1  easier once there's a judgment in the case, whichever way it

2  goes.

3          Is that something that the Court would entertain at

4  this point?

5          I guess the plaintiff, is that something the plaintiff

6  would agree to?

7          THE COURT:  Let me ask.  That's the initial question.

8  Is this, Mr. Schrier, something that you raised with the

9  plaintiff, or is this the first time you're hearing it?

10          MR. SCHRIER:  I don't think we raised it recently.

11  But if we're talking about it, it's been a year, if it could

12  effectively be resolved now; if not, maybe we can make a motion

13  for it.  But I guess the question is, is that something that

14  would be amenable?

15          THE COURT:  Let me hear from Mr. Wolfgram.

16          MR. WOLFGRAM:  I would need time to consider that.

17  Offhand, we'd have to talk with defendants' counsel.  This is

18  kind of a very big request.  And since this is the main issue

19  of the case, offhand I'd say no.  Defendants detained the

20  containers over two liens, two lien documents, which we are

21  disputing, which we believe are fabricated.  So it's her burden

22  now to pay the storage fees on those containers until there's a

23  conclusion, the trial.  I mean, I'll talk to my client, and

24  we'll get back to you, Richard.

25          THE COURT:  I think that makes sense.  What I would

1   say is, obviously, there would have to be a process that both

2   parties would agree to.  I'm not in any way opining on the

3   request for -- or any impact it might have here.  But just what

4   pops into my mind is who's going to be responsible for selling

5   the product, how are you going to ensure that the sales are --

6   or the transactions are the appropriate value and the like.  I

7   mean, there are a whole bunch of things before you even start

8   considering what is the impact and would the parties have to

9   agree to, that the case would still proceed even though the

10  basis for the case has been, in essence, liquidated and the

11  funds placed in escrow.

12          There are both a lot of logistical and legal things

13  that the parties need to consider.  And, obviously,

14  Mr. Wolfgram, initially you need to raise the issue with your

15  client to see whether they -- whether your client has an

16  appetite for that, what is being suggested.  So I'll leave that

17  to the parties.  And if there is an agreement or no agreement

18  between the parties, let me know.

19          So we have the briefing schedule for the second

20  sanctions motion.  Let me just confirm that the motion -- and

21  I'm fairly confident I know the answer.  The motions to

22  disqualify, that's fully briefed, and there are no other

23  submissions that either party intends to submit.  Is that

24  correct from the plaintiff, Mr. Wolfgram?

25          MR. WOLFGRAM:  Yes, your Honor.  Essentially, again,

1    our motion is for disqualification and terminating sanctions.

2    This is a continuance of the first.  So I would ask the

3    Court -- it's a lot of papers since we have filed.  I'd ask the

4    Court possibly to consider the first motion first in line with

5    the second motion.  I don't know how the Court will look at the

6    motions, in order or whatnot.

7              THE COURT:  I mean, my intention was to look at the

8    disqualification motion first, unless you're saying that

9    that --

10             MR. WOLFGRAM:  No, that's fine.  Thank you.  That's

11   good.  Thank you.

12             THE COURT:  All right.  Mr. Schrier, is there anything

13   else from the defendants with regard to the disqualification?

14             MR. SCHRIER:  No.  My understanding is that the

15   disqualification motion has been fully briefed and submitted.

16             THE COURT:  So I'll deal with that motion.  And then

17   when the other motion is fully submitted, I'll review that.

18             So let me ask, is there anything else that either

19   party believes that we should deal with today or anything that

20   I have missed related to today's conference?

21             MR. WOLFGRAM:  I have nothing more, your Honor.  This

22   is Pete Wolfgram for plaintiff.

23             THE COURT:  Okay.

24             MR. SCHRIER:  This is Richard Schrier.  I think we

25   covered everything.

1          THE COURT:  Thank you, counsel.  I think this has been

2    helpful in clarifying everyone's arguments.  I look forward to

3    getting your papers on the second sanctions motion.

4          Thank you very much.  Court is adjourned.

5          (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25